**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Ernesto Salgado Martinez, | ) No. CV-05-1561-PHX-EHC |
| Petitioner, | ) |
| | ) DEATH PENALTY CASE |
| vs. | ) |
| | ) |
| | ) **MEMORANDUM OF DECISION** |
| Dora Schriro, et al., | ) **AND ORDER** |
| Respondents. | ) |
| | ) |
| | ) |

Petitioner Ernesto Salgado Martinez, a state prisoner under sentence of death, has filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced in violation of the United States Constitution.  (*See* Dkt. 30.)[1]  Pursuant to the Court's general procedures governing resolution of capital habeas proceedings, the parties have completed briefing of both the procedural status and the merits of Petitioner's claims.  (Dkts. 50, 57.)  Petitioner has also filed several motions for evidentiary development as to numerous claims. (Dkts. 62, 74, 80, 85.)  This order addresses each of Petitioner's pending claims and determines that he is not entitled to federal habeas relief.

---

[1]     "Dkt." refers to the documents in this Court's case file.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1997, a jury convicted Petitioner of theft, weapons-related charges, and first-degree murder for the killing of Robert Martin, a Department of Public Safety Officer who had stopped Petitioner on the Beeline Highway between Mesa and Payson, Arizona. Following an aggravation/mitigation hearing, the sentencing judge found that the State had proven two aggravating circumstances: that Petitioner was previously convicted of a serious offense, pursuant to A.R.S. § 13-703(F)(2); and that the victim was an on-duty peace officer who was killed in the course of performing his official duties, under A.R.S. § 13-703(F)(10). The judge found insufficient mitigation to warrant leniency and sentenced Petitioner to death for the murder and to terms of imprisonment on the other counts. The Arizona Supreme Court affirmed on direct appeal, and the United States Supreme Court denied certiorari. *State v. Martinez*, 196 Ariz. 451, 999 P.2d 795, *cert. denied*, 531 U.S. 934 (2000).

The Arizona Supreme Court provided the following description of the events surrounding the offense:

> Martinez drove from California to Globe, Arizona in a stolen blue Monte Carlo to visit friends and family. After learning that his parents had moved to Payson, Arizona, Martinez met his friend Oscar Fryer. Fryer asked Martinez where he had been. Martinez told Fryer that he had been in California. Fryer then asked Martinez if he was still on probation. Martinez responded that he was on probation for eight years and had a warrant out for his arrest. Martinez then pulled a .38 caliber handgun with black tape on the handle from under his shirt and showed it to Fryer. Fryer asked Martinez why he had the gun, to which Martinez responded, "[f]or protection and if shit happens." Tr. Sept. 9, 1997 at 83. Fryer then asked Martinez what he would do if he was stopped by the police. Martinez told Fryer, "he wasn't going back to jail." *Id.* at 85.
>
> Sometime after his conversation with Fryer, Martinez left Globe and drove to Payson. On August 15, 1995, at approximately 11:30 a.m., Martinez was seen at a Circle K in Payson. He bought ten dollars worth of gas and proceeded south down the Beeline Highway toward Phoenix. Martinez was driving extremely fast and passed several motorists, including a car driven by Steve and Susan Ball. Officer Martin was patrolling the Beeline Highway that morning and pulled Martinez over at Milepost 195. Steve and Susan Ball saw Officer Martin's patrol car stopped behind Martinez' Monte Carlo and commented, "Oh, good, he got the speeding ticket." Tr. Sept. 10, 1997 at 32. As they passed by, Susan Ball noticed Officer Martin standing at the driver's side door of the Monte Carlo while Martinez looked in the backseat.
>
> Shortly after Steve and Susan Ball passed, Martinez shot Officer Martin four times with the .38 caliber handgun. One shot entered the back of Officer

Martin's right hand and left through his palm.  Another shot passed through Officer Martin's neck near his collar bone.  A third shot entered Officer Martin's back, proceeded through his kidney, through the right lobe of his liver, through his diaphragm, and lodged in his back.  A fourth shot entered his right cheek, passed through his skull, and was recovered inside Officer Martin's head.  The hand and neck wounds were not fatal.  The back and head wounds were.

After murdering Officer Martin, Martinez took Officer Martin's .9mm Sig Sauer service weapon and continued down the Beeline Highway at speeds over 100 mph.  Martinez again passed Steve and Susan Ball, which they found strange.  They began discussing how not enough time had passed for Martinez to have received a speeding ticket because it had only been a couple of minutes since they had seen him pulled over.  They stayed behind Martinez for some time and watched him go through a red light at the Fort McDowell turnoff.  Steve Ball commented, "Yeah, he just ran that red light.  Something is up here.  Something is going on."  Tr. Sept. 10, 1997 at 69.  Steve and Susan Ball continued down the Beeline Highway and lost sight of Martinez until they reached Gilbert Road.  At the red light on Gilbert Road, they caught up to him and took down his license plate.

Martinez passed through Phoenix and arrived in Blythe, California at around 4:00 p.m. where he called his aunt for money.  At 6:00 p.m., Martinez called his aunt again because she failed to wire the money he requested.  Growing impatient, at approximately 8:00 p.m., Martinez entered a Mini-Mart in Blythe and, at gunpoint, stole all of the $10 and $20 bills from the register.  Martinez killed the clerk with a single shot during the robbery.[FN1]  A .9mm shell casing was recovered at the Mini-Mart the following day.  Ballistics reports determined that this shell casing was consistent with the ammunition used in Officer Martin's .9mm Sig Sauer.

> FN1: The trial court excluded evidence of the murder under Rule 403, Ariz. R. Evid.

Later that night, Martinez drove to his cousin's house in Coachella, California, near Indio.  Around 12:00 p.m. the next day, August 16, 1995, Martinez took David Martinez, his cousin, and Anna Martinez, David's wife, to a restaurant in Indio.  After leaving the restaurant, Martinez noticed that a police car was following him.  David asked Martinez if the car was stolen to which Martinez responded, "I think so."  Tr. Sept. 15, 1997 at 146-47.  Martinez turned onto a dirt road and instructed David and Anna to get out of the car.  They left the car and went to a nearby trailer compound to call Anna's aunt to come and get them.

Tommy Acuna,[FN2] who lived in his grandmother's house at the compound, was swimming when David and Anna appeared at the fence surrounding the compound.  David and Anna asked Tommy if they could use his phone but Tommy refused.  Tommy did permit Anna to use the bathroom.  Anna went into the bathroom and came out a couple of minutes later.  After showing David and Anna out, Tommy went back to the bathroom "to see if they left anything in there because she wasn't in there that long."  Tr. Sept. 16, 1997 at 48.  He found a towel on the floor with the .38 caliber handgun wrapped inside.  Tommy took the gun, hid it in his pants, and walked outside.  He testified that he hid the gun because it was his grandmother's house.  By the time Tommy walked outside, the police had surrounded the compound.  An

1    officer monitoring the perimeter called out to Tommy and told him that he was
     going to search him.  Tommy walked over to the officer and exclaimed, "I
2    have got the murder weapon." Tr. Sept. 15, 1997 at 192.  The officer searched
     Tommy and found the .38 caliber handgun.  This gun was later identified as
3    the weapon that fired the bullets which killed Officer Martin.

4           FN2:  Tommy's brother Johnny Acuna was a friend of Martinez.

5           After David and Anna got out of the Monte Carlo, Martinez turned
     around on the dirt road.  Another police car appeared on the scene and headed
6    towards Martinez.  Martinez saw this second police car, left the Monte Carlo,
     ran toward the trailer compound, and jumped the fence.  He then ran into
7    Johnny Acuna's trailer.

8           The SWAT team evacuated the area and tried to communicate with
     Martinez.  After those attempts failed, the SWAT team negotiator threatened
9    to use tear gas.  Martinez responded, "I am not coming out; you will have to
     come in and shoot me." Tr. Sept. 17, 1999 at 23.  After further negotiations,
10   however, Martinez agreed to come out and was taken into custody.

11          While in custody, Martinez called his friend, Eric Moreno, and
     laughingly told Moreno that "he got busted for blasting a jura."[FN3]  Tr. Sept.
12   15, 1997 at 13.  Martinez also told Moreno that a woman on the highway
     might have seen what had happened.  They talked about the guns and Martinez
13   told Moreno that one of the guns had been "stashed."  *Id.* at 21.  After
     obtaining a warrant, the police searched Johnny Acuna's trailer and found
14   Officer Martin's .9mm Sig Sauer under a mattress.

15          FN3:  "Jura" is slang for police officer.  Tr. Sept. 15, 1997 at 13.

16   *Martinez*, 196 Ariz. at 453-55, 999 P.2d at 797-99.

17          In 2002, Petitioner initiated state post-conviction relief ("PCR") proceedings pursuant

18   to Rule 32 of the Arizona Rules of Criminal Procedure.  An amended petition was filed in

19   June 2003.  In August 2004, the trial court denied PCR relief.  On May 24, 2005, the Arizona

20   Supreme Court summarily denied a petition for review.

21          Petitioner filed an initial petition for habeas corpus relief with this Court on May 25,

22   2005, and an amended petition on May 23, 2006.  (Dkts. 1, 30.)  The amended petition raised

23   twenty-five claims for relief.  After Respondents filed an Answer, Petitioner filed a Traverse

24   that withdrew Claims 3, 14, 18, 19, 20, 21 (in part), and 25.  Petitioner thereafter filed a

25   motion for evidentiary development of Claims 1, 2, 4, 9, 11, 12, 16, 17, and 21.  (Dkt. 62.)

26   Subsequently, Petitioner filed two supplemental motions relating to evidentiary development

27   of Claim 4, as well as a motion to file additional evidence in support of his request for

28   discovery relating to Claim 1.  (Dkts. 74, 80, 85.)

1          **PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**

2          A writ of habeas corpus may not be granted unless it appears that a petitioner has

3   exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v.*

4   *Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly

5   present" the operative facts and the federal legal theory of his claims to the state's highest

6   court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848

7   (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78

8   (1971).  If a habeas claim includes new factual allegations not presented to the state court,

9   it may be considered unexhausted if the new facts "fundamentally alter" the legal claim

10  presented and considered in state court.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

11         Exhaustion requires that a petitioner clearly alert the state court that he is alleging a

12  specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir.

13  2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process

14  not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-

15  70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency

16  of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked

17  specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999)

18  ("The mere similarity between a claim of state and federal error is insufficient to establish

19  exhaustion.").  A petitioner must make the federal basis of a claim explicit either by citing

20  specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases

21  that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153,

22  1158 (9th Cir. 2003) (en banc); *cf. Fields v. Washington*, 401 F.3d 1018, 1022 (9th Cir. 2005)

23  (mere citation to a state case that conducts both a state and federal law analysis does not, by

24  itself, satisfy exhaustion).

25         In Arizona, there are two primary procedurally appropriate avenues for petitioners to

26  exhaust federal constitutional claims:  direct appeal and post-conviction relief (PCR)

27  proceedings.  Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings

28  and provides that a petitioner is precluded from relief on any claim that could have been

raised on appeal or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner.  *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S. at 729-30.  The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989).  A state procedural default is not independent if, for example, it depends upon a federal constitutional ruling.  *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam). A state bar is not adequate unless it was firmly established and regularly followed at the time of the purported default.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy).  If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted.  *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims.  *Reed v. Ross*, 468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were

1    not heard on the merits in federal court.  *Coleman*, 501 U.S. at 750.

2         Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some

3    objective factor external to the defense impeded counsel's efforts to comply with the State's

4    procedural rule."  *Id*. at 753.  Objective factors which constitute cause include interference

5    by officials which makes compliance with the state's procedural rule impracticable, a

6    showing that the factual or legal basis for a claim was not reasonably available, and

7    constitutionally ineffective assistance of counsel.  *Murray v. Carrier*, 477 U.S. 478, 488

8    (1986).  To establish prejudice, a habeas petitioner bears the burden of demonstrating "not

9    merely that the errors at his trial constituted a *possibility* of prejudice, but that they worked

10   to his *actual* and substantial disadvantage, infecting his entire trial with errors of

11   constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).

12        There are two types of claims recognized under the fundamental miscarriage of justice

13   exception to procedural default:  (1) that a petitioner is "innocent of the death sentence," –

14   in other words, that the death sentence was erroneously imposed; and (2) that a petitioner is

15   innocent of the capital crime.  In the first instance, the petitioner must show by clear and

16   convincing evidence that, but for constitutional error, no reasonable factfinder would have

17   found the existence of any aggravating circumstance or some other condition of eligibility

18   for the death sentence under the applicable state law.  *Sawyer v. Whitley*, 505 U.S. 333, 336,

19   345 (1992).  In the second instance, the petitioner must show that "a constitutional violation

20   has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513

21   U.S. 298, 327 (1995).  To establish the requisite probability, the petitioner must show that

22   "it is more likely than not that no reasonable juror would have found petitioner guilty beyond

23   a reasonable doubt."  *Id*.  The Supreme Court has characterized the exacting nature of an

24   actual innocence claim as follows:

25        [A] substantial claim that constitutional error has caused the conviction of an
          innocent person is extremely rare. . . . To be credible, such a claim requires
26        petitioner to support his allegations of constitutional error with new reliable
          evidence – whether it be exculpatory scientific evidence, trustworthy
27        eyewitness accounts, or critical physical evidence – that was not presented at
          trial.  Because such evidence is obviously unavailable in the vast majority of
28        cases, claims of actual innocence are rarely successful.

*Id*. at 324; *see also House v. Bell*, 126 S. Ct. 2064, 2077 (2006).

## AEDPA STANDARD FOR RELIEF

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh*, 521 U.S. at 333 n.7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

1   the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

2   of the holdings of the Supreme Court at the time the petitioner's state court conviction

3   became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

4   *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

5   the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

6   advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529

7   U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

8   2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent

9   may be "persuasive" in determining what law is clearly established and whether a state court

10  applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

11      The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

12  The Court has explained that a state court decision is "contrary to" the Supreme Court's

13  clearly established precedents if the decision applies a rule that contradicts the governing law

14  set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

15  Supreme Court on a matter of law, or if it confronts a set of facts that is materially

16  indistinguishable from a decision of the Supreme Court but reaches a different result.

17  *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

18  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

19  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

20  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

21  clause."  *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

22      Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

23  may grant relief where a state court "identifies the correct governing legal rule from [the

24  Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

25  "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

26  where it should not apply or unreasonably refuses to extend that principle to a new context

27  where it should apply."  *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

28  application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner

must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to

1   accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

2   1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

3                                    **DISCUSSION**

4       **Claim 1**

5       Claim 1 has several different aspects.  First, Petitioner alleges that the trial judge was

6   biased against him because the judge's bailiff was a friend of the victim and the victim's

7   wife. (Dkt. 30 at 7-15.)[2]  Second, Petitioner alleges ineffective assistance of counsel ("IAC")

8   at trial and on direct appeal because neither trial counsel nor appellate counsel properly

9   raised the judicial bias claim.  (*Id.*)   Third, Petitioner alleges that he was denied a

10  fundamentally fair PCR proceeding because even though the trial judge was removed from

11  the case prior to sentencing, that judge later presided at his PCR proceeding.  (*Id.*)  Finally,

12  Petitioner asserts IAC of PCR counsel for failing to challenge the trial judge for presiding

13  over his PCR proceeding despite having been removed prior to sentencing.  (*Id.* at 15.)

14      **Relevant Background**

15      Maricopa Superior Court Judge Jeffrey A. Hotham presided over Petitioner's trial, and

16  Ron Mills was the judge's bailiff.  Mr. Mills had a personal relationship with the victim and

17  his widow that spanned almost thirty years.  (RT 9/2/97 at 45-56.)[3]   During pretrial

18  proceedings, this relationship came to light when defense counsel observed the victim's

19  widow and Mr. Mills exchanging an embrace as they greeted one another.  (*Id.* at 43-44.)

20  Prior to jury selection, defense counsel moved to have the bailiff temporarily reassigned for

21

22  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

23      [2]      The Court's pinpoint citation to page numbers for documents filed in this civil
    action refer to the page number of the pleading itself, not the automated page number
24  generated by the District's electronic case filing system.

25      [3]      "RT" refers to the state court reporter's transcript.  "ME" refers to the minute
    entries of the trial court.  "ROA" refers to the state court record on appeal filed in Arizona
26  Supreme Court Case No. CR-98-0393-AP.  "ROA-PCR" refers to the state court record filed
    in Arizona Supreme Court Case No. CR-04-0432-PC.  Certified copies of the appeal and
27  post-conviction records, along with the original reporter transcripts and appellate briefs, were
28  provided to this Court by the Arizona Supreme Court.  (*See* Dkt. 67.)

the duration of the trial, and Judge Hotham held a hearing at which Mr. Mills testified about his relationship with the victim and his wife. (*Id.* at 45-56.) The judge denied the motion, expressing confidence that his bailiff could do his assigned job. (RT 9/3/97 at 4-5; ME 9/3/97.) However, the judge did impose certain conditions on the bailiff with respect to the trial: that he refrain from mentioning his law enforcement background to the jurors and that "he not officially greet or say hello or show any emotion or any kind of sympathy during trial." (*Id.* at 4.)

During trial, following testimony regarding an autopsy of the victim, Judge Hotham informed counsel outside the presence of the jury that he had ordered Mr. Mills not to attend trial that day "so that no one could ever question that my bailiff reacted to the gory photographs in any inappropriate manner and that that would have some effect on the jury." (RT 9/23/97 at 150; ROA 157.) After the close of the evidence, Mr. Mills escorted the jurors to their deliberation room. (RT 9/25/97 at 106.)

After the jury returned guilty verdicts, the bailiff was seen crying in the courtroom and in the hallway outside the courtroom where he was consoled by the victim's widow and family. (ME 12/2/97 at 2.) Although Judge Hotham did not witness Mr. Mills's emotional reaction, defense counsel filed a motion for change of judge for cause. (*Id.*) The presiding criminal judge heard the motion and found no evidence that Judge Hotham could not be fair and impartial. (*Id.*; ROA 161.) Nonetheless, concerned that it might appear Judge Hotham had an interest in the sentencing outcome in light of his bailiff's relationship to the victim's family and noting that "death is different," the presiding judge ruled that the better course was to assign another judge to conduct the sentencing proceedings. (*Id.* at 3-4.) Consequently, Maricopa County Superior Court Judge Christopher Skelley presided at sentencing. However, after Petitioner filed a PCR petition following conclusion of direct appeal proceedings, the matter was reassigned to Judge Hotham, who presided over the PCR proceedings and ultimately ruled on the PCR petition.

**IAC Allegations**

In his PCR petition Petitioner asserted trial and appellate IAC for failing to argue

1    judicial bias, and the PCR court denied the claims on the merits. (ROA-PCR 11; ME 8/24/04

2    at 5.) Although properly exhausted, the Court concludes that the claims are meritless on their

3    face and, therefore, Petitioner's requested evidentiary development is not warranted.

4    <u>IAC Standard</u>

5    To prevail on a claim of ineffective assistance of counsel, a petitioner must show that

6    counsel's performance was deficient and that the deficient performance prejudiced his

7    defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The performance inquiry

8    asks whether counsel's assistance was reasonable considering all the circumstances. *Id.* at

9    688-89. A court indulges a strong presumption that counsel's conduct falls within the wide

10   range of reasonable professional assistance; that is, the defendant must overcome the

11   presumption that, under the circumstances, the challenged action might be considered sound

12   trial strategy. *Id.* at 689.

13   A petitioner must affirmatively prove prejudice by "show[ing] that there is a

14   reasonable probability that, but for counsel's unprofessional errors, the result of the

15   proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability

16   sufficient to undermine confidence in the outcome." *Id.* To establish prejudice with regard

17   to appellate counsel's representation, there must be a reasonable probability that, but for

18   counsel's failure to raise the claim, Petitioner would have prevailed on appeal. *See Smith v.*

19   *Robbins*, 528 U.S. 259, 285-86 (2000).

20   A court need not address both components of the *Strickland* test, or follow any

21   particular order in assessing deficiency and prejudice. *Strickland*, 466 U.S. at 697. If it is

22   easier to dispose of an ineffectiveness claim on the ground of lack of prejudice, without

23   evaluating counsel's performance, then that course should be taken. *Id.*

24   Under the AEDPA, in addition to satisfying both prongs of the *Strickland* standard,

25   Petitioner must make the additional showing that the state court's denial of his IAC claim

26   was contrary to or an unreasonable application of clearly established federal law. *See* 28

27   U.S.C. § 2254(d)(1).

28

Discussion

Petitioner argues that trial counsel was ineffective for not filing a motion to recuse Judge Hotham until the penalty phase and that appellate counsel was ineffective for not raising a claim of judicial bias on direct appeal. (Dkt. 30 at 9-15.) In the PCR proceedings, Judge Hotham rejected these allegations:

> The Petitioner has failed to produce evidence that indicates the trial judge's relationship with the bailiff created a situation that was so inherently prejudicial that prejudice to the Petitioner can be presumed, nor has he shown that there was actual prejudice. The Petitioner claims that the Petitioner was not protected from prejudice during the trial by later having a different judge handle the sentencing, but he does not produce evidence of actual prejudice. Without evidence that the trial judge's relationship with the bailiff was such that prejudice can be presumed and without evidence of actual prejudice to the Petitioner, the Petitioner has failed to show that his counsel's representation fell below an objective standard of reasonableness under current professional norms.

(ME 8/24/04 at 5.) This Court concludes that the PCR court's ruling is neither contrary to nor an unreasonable application of *Strickland*.

A defendant is entitled to a fair trial, free from judicial bias. *In re Murchison*, 349 U.S. 133, 136 (1955). A judge must disqualify himself from any proceeding if his impartiality might be reasonably questioned or if he has a personal bias or prejudice concerning a party. *State v. Carver*, 160 Ariz. 167, 172, 771 P.2d 1382, 1387 (1989); *see also* Ariz. R. Crim. P. 10.1(a) ("In any criminal case prior to the commencement of a hearing or trial the state or any defendant shall be entitled to a change of judge if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice of the assigned judge."). "Bias or prejudice means a hostile feeling, ill will, undue friendship, or favoritism towards one of the litigants." *Carver*, 160 Ariz. at 172, 771 P.2d at 1387. There is a presumption that judges are unbiased, honest, and have integrity. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). A petitioner may show judicial bias in one of two ways – by demonstrating the judge's actual bias or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias). *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994); *Fero v. Kerby*, 39 F.3d 1462, 1478-79 (10th Cir. 1994).

Other than the fact of the bailiff's relationship with the victim, nothing in the record indicates that the judge was actually biased or had an incentive to be biased.  Nor does the record reflect that the bailiff violated Judge Hotham's admonitions to not interact with the victim's family, relay his law enforcement background to the jurors, or have any emotional reaction during trial.  The presiding criminal judge considered Petitioner's post-verdict motion to recuse Judge Hotham and found that there was no evidence of actual prejudice or interest.  (ME 12/2/97 at 4; ROA 161.)   Judge Hotham's removal from the case for sentencing was made out of an abundance of caution because there was an appearance of *potential* interest in the outcome, not because the defendant had established bias or a substantial likelihood of bias.  An appearance of interest or prejudice sufficient to support a claim of judicial bias is more than speculation; "[i]t occurs when the judge abandons his judicial role and acts in favor of one party or the other."  *Carver*, 160 Ariz. at 173, 771 P.2d at 1388.  Because the record did not support such a finding against Judge Hotham, counsel's failure to move for the judge's recusal before trial or to raise this claim on appeal was not deficient.  *See U.S. v. Garfield*, 987 F.2d 1424, 1427 (9th Cir. 1993) (finding no deficient performance for not seeking judge's recusal where record revealed no improper bias); *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard.").

On this record, the Court cannot say that the PCR court's resolution of Petitioner's trial and appellate IAC claims was contrary to or an unreasonable application of controlling Supreme Court law.  Accordingly, Petitioner is not entitled to habeas relief on these IAC claims.

**Judicial Bias**

In his PCR petition, Petitioner argued that Judge Hotham should have recused himself due to the relationship of his bailiff with the victim and the victim's wife.  (ROA-PCR 11.) However, the PCR court concluded that Petitioner had waived the claim, pursuant to Ariz. R. Crim. P. 32.2(a)(3), by failing to include it in his direct appeal.  (ME 8/24/04 at 4.)  This preclusion ruling rests on an independent and adequate state procedural bar.  *See Smith*, 536

U.S. at 860 (holding that Arizona's Rule 32.2(a) is independent of federal law); *Ortiz*, 149 F.3d at 931-32 (holding that Arizona's Rule 32.2(a)(3) is an adequate procedural bar). Consequently, federal habeas review of Petitioner's judicial bias claim is barred unless Petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the default.[4]

**Cause and Prejudice**

Petitioner asserts that IAC by his direct appeal counsel provides cause to excuse the procedural default of his judicial bias claim. (Dkt. 57 at 4, 11.)  As just discussed, the Court has concluded that this IAC allegation is meritless.  Therefore, appellate IAC does not excuse the default of Petitioner's judicial bias claim. *See Murray v. Carrier*, 477 U.S. at 488.

Citing *Banks v. Dretke*, 540 U.S. 668 (2004), Petitioner also argues as cause that Judge Hotham suppressed information necessary for appellate counsel to prosecute this claim. (Dkt. 57 at 5, 8-11.) Specifically, he asserts that the judge failed to disclose whether he had prior knowledge of the bailiff's relationship with the victim, the quantity and substance of conversations he had with the bailiff prior to the defense motion to reassign the bailiff, what he learned from the bailiff after the hearing on the reassignment motion, and why he removed the bailiff during the medical examiner's testimony. (*Id.*)  It also appears that Petitioner bases his cause argument on the fact that Judge Hotham presided over his PCR proceeding when he had been removed from the case prior to sentencing by the presiding judge. (*Id.*)

The Court finds neither argument persuasive in explaining why Petitioner did not present this claim on direct appeal.  Both the pretrial reassignment hearing and the post-verdict motion to remove Judge Hotham for cause provided a sufficient factual basis from which appellate counsel could assess whether to include a claim of judicial bias in the direct

---

[4]     Petitioner also argues that his judicial bias claim was fairly presented to the Arizona Supreme Court on direct appeal because that court should have *sua sponte* reviewed the record for fundamental error and discovered the bias issue. (Dkt. 57 at 7-8.) The Court summarily rejects this baseless argument.

appeal.  Accordingly, the Court finds that Petitioner has not established cause to excuse the procedural default.  Absent cause, there is no need to discuss prejudice.  Petitioner does not argue that a fundamental miscarriage will occur if his judicial bias claim is not addressed on the merits.  Accordingly, this aspect of Claim 1 is procedurally barred, and Petitioner's requests for evidentiary development on the merits of his bias allegation are denied.  (Dkt. 62 at 7-19; Dkt. 85.)

**PCR-Related Issues**

Petitioner also complains that his federal constitutional rights were violated when Judge Hotham presided at his PCR proceeding and when PCR counsel failed to move to have Judge Hotham removed from the PCR proceeding.  (*Id.* at 15.)  These allegations were never presented in state court and would be found precluded if Petitioner tried to raise them now.  *See* Ariz. R. Crim. P. 32.2.  Thus, they are procedurally defaulted.  In addition, the Court finds that these allegations are not cognizable grounds for habeas relief.  A claim that a PCR judge was biased does not attack the constitutionality of a prisoner's detention; rather, it represents an attack upon a proceeding collateral to the detention.  *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989); *see also Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997).  In addition, federal statute expressly prohibits habeas relief based on an allegation of PCR counsel's ineffectiveness.  *See* 28 U.S.C. § 2254(i) (stating that "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief"); *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Harris v. Vasquez*, 949 F.2d 1497, 1513-14 (9th Cir. 1990) (no Sixth Amendment right to counsel in post-conviction proceedings).  Therefore, the PCR-related aspects of Claim 1 are dismissed as procedurally barred and not cognizable.

**Summary of Findings**

With respect to Claim 1, the Court finds that Petitioner's trial and appellate IAC allegations relating to the failure to urge Judge Hotham's recusal before trial are meritless.  The claim that Judge Hotham was biased during trial is procedurally barred.  Petitioner's

1   contention that Judge Hotham was biased during PCR proceedings is both defaulted and not

2   cognizable in a habeas petition.  Finally, the claim that PCR counsel was ineffective is

3   procedurally barred, prohibited by 28 U.S.C. § 2254(i), and not cognizable in these

4   proceedings.

5       **Claim 2**

6       Petitioner alleges that he was convicted in violation of the Fourteenth Amendment due

7   to *Batson* violations occurring during pre-trial jury selection.  (Dkt. 30 at 15-28.)

8       **Background**

9       During a break in the voir dire proceedings, Petitioner's girlfriend, Yadara Salaiz,

10  congregated and conversed with potential jurors and then yelled her affection down the hall

11  to Petitioner.  (RT 9/4/97 at 111-24.)  She first spoke with juror #37, Burrell, and then with

12  Eric Veitch as well as juror #94, Myers.  Juror Burrell heard Ms. Salaiz ask Veitch about a

13  drug treatment and rehabilitation facility that his wife operated and Mr. Veitch's explanation

14  of the program.  (*Id.*)  The court held an in-chambers discussion about the incident and

15  brought in juror Burrell to report what had happened.  (*Id.*)  The discussion also extended to

16  Burrell's opposition to the death penalty and her view that she could not be an impartial

17  juror.  (*Id.*)  Burrell was excused for cause in part due to the taint she received from her

18  interactions with Ms. Salaiz.  (*Id.* at 119, 164.)

19      In exercising its peremptory strikes, the State removed the only black members of the

20  jury panel, Linda Preston and Eric Veitch.  Defense counsel objected to the strikes pursuant

21  to *Batson v. Kentucky,* 476 U.S. 79 (1986).  (RT 9/8/97 at 161-65.)  The trial court required

22  the prosecutor to articulate a legitimate non-discriminatory reason for the strikes.  Regarding

23  Linda Preston, the prosecutor indicated:

24          PROSECUTOR:  The strike in terms of Linda Preston was made
        because of her views on the death penalty, Your Honor, and are racially and
25      genderly neutral.  Her feelings are very strong in that she states that some
        people that are innocent may accidentally lose their lives.  Regardless of what
26      they say in response to questions like that, that's still an opinion they hold into
        the jury room, and I think I am entitled not to take a chance that that may sway
27      their verdicts.

28          THE COURT:  Other circumstances, or was there anything else that

came out during voir dire that you thought significant that led to this decision.?

     PROSECUTOR: I noticed that her brother was shot, and I don't know that he hasn't left some residual feelings with her. But in terms of that, its basically her very, very strong beliefs of the death penalty issue, and her very strong opinions on that, because she also says that she would, in her response to, if you were charged with a similar offense, would you like people with your frame of mind? And she says: I hope they would have an opinion. And this is a very opinionated woman, and I feel that in terms of the death penalty issue, that it may sway her thinking.

(*Id.* at 162-63.)

After hearing the prosecutor's explanations and defense counsel's further argument, the court denied Petitioner's *Batson* motion regarding Preston, as follows:

     THE COURT: All right. Thank you. The Court finds that the State has shown sufficient objective race and gender neutral reasons for the strike, so the strike will be allowed.

(*Id.* at 163.)

With respect to Mr. Veitch, the prosecutor explained:

     PROSECUTOR: Mr. Veitch is, of course, a pastor. He's strongly opposed to the death penalty. This is, in and of itself, I believe, a racially neutral reason for the strike.

     He also, I might add, had a conversation with the girlfriend of the defendant, as did some other jurors. And although he may not have known or claims not to have known at the time that this was the girlfriend of the defendant, he did have an extensive conversation with her and counseled her and must have known during the jury selection process that this is inappropriate to be speaking to people in the hallway.

    . . . .

     . . . Regardless of his race, he is a pastor, and pastors are forgiving, Your Honor, and we are entitled to a juror that is not going to allow their feelings to enter into this in any fashion. And I feel that those are all racially neutral reasons.

(*Id.* at 163-64.)   Based upon the prosecutor's explanations, the court made its ruling regarding Veitch:

     THE COURT: Yes, If the State intends to use one of its strikes on Mr. Veitch, . . . the [Court] does find that the State's reasons are race neutral, objective and sufficient. So, any *Batson* request is denied.

(*Id.* at 165.)

On direct review, the Arizona Supreme Court determined that Petitioner had not carried his burden of proving intentional discrimination. The court concluded that Mr.

Veitch's opposition to the death penalty, his conversation with Petitioner's girlfriend, and his possible sympathy for Petitioner due to his occupation as a pastor. *Martinez*, 196 Ariz. at 456, 999 P.2d at 800.  With regard to Ms. Preston, the court concluded that the State had provided three legitimate non-discriminatory reasons for her strike: "(1) her strong opposition to the death penalty; (2) her strong opinions in general; and (3) her possible residual feelings about her brother's shooting." *Id.* at 457, 999 P.2d at 801.  The court also distinguished four white jurors that Petitioner had argued were similarly situated.  *Id.* at 456-57, 999 P.2d at 800-01.

**Analysis**

In *Batson*, the United States Supreme Court held that the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race.  476 U.S. at 89.  *See Powers v. Ohio*, 499 U.S. 400, 409 (1991) (*Batson* applies where defendant and excluded juror are of different races).  Under *Batson* and its progeny, a defendant's challenge to a peremptory strike requires a three-step analysis.  First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory strike on the basis of race.  *See Rice v. Collins,* 546 U.S. 333, 338 (2006).  If the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for the strike.  *Id.*  The trial court then must determine whether the defendant has carried his burden of proving intentional discrimination.  *Id.*

With respect to *Batson*'s second step, while the prosecutor must offer a "comprehensible reason" for the strike, *id.*, the reason need not be "persuasive, or even plausible," *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam).  "So long as the reason is not inherently discriminatory, it suffices."  *Rice*, 546 U.S. at 338; *see Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

Under the third *Batson* step, after the prosecution puts forward a race-neutral reason, the court is required to evaluate the persuasiveness of the justification to determine whether the prosecutor engaged in intentional discrimination.  *Purkett*, 514 U.S. at 768.  To accept

a prosecutor's stated nonracial reasons, the court need not agree with them.  The question is not whether the stated reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed.  *See Hernandez*, 500 U.S. at 365.  However, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.  "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotations omitted); *see Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004) (concluding that the prosecutor's explanations for striking the jurors were supported by the trial record).  Both the United States Supreme Court and the Ninth Circuit have also utilized comparative juror analyzes to assess whether a prosecutor's race-neutral explanation for a strike was in fact a pretext for a discriminatory strike.  *Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination at *Batson*'s third step."); *see Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006); *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (en banc).

Upon habeas review, a petitioner is entitled to relief on a *Batson* claim if the state court's denial of the claim constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338.  Thus, this Court can grant relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.*  In addition, under § 2254(e)(1), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 338-39.  Therefore, although "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42.

In this case, one of the reasons for striking both jurors was their opposition to the death penalty.  This is a race-neutral reason for a peremptory challenge.  Both Preston and

Veitch communicated their opposition to the death penalty on their juror questionnaires. (*See* Dkt. 72.)  Striking a juror who states an opposition to the death penalty in a capital trial is a race-neutral reason for a peremptory challenge. *See, e.g., Hicks v. Collins*, 384 F.3d 204, 224 (6th Cir. 2004) (reservation about the death penalty is a plausible reason for striking a juror); *State v. Bolton*, 182 Ariz. 290, 896 P.2d 830, 842 (1995) (listing cases).  The prosecutor's other reasons for striking Veitch (the forgiving nature of a pastor and his conversation with Petitioner's girlfriend) and Preston (strong opinionated personality and possible residual feeling about brother's shooting) were clearly race-neutral under *Batson*; they were not implausible or fantastic.  *Purkett*, 514 U.S. at 768.

Because the prosecutor satisfied the second step of *Batson* by providing race-neutral reasons for striking the black jurors, the remaining issue is whether the state courts were unreasonable in crediting these explanations.  *See Rice*, 546 U.S. at 338.

Eric Veitch

Petitioner contends that a comparative juror analysis with the white panelists who were chosen to sit on the jury supports his contention that the strike of Veitch was discriminatory and the prosecutor's explanations pretextual. (Dkt. 30 at 18.) When the entire voir dire proceedings are considered, Petitioner contends that the empaneled white jurors also expressed reservations about the death penalty, yet were not struck.  (*Id.*)  Petitioner also cites Veitch's voir dire examination that if selected to be a juror, he would impartially follow the law and do his civic duty.  (RT 9/8/97 at 61.)  Regarding the prosecution's additional reasons, Petitioner contends that the prosecutor exaggerated the conversation Veitch had with Ms. Salaiz reasoning that being polite cannot be a legitimate reason for a peremptory challenge.  (Dkt. 30 at 20-21.)  Regarding Veitch being a forgiving person because he was a pastor, Petitioner argues that there was another pastor and a social worker on the voir dire panel who were not questioned on this basis.  (*Id.* at 22.)

The Arizona Supreme Court, after reviewing the voir dire proceedings of the white jurors on the panel – (#48) Dillon, (#27) Lester, (#4) Campbell, and (#58) Reith – concluded that the jurors were not similarly situated to Veitch because each of these jurors indicated on

their juror questionnaire that they favored the death penalty (*see* Dkt. 72). *Martinez*, 196 Ariz. at 456-57, 999 P.2d at 800-01. The court noted that Veitch held the opposite view, indicating that life in prison would work better. *Id.* Comparatively, the court noted that none of the empaneled jurors were involved in the incident with Ms. Salaiz. *Id.* at 456, 999 P.2d at 800. Finally, the appellate court rejected Petitioner's arguments that Veitch's strike was pretextual because other jurors with a forgiving nature were not struck. *Id.* None of the empaneled jurors were pastors or social workers. (*See* RT 9/8/97 at 171.) The Court further notes that the prosecution struck a juror who was a social worker based on the view that she had a forgiving nature and would give others a second chance. (*Id.* at 166-67.)

After carefully reviewing the record, the Court concludes that it was not unreasonable for the trial judge to find the prosecutor's explanation for striking Mr. Veitch to be credible. The record supports the state court's findings, and Petitioner has failed to prove that the prosecutor's reasons were pretextual or that he engaged in purposeful racial discrimination.

Linda Preston

Petitioner argues that despite Preston's opposition to the death penalty, she is similarly situated to white jury panelists who also voiced a concern that the result of the death penalty may be that innocent people die. (Dkt. 30 at 25.) Regarding possible residual feelings from her brother being shot, Petitioner argues that the prosecution is exaggerating this event because Preston told the prosecutor that she was living in Las Vegas when this occurred and that she did not know too much about it. (*Id.* at 26.) Finally, regarding Preston being opinionated, Petitioner argues that the prosecution's explanation was invalid. (*Id.* at 24-25.)

During individual voir dire, the prosecution questioned Preston about her juror questionnaire, which indicated opposition to the death penalty because she believed some innocent people may lose their lives. (*See* Dkt. 72.) When questioned, Preston's answers as to whether she could be impartial were ambiguous. (RT 9/8/97 at 101-02.) First, she indicated that the strength of her views regarding the death penalty would make it difficult for her to make a determination of guilt or innocence based solely on the evidence presented. (RT 9/8/97 at 101-02.) However, she then indicated that she could be a fair and impartial

juror. (*Id.* at 102.)  The prosecution did not move to strike her for cause. (*Id.*)  The Arizona Supreme Court noted the ambiguity of Preston's answers regarding whether she could be fair and impartial juror. *Martinez*, 196 Ariz. at 457, 999 P.2d at 801.  Based upon her voir dire responses and her juror questionnaire, the court found that the prosecution's justification that Preston was opposed to the death penalty supported by the record. *Id.*  The court also found that Preston was not similarly situated to white panel members who all indicated support for the death penalty. *Id.*  Based on this record, the court concluded that this particular justification was not pretextual. *Id.*  Regarding residual feelings due to her brother being shot, Petitioner acknowledged and the supreme court found that this rationale was supported in the record. (Opening Br. at 36; *Martinez*, 196 Ariz. at 457, 999 P.2d at 801.)  Finally, regarding Preston being opinionated, the court made no formal finding.

As with Mr. Veitch, this Court concludes that the trial judge was not unreasonable in crediting the prosecutor's explanations for his strike of Preston. *See Rice*, 546 U.S. at 338. The Court's review of both explanations – her opposition to the death penalty and residual feeling for her brother – were supported by the record.  Similarly, comparative analysis of Preston with the empaneled jurors does not demonstrate a pretext for racial discrimination. Consequently, Petitioner has not demonstrated that the prosecution engaged in purposeful racial discrimination.

**Conclusion**

The prosecutor offered race-neutral explanations for striking Veitch and Preston.  The burden thereafter shifted to Petitioner to prove that those reasons were pretextual and that the strikes were discriminatory.  Applying *Batson*, the trial court and the Arizona Supreme Court accepted the prosecutor's race-neutral explanations and concluded that Petitioner had failed to meet his burden of proving discriminatory intent.  As previously noted, on habeas review, "[a] state court's finding of the absence of discriminatory intent is a 'pure issue of fact' accorded significant deference." *Miller-El I*, 537 U.S. at 339 (explaining that the trial judge can measure the credibility of a prosecutor's race-neutral explanations by reference to several factors, including its personal observations of the juror and of "the prosecutor's demeanor;

1    by how reasonable, or how improbable the explanations are, and by whether the proffered

2    rationale has some basis in accepted trial strategy"). Petitioner has not rebutted this

3    presumption with clear and convincing evidence.

4         Because the state court decision was not an unreasonable application of *Batson*, and

5    because it was not based on an unreasonable determination of the facts in light of the

6    evidence presented, Petitioner is not entitled to relief on Claim 2. The Court further notes

7    that because analysis of this claim is necessarily limited to the record that was before the trial

8    court, none of the evidentiary development sought by Petitioner is relevant. (Dkt. 62 at 19-

9    27.) Therefore, his request for evidentiary development of Claim 2 is denied.

10   **Claim 4**

11        Petitioner alleges that the trial court denied his federal constitutional right of

12   confrontation by allowing the prosecution to introduce testimonial hearsay to prove charged

13   offenses at trial, namely that the vehicle driven by him at the time of the crime was stolen and

14   that the license plate on the vehicle was also stolen. (Dkt. 30 at 34-40.) Respondents contend

15   that the claim is procedurally defaulted because it was not raised on direct appeal. (Dkt. 50

16   at 45.)

17        Petitioner did not fairly present this claim on direct appeal. Nor did he pursue the

18   claim during state PCR proceedings after the Supreme Court decided *Crawford v.*

19   *Washington*, 541 U.S. 36 (2004). Petitioner argues, based on then-existing Ninth Circuit

20   law, that *Crawford* applies retroactively. (Dkt. 157 at 31.) However, the Ninth Circuit was

21   reversed by the Supreme Court in *Whorton v. Bockting*, 127 S. Ct. 1173 (2007), which holds

22   that *Crawford* does not apply retroactively in federal habeas corpus proceedings. And in any

23   event, retroactivity of *Crawford* does not excuse Petitioner's failure to assert a violation of

24   his Sixth Amendment right of confrontation either on appeal or in his PCR petition.

25        Petitioner does not assert cause for his failure to exhaust Claim 4 in state court, but

26   does argue that a fundamental miscarriage of justice will occur if the claim is not heard on

27   the merits because "the exclusion of the purported theft of the Monte Carlo greatly weakens

28   the prosecution's case for motive and premeditation." (Dkt. 157 at 31.) In his motion for

evidentiary development, Petitioner seeks discovery to "test the veracity" of a detective who testified that the vehicle's ignition switch was missing and that a screwdriver could have been used to start the car. (Dkt. 62 at 29.) In a supplemental motion, Petitioner's federal habeas counsel avow that their investigator, during a recent inspection of the vehicle, discovered the ignition switch in two pieces under the passenger seat. (Dkt. 74 at 5.) Citing the fact that the ignition parts were not listed in the vehicle inventory, counsel theorize that, if allowed additional discovery, they can establish that the ignition was intact at the time the vehicle was impounded, thus establishing the *Schlup* actual innocence gateway. (*Id.* at 7.) Petitioner asks the Court to consider not only this "new" evidence but also that proffered in support of Claims 9, 16, and 17.

The Court has considered all of Petitioner's evidence and concludes that he has failed to establish that no reasonable juror would have found him guilty of premeditated first degree murder. Petitioner's theory of innocence rests on "excluding" the following: evidence that he was driving a stolen car; testimony from Oscar Fryer that he was on the run from an arrest warrant, had a gun in case "shit happens," and had no intention of going back to jail (see Claim 9); testimony from Eric Moreno that Petitioner called him the night of his arrest and laughed about blasting a police officer (see Claim 16); and testimony from the medical examiner that the shot to Officer Martin's head was likely the last shot fired (see Claim 17). However, as Petitioner acknowledges, when evaluating a claim of actual innocence, the Court must consider all of the evidence, without regard to its admissibility under the rules of evidence at trial. *House v. Bell*, 126 S. Ct. at 2077. Thus, the Court does not exclude these facts from its consideration; rather, it considers Petitioner's new evidence and assesses whether, combined, all of the evidence demonstrates that no reasonable juror would have convicted Petitioner.

Petitioner's "new" evidence does not establish actual innocence. First, whether the ignition was intact at the time Petitioner was arrested does not negate the fact that the owner had reported it stolen. Second, Petitioner has not demonstrated that Fryer and Moreno testified falsely. Rather, as discussed with respect to Claims 9 and 16, he offers only

additional impeachment evidence that does not significantly discredit their testimony. Finally, Petitioner proffers a declaration from an expert that disagrees with the medical examiner's conclusion about the sequence of shots, but this is nothing more than a second opinion.  The Court finds that Petitioner has not made the requisite showing of actual innocence and that the failure to consider Claim 4 on the merits will not result in a fundamental miscarriage of justice.  Accordingly, Claim 4 is procedurally barred, and Petitioner's request for evidentiary development on the merits of Claim 4 is denied.

**Claim 5**

Petitioner argues that the admission of evidence relating to, and the failure to sever counts based on, the subsequent convenience store robbery and shooting violated his federal right to due process. (Dkt. 30 at 40.)  He further argues that his rights were violated by the admission of improper character evidence of the victim.  (*Id.* at 42.)

**Procedural Default**

A review of Petitioner's appellate brief and PCR petition reveals that he only exhausted a claim based on the trial court's admission of other act evidence.  (Appellant's Opening Br. at 53.)  He did not raise any claims alleging federal constitutional error in failing to sever counts or admitting evidence of the victim's character.  If Petitioner were to return to state court now and attempt to litigate these claims, they would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because they do not fall within an exception to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, allegations based on the failure to sever and to prohibit evidence of the victim's character are  "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  They will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice.

Petitioner asserts as cause appellate counsel's failure to raise these claims on direct appeal. (Dkt. 57 at 36-38.)  Before ineffective assistance of appellate counsel may be utilized as cause to excuse a procedural default, the particular IAC allegation must first be exhausted

before the state courts as an independent claim.  *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Murray v. Carrier*, 477 U.S. at 489-90; *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988).  During PCR proceedings, Petitioner did not present any appellate IAC claims based on counsel's failure to raise these allegations on appeal.  Therefore, appellate IAC cannot constitute cause.  Because Petitioner has failed to establish cause, there is no need to address prejudice.

Petitioner also asserts that a fundamental miscarriage of justice will occur if his claims regarding the failure to sever counts and the admission of evidence of the victim's character are not considered on the merits.  (Dkt. 57 at 37-38.)  However, Petitioner points to no new reliable evidence not presented at trial that would demonstrate that he is actually innocent. *Schlup v. Delo*, 513 U.S. at 327.  These aspects of Claim 5 are procedurally barred.

**Merits**

Petitioner asserts that the trial court's admission of his armed robbery of a convenience store hours after shooting Officer Martinez violated his due process rights under the Fourteenth Amendment.  (Dkt. 30 at 47.)

On direct appeal, the Arizona Supreme Court rejected this claim:

> The trial court also limited the State's evidence on the Mini-Mart robbery to the taking of cash from the store, the discharge of Officer Martin's .9mm Sig Sauer, and the underlying ballistics evidence.  *Id.* at 2-3.  The trial court precluded all references to the clerk's "murder, homicide, death or autopsy."  *Id.*  Martinez conceded that this evidence was relevant to establish identity and motive under Rule 404(b).  *See* Defendant's Response to State's Motion to Preclude Evidence Pursuant to Rule 404(b) at 9.  He agreed that it linked Officer Martin's gun with Martinez' arrest in Indio.  *Id.*  He also acknowledged that the Mini-Mart robbery showed consciousness of guilt under *State v. Kemp*, 185 Ariz. 52, 59, 912 P.2d 1281, 1288 (1996).  *Id.*

> By his earlier concessions, Martinez agreed that the evidence about the Mini-Mart robbery was entitled to substantial probative weight.  But on appeal, he attempts to retract his concessions, and asserts that engaging in a California convenience store robbery does not show consciousness of guilt as to the Arizona homicide.  To the extent that we understand this argument, flight from Arizona demonstrates consciousness of guilt as much as flight within Arizona. The .9mm shell casing recovered at the Mini-Mart on August 16, 1995 provided the final link to Officer Martin's murder.  Officer Martin's .9mm Sig Sauer was missing and the shell casing found at the Mini-Mart traced Martinez' flight from the Beeline Highway, through Phoenix, to Blythe, California.  The trial court precluded the State from introducing evidence of the clerk's murder to prevent unfair prejudice.  That was protection enough.

1

2

> The other evidence was extremely relevant. There was no error in the trial court's Rule 403 balancing.

*Martinez*, 196 Ariz. at 459-60, 999 P.2d at 803-04.

3

4

5

6

7

8

9

10

11

In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted). Thus, this Court is prohibited from reviewing whether "other crimes" evidence was properly admitted by the state trial court pursuant to Arizona Rule of Evidence 404(b), which is simply a matter of state evidentiary law. Instead, the admission of evidence at a state trial will form the basis for federal habeas relief only when the evidentiary ruling renders a trial unfair in violation of a petitioner's due process rights. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States,* 493 U.S. 342, 352 (1990). Pursuant to this narrow definition, the Court has declined to hold that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice. *Estelle v. McGuire*, 502 U.S. at 75 & n.5 (stating that Supreme Court was expressing no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime); *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967) (rejecting the argument that due process requires the exclusion of prejudicial evidence). Thus, there is no clearly established Supreme Court precedent which holds that a state violates due process by admitting propensity evidence in the form of other acts evidence. *See, e.g.*, *Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003) (state court decision allowing admission of evidence pertaining to petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that state violated due process by permitting propensity evidence in the form of other bad acts evidence).

28

1   Moreover, although "clearly established Federal law" under the AEDPA refers only
2   to holdings of the United States Supreme Court, this Court notes that even under Ninth
3   Circuit precedent Petitioner would not be entitled to relief.  The Ninth Circuit has held that
4   the admission of "other acts" evidence violates due process only when "there are *no*
5   permissible inferences the jury may draw from the evidence." *Jammal,* 926 F.2d at 920; *see*
6   *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). Therefore, whether or not the
7   admission of evidence is contrary to a state rule of evidence, a trial court's ruling does not
8   violate due process unless the evidence is "of such quality as necessarily prevents a fair
9   trial." *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1465 (9th Cir. 1986).

10   As the Arizona Supreme Court explained, the evidence detailing Petitioner's
11   subsequent armed robbery allowed several permissible inferences, including identity and
12   consciousness of guilt.  Therefore, admission of the evidence did not render Petitioner's trial
13   fundamentally unfair in violation of his due process rights, and Petitioner is not entitled to
14   relief on Claim 5.

15   **Claim 6**

16   Petitioner asserts that the prosecution improperly vouched for its witness, Oscar Fryer,
17   and improperly elicited a prior consistent statement from him.  (Dkt. 30 at 50.)  Petitioner
18   concedes he never properly exhausted these allegations in state court and argues that
19   appellate counsel's ineffectiveness constitutes cause.  (Dkt. 57 at 41, 43.)  However, he did
20   not exhaust in his state PCR proceedings any appellate IAC claims based on the failure to
21   raise the allegations contained in Claim 6 on direct appeal.  Accordingly, appellate IAC
22   cannot constitute cause.  *Edwards v. Carpenter*, 529 U.S. at 451-53.  Because Petitioner has
23   failed to establish cause, there is no need to address prejudice.

24   Petitioner also asserts that a fundamental miscarriage of justice will occur if Claim 6's
25   allegations are not considered on the merits.  (Dkt. 57 at 41.)  However, Petitioner fails to
26   point to any new reliable evidence not presented at trial that would demonstrate that he is
27   actually innocent.  *Schlup v. Delo*, 513 U.S. at 327.  Claim 6 is procedurally barred.

28   **Claim 7**

- 30 -

Petitioner alleges that the trial court's jury instruction regarding premeditation violated his federal right to due process. (Dkt. 30 at 53.) Petitioner contends that the instruction reduced the state's burden of proof by improperly focusing on the length of time necessary for premeditation instead of requiring actual reflection. (Dkt. 57 at 44-45.) In denying relief on this claim, the PCR court ruled that, read as a whole, the instructions were not erroneous. (ME 8/24/04 at 7.)

An allegedly improper jury instruction will merit habeas relief only if "the instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 72; *see Jeffries v. Blodgett,* 5 F.3d 1180, 1195 (9th Cir. 1993). The instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973)). It is not sufficient for a petitioner to show that the instruction is erroneous; instead, he must establish that there is a reasonable likelihood that the jury applied the instruction in a manner that violated a constitutional right. *Id.*; *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977). Petitioner cannot make this showing.

The instruction provided by the trial court was not erroneous under state law. At trial, the court provided the following instruction with respect to premeditation:

> "Premeditation" means that the defendant's intention or knowledge existed before the killing long enough to permit reflection; however, the reflection differs from the intent or knowledge that conduct will cause death. It may be as instantaneous as successive thoughts in the mind, but it must be actual reflection, and it may be actual reflection, and it may be proved by direct or circumstancial [sic] evidence. It is this period of reflection regardless of its length which distinguishes first degree murder from intentional or knowing second degree murder. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

(RT 9/25/97 at 97-98.) This instruction, with its statement that premeditation requires a "period of reflection," accurately described state law regarding premeditation. At the time

of Petitioner's trial, A.R.S. § 13-1101(1) defined premeditation as follows:

> "Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.[5]

A.R.S. § 13-1101(1) (1997). Arizona courts had further explained: "The necessary premeditation, however, may be as instantaneous as successive thoughts of the mind, and may be proven by either direct or circumstantial evidence." *State v. Kreps*, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985); *see State v. Spears*, 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996); *State v. Lopez*, 158 Ariz. 258, 262, 762 P.2d 545, 549 (1988); *State v. Sellers*, 106 Ariz. 315, 316, 475 P.2d 722, 724 (1970).

The Court finds that, on its face, the challenged jury instruction does not permit a finding of premeditation based solely on the passage of time. First, it explicitly distinguishes intent as existing before, and as something distinct from, reflection. Second, the exclusion of acts that are the "instant effect of a sudden quarrel or heat of passion" from a finding of premeditation clarifies that impulsive acts do not satisfy the premeditation requirement. Third, nothing in the prosecutor's closing argument or the court's instructions inaccurately suggested that the State needed only to prove the time element of reflection in lieu of actual reflection.

As Petitioner notes, the Arizona Supreme Court has since "discouraged" use of the phrase "instantaneous as successive thoughts in the mind" in jury instructions. *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003). The *Thompson* court, resolving conflicting decisions of the Arizona Court of Appeals, held that the statutory definition of premeditation requires actual reflection and not the mere passage of time. *Id.* at 478, 65 P.3d at 427. However, contrary to Petitioner's assertion, the Arizona Supreme Court did not find the phrase, "instantaneous as successive thoughts in the mind," to be constitutionally impermissible. *Id.* at 479, 65 P.3d at 428.

---

[5]      In 1998, A.R.S. § 13-1101(1) was amended to include the clause, "Proof of actual reflection is not required."

Even if the instruction was erroneous, review in the context of the entire trial reveals that Petitioner's due process rights were not violated. *See Cupp v. Naughten*, 414 U.S. at 146 (use of an "undesirable, erroneous, or even 'universally condemned'" instruction does not equate to a constitutional violation). First, there was significant evidence that the crime was premeditated. Petitioner was driving a stolen car with a stolen license plate and was armed with a gun. He told his friend, Oscar Fryer, that he was on probation, that there was an outstanding warrant for his arrest, and that he was not going back to prison if stopped by the police. Petitioner shot Officer Martin not once, but four times, including in the head. After his arrest, Petitioner called his friend, Eric Moreno, and laughingly bragged to blasting a "jura" (slang for policeman). Petitioner also stole Officer Martin's firearm and used that weapon in a robbery only hours after the shooting.

Second, although defense counsel argued lack of premeditation as an alternative defense in his closing, Petitioner's primary defense throughout trial was mistaken identity. "The premeditation instruction therefore neither removed a right from [Petitioner] nor hindered his ability to raise total innocence or mistaken identity as his defense. If the trial court erred, the error did not take from defendant a right essential to his defense." *State v. Adams*, 194 Ariz. 408, 415, 984 P.2d 16, 23 (1999).

Because the instruction on premeditation did not inaccurately describe the element of premeditation, and viewing the instruction in the context of the evidence adduced at trial and the nature of the defense theory, the Court concludes that Petitioner has failed to meet his burden of showing that the instruction rendered his trial fundamentally unfair. Therefore, the PCR court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 7.

**Claim 8**

Petitioner asserts that the court's deletion of a paragraph from his second degree murder instruction violated his federal right to due process. (Dkt. 30 at 58.) The omitted paragraph read: "If you determine that the defendant is guilty of either first degree murder or second degree murder and you have a reasonable doubt as to which it was, you must find

the defendant guilty of second degree murder." (ROA 155.)   In place of the omitted

paragraph, the trial court gave the following instruction:

> You are to first consider the offense of first degree murder.
>
> If you cannot agree on a verdict on that charge after reasonable efforts, then
> you may consider whether the State has proven beyond a reasonable doubt that
> the defendant is guilty of the less serious offense of second degree murder.

(RT 9/25/97 at 98.)

Petitioner raised this claim on direct appeal. (Appellant's Opening Br. at 61-62.)   In

denying relief, the Arizona Supreme Court first noted that the trial court's refusal of

Petitioner's proffered instruction was based on the court's decision in *State v. LeBlanc,* 186

Ariz. 437, 924 P.2d 441 (1996), in which the court abandoned the "acquittal first" procedure

for lesser-included offenses in favor of the "reasonable efforts" procedure. *Id.* at 440, 924

P.2d at 444.   In *LeBlanc*, the court decided to require jurors to use "reasonable efforts" in

reaching a verdict on the charged offense before considering lesser-included offenses so that

jurors do not have to acquit the defendant on the charged offense before considering

lesser-included offenses. *Id.*

In this case, the Arizona Supreme Court held that the trial court's instruction was not

improper:

> It did not fail to instruct the jury on the procedure when reasonable doubt
> exists on the degree of homicide. Rather, it expressly stated, "[y]ou are to first
> consider the offense of first degree murder." *Id.* If the jury could not agree
> that Martinez was guilty of first degree murder after reasonable efforts, then
> it was instructed to consider whether the State had proven, beyond a
> reasonable doubt, that Martinez was guilty of second degree murder. From the
> court's instruction, the jury could return a verdict of first degree murder only
> if the State proved Martinez' guilt beyond a reasonable doubt.  If it had any
> doubts, the "reasonable efforts" instruction allowed the jury to consider the
> lesser-included offense of second degree murder. There was no error.

*Martinez*, 196 Ariz. at 460-61, 999 P.2d at 804-05.

Petitioner argues that the Arizona Supreme Court unreasonably applied *Beck v.*

*Alabama*, 447 U.S. 625, 627 (1980), in denying relief on this claim.  *Beck* held that in a

capital murder trial, failure to give an instruction on a lesser-included non-capital offense

which is supported by the evidence violates the defendant's due process rights by placing the

jury in the position of either acquitting the defendant or finding him guilty of a capital crime. Therefore, "the goal of the *Beck* rule is . . . to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Villafuerte v. Stewart*, 111 F.3d 616, 623 (9th Cir. 1997) (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)). *Beck* is satisfied so long as the jury had the option of at least one lesser-included offense, even if there are other lesser-included offenses also supported by the evidence. *See Schad v. Arizona,* 501 U.S. 624, 645-46 (1991).

There is no dispute that the trial court instructed the jury on second degree murder as a lesser-included offense. Therefore, the Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of *Beck*. Petitioner is not entitled to relief on Claim 8.

**Claim 9**

Petitioner contends that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose impeachment evidence regarding Oscar Fryer, a prosecution witness whose testimony supported that Petitioner committed the murder with premeditation. (Dkt. 30 at 61-76.) Petitioner further argues that trial counsel ineffectively prepared for Fryer's trial testimony. (*Id.*)

Petitioner concedes that he did not fairly present either aspect of Claim 9 in state court. (Dkt. 57 at 61, 67; Dkt. 62 at 36, 38.) He contends that the prosecution's withholding of material impeachment evidence constitutes cause and prejudice to excuse the default of his *Brady* claim and that actual innocence excuses his failure to exhaust the IAC aspect of Claim 9 in state court. The Court disagrees.

**Undisclosed Impeachment Evidence**

Oscar Fryer testified at trial that he was with Petitioner in Globe, Arizona, on three occasions shortly prior to Officer Martin's murder. (RT 9/9/97 at 78-86.) Fryer's contacts with Petitioner were corroborated by Fryer's girlfriend, Stephanie Campos. (*Id.* at 58-66.) Fryer testified that Petitioner was driving a blue Monte Carlo with a white top and that Petitioner showed him a .38-caliber handgun with black tape around the handle. (*Id.* at 78-

86.) Fryer further testified that Petitioner told him there was an outstanding warrant for his arrest, he was on the run, and he was not going back to jail if stopped by the police. (*Id.*)

During cross-examination, Fryer was impeached with two prior felony convictions. (*Id.* at 88-89.) Defense counsel also brought out from Fryer that prior to trial he had violated his probation, that he was on the run, and that he would not agree to cooperate or turn himself into authorities until he had negotiated and had in his possession a written plea agreement dealing with charges of assault on a police officer, domestic violence, resisting arrest, and escape. (*Id.* at 88-93.) Defense counsel introduced Fryer's plea agreement into evidence, which provided that if Fryer cooperated and testified for the prosecution, his three felony charges would be reduced to one misdemeanor assault charge and he would be sentenced to probation. (*Id.*)

In Claim 9, Petitioner asserts that the prosecution failed to disclose that Fryer received other benefits in exchange for his testimony and that he was using drugs at the time of the trial. Specifically, Petitioner asserts that prior to trial, Fryer was on probation and tested positive for drugs on multiple occasions. (*See* Dkt. 57 at 56-57; Dkt. 62, Ex. 6.) Despite Fryer's drug abuse, the prosecution did not move to revoke his probation. (*Id.*) Fryer indicated to his probation officer that he regularly abused methamphetamine, which included the time frame of Petitioner's trial. (*Id.*) In addition, Fryer lied to a police officer about a suspect's location on January 29, 1996, yet was not charged with making a false report to law enforcement. (*Id.*) After trial but prior to sentencing, Fryer again tested positive for drugs and pled guilty to theft of $900 from a restaurant. (*Id.*)

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty to disclose includes impeachment as well as exculpatory material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). In order to prevail on a *Brady* claim, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was

1   suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted. *Strickler*

2   *v. Greene,* 527 U.S. 263, 281-82 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004);

3   *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  Establishing the second and third factors also

4   establishes cause and prejudice for any failure to develop a *Brady* claim in state court.

5   *Banks*, 540 U.S. at 691.

6       Evidence is material for *Brady* purposes "if there is a reasonable probability that, had

7   the evidence been disclosed to the defense, the result of the proceeding would have been

8   different."  *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682); *see Banks*, 540 U.S.

9   at 699; *Strickler*, 527 U.S. at 280.  The Supreme Court has explained that materiality does

10  not require a showing that the defendant would have been acquitted had the suppressed

11  evidence been disclosed.  *Id.* at 434-35.  Instead, a *Brady* violation occurs if "the favorable

12  evidence could reasonably be taken to put the whole case in such a different light as to

13  undermine confidence in the verdict."  *Id.* at 435.

14      The Court concludes that the withheld impeachment information in this case was not

15  material; therefore, Petitioner cannot establish cause and prejudice for the default of Claim 9.

16  First, Fryer was thoroughly impeached at trial.  His plea agreement was introduced, he was

17  cross-examined about all of the favorable treatment he obtained as a result of the agreement,

18  and was impeached with the factual basis of his prior felony convictions.  The fact that he

19  tested positive for drugs two weeks prior to his testimony would not likely have affected the

20  jury's verdict.  Similarly, the fact that Fryer continued to engage in criminal activity even

21  after working out a plea to testify against Petitioner does not put his credibility in a whole

22  new light given all of the other impeaching evidence brought out at trial.

23      Second, the additional impeachment evidence would have had little effect on Fryer's

24  already impeached credibility because his testimony was corroborated by other evidence.

25  Consistent with Fryer's testimony, Petitioner was driving a blue Monte Carlo with a white

26  top, had a warrant out for his arrest, had violated his probation and was on the run from

27  authorities, and had possession of a .38-caliber revolver with black tape around the handle

28  of the gun.  Moreover, his fingerprint was found on the tape, and it was this revolver that was

1  later identified as the murder weapon (RT 9/22/97 at 114).  *See Martinez*, 196 Ariz. at 453-
2  55, 999 P.2d 797-99.

3       Finally, Fryer's testimony was not the linchpin evidence of premeditation portrayed
4  by Petitioner.  Fryer relayed a conversation with Petitioner that took place *prior* to the
5  shooting.  Although damaging, it was less relevant than the fact that Petitioner was driving
6  a stolen car when pulled over, that he had absconded from law enforcement and there was
7  an outstanding warrant for his arrest, and that he shot Officer Martin not once, but four times.
8  In addition, after his arrest Petitioner bragged about "blasting" a police officer.  (RT 9/15/97
9  at 13.)  This was more than enough evidence from which the jury could find that Petitioner
10  acted with premeditation.

11      Petitioner's reliance on *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002), is misplaced.
12  There, a jailhouse informant claimed that the defendant had confessed to murder and
13  insurance fraud.  *Id.* at 1045-46.  His testimony provided the only evidence of the fraud,
14  which in turn provided the motive for the murders.  *Id.*  Despite interviewing the informant
15  over a year before trial, the prosecution did not disclose his identity until the day before trial.
16  *Id.* at 1048.  In addition, the prosecution failed to disclose the informant's long history of
17  persistent misconduct during his fifteen years as an informant, the fact that the informant had
18  lied to police a week before trial about having evidence implicating the defendant in an
19  unrelated murder, numerous benefits the informant received with regard to other criminal
20  activities, and the fact that he had acted as an informant in a previous murder case.  *Id.* at
21  1054-58.

22      Here, Fryer was not a jailhouse informant, but Petitioner's close friend.  Fryer did not
23  claim that Petitioner confessed to the crime, only that if stopped by police  "he wasn't going
24  back to jail."  (RT 9/25/97 at 85.)  Although the prosecution did not disclose that Fryer was
25  accused of lying to police more than a year before trial, this one incident pales in comparison
26  to the multiple deceptive acts by the professional informant in *Benn*.  In sum, the Court
27  concludes that *Benn* is easily distinguishable and that the undisclosed impeachment evidence
28  regarding Fryer did not put the whole case in such a different light as to undermine

confidence in the verdict.[6]

**Actual Innocence**

Petitioner contends that a fundamental miscarriage of justice will occur if the *Brady* and IAC aspects of Claim 9 are not considered on the merits. (Dkt. 57 at 67-71.) In addition to the undisclosed impeachment evidence, Petitioner identifies other impeachment evidence known to defense counsel but not utilized at trial and argues that had all of this impeachment evidence been presented no reasonable juror would have voted to convict him because the prosecution would not have been able to meet its burden of proving premeditation. (*Id.*)

The additional evidence Petitioner argues was known to defense counsel include the quality and quantity of benefits bestowed upon Fryer as a result of his 1997 plea agreement, such as the prosecution foregoing sentence enhancements, consecutive sentences, and probation revocation. (Dkt. 30 at 68.) Further, during an interview with defense counsel, when counsel had trouble following Fryer's statements, Fryer responded "whatever you want me to say, I will say it." (Dkt. 62, Ex. 10 at 24.)[7] Petitioner also notes alleged inconsistencies

---

[6]    In assessing whether Petitioner established cause for the default of Claim 9, the Court has considered the evidence proffered by Petitioner in his motion for evidentiary development in support of the alleged *Brady* violation. (Dkt. 62, Exs. 4-10.)

[7]    The full quote reads: "Whatever you guys want me to say, I'll say it. The truth is the truth. Everything that's written down here, I'll say it. You know. I've got – I have to say it." (Dkt. 62, Ex. 10 at 24.) In context, this is not significant impeachment. Indeed, immediately following this statement, defense counsel asked Fryer to slow down and tell them what Petitioner said to him at the car wash:

> FRYER: "I'm going to start all over again, right. I got to the carwash. I was sitting there, he came over, pulled in. I got out of the car, went to him. He came to me. We hugged each other and said what's up. Got in the car because he said that he was wanted. I noticed the gun — the bulge in his pants. I said "what you got there" and he showed me the gun. I opened it up and I looked at the slug. I said what you gonna do, are you ready to kill [some one] and his words were if anybody gets in my way, I will, okay. It's not I think he said that or anything like that, that's what he said. If anybody gets in his way, that's what he was gonna do. Cause I asked I said "what [] are you going to do if you get pulled over by a cop." I told him "are you going to run or what?" He said "[] no, I'm gonna shoot out for those [people]." There, is

- 39 -

in Fryer's pretrial statements to the police and to defense counsel about his conversation with Petitioner at the car wash, including Petitioner's clothing, whether Petitioner's weapon fired five or six shots, the type of bullets Petitioner was using for the handgun, and whether Fryer was under the influence of drugs and/or alcohol at the carwash.  (Dkt. 57 at 74-75.)  After trial but prior to sentencing, Fryer again tested positive for drugs and pled guilty to theft of $900 from a restaurant.  (*Id.*)

As already discussed, Fryer's testimony relaying Petitioner's statement that he had the gun in case "shit happens" and that he was not going back to jail  was not the only evidence of motive and premeditation presented at trial.  Petitioner shot Officer Martin multiple times; he was on the run and there was a warrant out for his arrest; he was driving a stolen car with a stolen license plate; and he bragged after being arrested that he had blasted a police officer. This was sufficient evidence from which a reasonable juror could conclude that Petitioner acted with premeditation in killing Officer Martin.  Moreover, the additional impeachment evidence of Fryer is mainly cumulative, and his credibility was reinforced by the fact that he accurately described the murder weapon and the car Petitioner was driving.  Considering both the undisclosed and unused impeachment evidence collectively, the Court finds that Petitioner has failed to show that "it is more likely than not that no reasonable juror would

---

that what you guys wanted to hear?  That's exactly what he told me, alright.

DEFENSE COUNSEL:  All we want to hear is what he told you.

FRYER:  That's what he told me.

DEFENSE COUNSEL:  There's nothing here that we want to hear other than the truth.  And let's deal with that.

FRYER:  He said he wasn't gonna run, he wasn't gonna [] go on a hot pursuit chase or anything like that, he was gonna blast.  He showed me the gun and he said "I'm gonna blast."  That's what he intended to do.  He did it.  And when I [] heard that he did it, I was like [], that [guy] wasn't [kidding], he did what he said he was gonna do, alright.

(*Id.* at 25-26.)  This evidence does not support a claim of actual innocence.

have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. at 327. Claim 9 is procedurally barred, and Petitioner's request for evidentiary development on the merits of Claim 9 is denied.

**Claim 10**

Petitioner argues that his two 1996 convictions for dangerous assault by a prisoner under A.R.S. § 13-1206 did not qualify as "serious offenses" for purposes of the A.R.S. § 13-703(F)(2) aggravating factor; therefore, his death sentence was imposed in violation of federal due process. (Dkt. 30 at 76.)

In 1993, the Arizona legislature amended A.R.S. § 13-703(F)(2) to provide as a capital-eligible aggravating factor that the "defendant has been or was previously convicted of a serious offense, whether preparatory or completed." In defining "serious offense," the legislature included a separate list of offenses, which were not enumerated by any specific statutory code. The list includes "aggravated assault resulting in serious physical injury or committed by the use, threatened use or exhibition of a deadly weapon or dangerous instrument." A.R.S. § 13-703(H)(4).[8]

In this case, the sentencing judge based its (F)(2) finding on Petitioner's conviction in 1993 on one count of Aggravated Assault under A.R.S. §§ 13-1203 and 13-1204 and his conviction in 1996 on two counts of Dangerous or Deadly Assault by a Prisoner under A.R.S. § 13-1206. On appeal, Petitioner argued that his federal constitutional rights were violated when the sentencing judge found that the 1996 convictions qualified as "serious offenses" because assault by a prisoner is not listed in § 13-703(H)(4) and because a person may, theoretically, commit assault recklessly. (Appellant's Opening Br. at 74-81.) The Arizona Supreme Court disagreed and held:

> Pursuant to A.R.S. § 13-703(H)(1)(d), a "serious offense" includes "[a]ggravated assault resulting in serious physical injury or committed by the

---

[8]    At the time of Petitioner's direct appeal, § 13-703(H)(4) had been recodified as § 13-703(H)(1)(d), and the Arizona Supreme Court's discussion of Petitioner's claim references the latter enumeration. Presently, this part of the statute is codified at A.R.S. § 13-703(I)(4).

use, threatened use or exhibition of a deadly weapon or dangerous instrument." This offense can be committed under A.R.S. § 13-1204(A)(2) and A.R.S. § 13-1206. A.R.S. § 13-703(H)(1)(d) provides a broad definition for aggravated assault which encompasses all aggravated assaults "resulting in serious physical injury or committed by the use, threatened use or exhibition of a deadly weapon or dangerous instrument." Neither section is specifically listed, but both sections fully satisfy the statutory definition. A.R.S. § 13-1206 is simply aggravated assault for prisoners. As a class 2 felony, it is a more serious offense than A.R.S. § 13-1204, a class 3 felony. A conviction under it satisfies A.R.S. § 13-703(F)(2).[FN8]

> FN8. The sentencing judge noted in his Special Verdict that even if he based his finding of the (F)(2) aggravating factor solely on Martinez' 1993 conviction, he would have found that "the mitigating circumstances in this case, individually and cumulatively, are just not sufficiently substantial to outweigh the (F)(2) [1993 conviction] and (F)(10) aggravating circumstances." Special Verdict at 23.

> Martinez' argument regarding the theoretical possibility of committing reckless assault is based upon the erroneous assumption that the old (F)(2) concepts, *see State v. McKinney,* 185 Ariz. 567, 581, 917 P.2d 1214, 1228 (1996) (finding that the (F)(2) aggravating factor does not apply to offenses which can be committed recklessly), carry over to the new (F)(2). But in 1993, the legislature abandoned the (F)(2) language "use or threat of violence" and replaced it with "serious offense." In so doing, the legislature provided a list of "serious offenses" described at A.R.S. § 13-703(H)(1)(a) through (k). This list contains several crimes that can be committed recklessly. Manslaughter is included in the A.R.S. § 13-703(H)(1) list. By definition, a person can commit manslaughter by "[r]ecklessly causing the death of another person." A.R.S. § 13-1103(A)(1). A person can also commit aggravated assault recklessly. A.R.S. §§ 13-1203(A)(1) & 13-1204.

*Martinez,* 196 Ariz. at 461-62, 999 P.2d at 805-06.

Petitioner argues that the (F)(2) factor was too vague to give him notice that it would apply to his conduct in committing murder and that retroactive application of the Arizona Supreme Court's enlargement of A.R.S. § 13-703(H)(4) violated his right to due process under *Bouie v. Columbia,* 378 U.S. 347 (1964). The Court disagrees.

In *Bouie,* the Court held that "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the Constitution forbids." *Id.* at 353-54. In determining that Petitioner's convictions under A.R.S. § 13-1206 qualified as aggravated assaults under A.R.S. § 13-703(H)(4), the Arizona Supreme Court simply applied the plain language of the statute, which does not tie "aggravated assault" to any specific provision of the criminal code. The court's reading of

§ 13-703(H)(4) to include aggravated assault by a prisoner "was not unforeseeable, nor an enlargement of the usual and ordinary meaning of the statute." *Poland v. Stewart*, 117 F.3d 1094, 1100 (9th Cir. 1997). Therefore, there was no due process violation, and the Arizona Supreme Court's decision was neither contrary to nor an unreasonable application of established Supreme Court precedent. Claim 10 is denied.

**Claim 11**

Petitioner alleges IAC at sentencing for counsel's failure to investigate and present evidence to rebut the "serious offense" aggravating factor. (Dkt. 30 at 86-91.) The Court agrees with Respondents that Petitioner failed to present this claim in state court. (Dkt. 50 at 66.) If Petitioner were to return to state court now and attempt to litigate this claim, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, Claim 11 is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1. Claim 11 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice.

Petitioner argues as cause that Respondents failed to disclose the police reports underlying his 1993 Gila County conviction for aggravated assault, which was one of three prior felony convictions used to established the (F)(2) aggravating factor. (Dkt. 57 at 74-77.) These reports, he argues, would have mitigated the weight of the aggravating factor by showing that although a witness said Petitioner had a gun in his hand, there was no allegation that he discharged or pointed it at anyone. (*Id.* at 77.) The Court finds this insufficient to establish cause for Petitioner's failure to pursue Claim 11 in his state PCR proceedings.

At the time of Petitioner's PCR proceeding, he was aware that the 1993 Gila County conviction was one of three convictions found by the trial judge to satisfy the (F)(2) aggravating factor. In addition, as federal habeas counsel now avow, he should have been aware that the police reports relating to this conviction were not in trial counsel's files. (*Id.* at 75.) Petitioner points to no external obstacle preventing his PCR counsel from obtaining

1   these reports, just as habeas counsel has done in these proceedings. The failure of the

2   prosecution to disclose the reports does not negate that the factual basis of the claim existed

3   at the time of the PCR proceeding – i.e., a review of the record and trial counsel's file would

4   have revealed that although a prior conviction was used to aggravate his sentence, it did not

5   appear that sentencing counsel had investigated the facts underlying the conviction.

6   Consequently, Petitioner should have pursued this claim in state PCR proceedings, and his

7   failure to do so cannot be attributed to the State's alleged failure to disclose the police reports

8   underlying the conviction.

9       Even if Petitioner was not at fault for failing to investigate and pursue Claim 11 in

10  state court, the alleged *Brady* violation fails to establish cause. The police reports underlying

11  Petitioner's 1993 aggravated assault conviction fall far short of being favorable to the

12  defense. They consist of two witnesses statements, each of which note that Petitioner had

13  a gun. For example, witness Saul Salas states:

14      We stopped at the stoplight by Checkers Auto. It was me, my girfriend Martha
        Rentria, and Willie Garcia. That's when Ernie Martinez started yelling out my
15      name. He was in back of us with some other guys. Ernie sat on the door
        calling my name. They pulled up besides us and Ernie said me [sic], "I heard
16      you were talking shit." When he was saying that he had a gun in his hand.

17  (Dkt. 62-4 at 59.) Petitioner pled guilty to aggravated assault, which under Arizona law

18  included "[i]ntentionally placing another person in reasonable apprehension of imminent

19  physical injury" and using "a deadly weapon or dangerous instrument" in doing so.

20  A.R.S. §§ 13-1203(A)(2), 13-1204(A)(2). That Petitioner did not point the gun at the victims

21  or discharge it, as he now asserts, hardly mitigates the fact that he was convicted of

22  aggravated assault and says nothing of the two 1996 prior offenses for dangerous or deadly

23  assault by a prisoner that were also found by the Court to satisfy the (F)(2) aggravating

24  factor. The 1993 witness statements were not material, and the prosecution's failure to

25  disclose them to defense counsel does not serve as cause of the default of Claim 11.

26      Petitioner has not established cause and prejudice and does not argue that a

27  fundamental miscarriage will occur if Claim 11 is not addressed on the merits. Accordingly,

28  Claim 11 is procedurally barred, and Petitioner's request for evidentiary development on the

1    merits of Claim 11 is denied.

2            **Claims 12 and 13**

3            In Claim 12, Petitioner asserts the trial court erred in concluding that he did not

4    establish the A.R.S. § 13-703(G)(1) mitigating circumstance and in failing to consider other

5    non-statutory mitigation, including genetics, cultural failures, and institutional failures. (Dkt.

6    30 at 92-105.) Petitioner also argues that sentencing counsel was constitutionally ineffective

7    for failing to rebut the testimony of the state's mental health expert through presentation of

8    his own mental health evidence and that there was prosecutorial misconduct at sentencing

9    because the prosecution allowed gross IAC to occur, thereby preventing Petitioner from

10   receiving a fair sentencing hearing.  (*Id.*)  In Claim 13, Petitioner contends that the

11   sentencing court failed to give sufficient weight to his proffered mitigation.  (Dkt. 30 at 105-

12   06.)

13           **Procedural Default**

14           Except for the allegation regarding the (G)(1) mitigating factor, Claim 12 was not

15   fairly presented in state court.  If Petitioner were to return to state court now and attempt to

16   litigate the unexhausted aspects of Claim 12, they would be found waived and untimely

17   under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because they

18   do not fall within an exception to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).

19   Therefore, these allegations are "technically" exhausted but procedurally defaulted because

20   Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  The

21   non-statutory mitigation, sentencing IAC, and prosecutorial misconduct aspects of Claim 12

22   will not be considered on the merits absent a showing of cause and prejudice or a

23   fundamental miscarriage of justice.

24           As cause, Petitioner argues that direct appeal counsel should have raised these issues.

25   (Dkt. 57 at 79.)  However, he did not exhaust in his state PCR proceedings any appellate IAC

26   claims based on the failure to raise these claims on appeal.  Accordingly, appellate IAC

27   cannot constitute cause.  *Edwards v. Carpenter*, 529 U.S. at 451-53.  Because Petitioner has

28   failed to establish cause, there is no need to address prejudice.  Petitioner does not argue that

a fundamental miscarriage will occur if the defaulted aspects of Claim 12 are not addressed on the merits. Accordingly, the non-statutory mitigation, sentencing IAC, and prosecutorial misconduct aspects of Claim 12 are procedurally barred.

**Merits**

Petitioner exhausted on direct appeal the argument that the trial court's rejection of the A.R.S. § 13-703(G)(1) mitigating circumstance violated his federal constitutional rights. (Appellant's Opening Br. at 82-95.) He also exhausted Claim 13 – that the state court failed to give sufficient weight to his age, his personality disorder, and his traumatic family history as mitigating factors. (*Id.* at 96-100.) Although properly exhausted, the Court concludes Petitioner's allegations are meritless.

In capital sentencing proceedings, the sentencer must not be precluded, whether by statute, case law, or any other legal barrier, and may not refuse to consider any constitutionally relevant mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. The Constitution and the clearly established law require that the sentencing court hear and consider all constitutionally relevant mitigating evidence; however, it is the sentencer that determines the *weight* to accord such evidence. *See Eddings*, 455 U.S. at 114-15 (emphasis added); *see also Harris v. Alabama*, 513 U.S. 504, 512 (1995) (stating that the Constitution does not require that a specific weight be given to any particular mitigating factor). "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994).

At sentencing, Petitioner sought to establish that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703(G)(1). Both Petitioner and Respondents presented testimony from mental health experts who opined about his mental condition. (RT 7/22/98; RT 7/31/98.) Both experts

1  evaluated Petitioner and concluded that his intelligence was in the superior range.  (RT
2  7/22/98 at 12; RT 7/31/98 at 12.)  Due to Petitioner's traumatic upbringing, which included
3  chronic violence inside the home by his father battering his mother, Petitioner's mental
4  health expert opined that he suffers from post-traumatic stress disorder and other personality
5  disorders.  (RT 7/22/98 at 16, 30.)  The state's mental health expert opined that Petitioner
6  does not suffer from a mental disease or defect but suffers from an antisocial personality
7  disorder.  (RT 7/31/98 at 16.)  The sentencing court concluded that Petitioner did not
8  establish that his capacity to appreciate the wrongfulness of his conduct or to conform his
9  conduct to the requirements of law was significantly impaired at the time of the crime.  (ROA
10 204.)  Further, the sentencing court rejected a finding of post-traumatic stress disorder,
11 finding instead that Petitioner suffers from a predominant anti-social personality disorder
12 with borderline and narcissistic features.  (*Id.* at 12.)

13      In addition to the (G)(1) statutory factor, Petitioner proffered evidence to support
14 other mitigating factors. (ROA 207, 213; RT 7/9/98.)  He urged the court to take into account
15 the fact that he was only 19 years old at the time of the crime, a statutory mitigating factor
16 under A.R.S. § 13-703(G)(3).  (ROA 207; RT 7/31/98 at 76.)  The sentencing judge agreed
17 that (G)(5) had been established, but gave it little weight based on Petitioner's level of
18 intelligence and significant past experience with the criminal justice system. (ROA 204 at
19 15-16.)  The trial court also found that Petitioner's personality disorder and his difficult
20 family history qualified as mitigating factors, but again declined to give them substantial
21 weight because Petitioner had failed to establish a sufficient causal link between this
22 mitigation and his criminal conduct. (*Id.* at 16-23.)

23      On direct appeal, the Arizona Supreme Court thoroughly considered the mitigating
24 evidence presented at sentencing.  *See Martinez*, 196 Ariz. at 462-65, 999 P.2d at 806-09.
25 Petitioner does not deny that the state courts considered his proffered mitigation but argues
26 that they unreasonably applied federal law by requiring that he establish a causal connection
27 between his evidence and the crime before giving it substantial weight.  (Dkt. 57 at 83.)
28 Petitioner is in error.  In conducting its independent review of a death sentence, the Arizona

Supreme Court has confirmed that its consideration of mitigating information does not require the establishment of a nexus between the mitigating factor and the crime. *See State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) ("We do not require a nexus between the mitigating factors and the crime to be established before we consider the mitigation evidence."). However, as occurred here, the failure to link the mitigating factor and the crime may be considered in assessing the quality and strength of the mitigation evidence. *Id.*; *see also Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) (the sentencing court is "free to assess how much weight to assign to such evidence"). The state court did not unreasonably apply federal law.

Finally, Petitioner argues that the state court unreasonably found the facts in rejecting his mental health expert in favor of the state's expert. (Dkt. 57 at 80-81.) However, as previously discussed, in compliance with *Lockett* and *Eddings*, the state courts thoroughly considered Petitioner's mental health mitigation evidence; it was up to the state court to determine the weight to which this evidence was entitled. *See Harris*, 513 U.S. at 512. Petitioner is not entitled to relief.[9]

### **Claim 16**

Petitioner alleges that counsel was ineffective at trial and sentencing for failing to properly investigate and prepare for the testimony of Eric Moreno and Patricia Baker. (Dkt. 30 at 133-38.) At trial, Moreno testified that Petitioner, following his arrest and questioning by police, called him at his home in Indio, California, and said he had "blasted" a police officer. (RT 9/15/97 at 13.) Baker, Moreno's mother, testified that Petitioner called to talk to Moreno on the day of Petitioner's arrest. (*Id.* at 75-83.)

Respondents argue that Claim 16 is procedurally defaulted. (Dkt 50 at 79-80.) Petitioner disagrees, contending that the claim was fairly presented to the Arizona Supreme

---

[9]         In his motion for evidentiary development, Petitioner seeks leave to expand the record, conduct discovery, and present testimony at an evidentiary hearing to establish that the trial court was incorrect in finding Dr. Bayless's testimony to be credible and to establish ineffective assistance of sentencing counsel. (Dkt. 62 at 46-49.) Neither is relevant to the legal issues presented in Claims 12 and 13. Accordingly, the requests are denied.

Court as a part of their independent sentencing review. However, this is not the type of claim exhausted by the supreme court's independent sentencing review. *See Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir. 2005) (discussing the scope of claims exhausted by the supreme court's independent sentencing review). Petitioner failed to present Claim 16 in state court. If Petitioner were to return to state court now and attempt to litigate this claim, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, Claim 16 is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1. Claim 16 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice.

As cause, Petitioner contends summarily that evidence "favorable to the defense and discoverable under *Brady* likely was withheld." (Dkt. 57 at 90; *see also* Dkt. 62 at 51.) As discussed with respect to Claim 11, any alleged prosecutorial disclosure violation fails to explain why Petitioner did not pursue this IAC claim in the PCR proceedings. Moreover, Petitioner's allegations of *Brady* misconduct fail to identify the allegedly suppressed material, let alone explain how such suppression impeded his development of an ineffectiveness claim based on counsel's cross-examination of Moreno and Baker. Speculation that the phone call was a fabrication is insufficient to establish cause. Absent cause, there is no need to discuss prejudice.

Petitioner also asserts that a fundamental miscarriage of justice will occur if Claim 11 is not considered on the merits. (Dkt. 57 at 87.) In support, Petitioner points to impeachment evidence of Moreno and Baker that was available but not used at trial. A report from Baker's second police interview states that Baker said she had had no contact with Petitioner following his arrest. (Dkt. 62-5, Ex. 19 at 7.) Baker also indicated that she had suffered a coma from a car accident and had trouble remembering dates and times. (Dkt. 57 at 90; Dkt. 62 at 53.) Specifically, she thought she saw Petitioner in Indio in the days preceding his arrest, when other prosecution witnesses placed Petitioner in Arizona at that time. (*Id.*) In

addition, Moreno acknowledged to police that he had used drugs, alcohol, and hallucinogens during the time leading up to Petitioner's arrest in Indio and had talked with Johnny Acuna about Petitioner's arrest prior to the phone conversation that he had with Petitioner. (*Id.*) The Court finds that Petitioner's proffered proof of innocence is well short of that needed to establish that no reasonable juror would have convicted him.

Read in context, Baker's statement to police that she had not had contact with Petitioner following his arrest clearly meant *after* the first night of his arrest. (Dkt. 62-5 at 1-8.)  As is evident from the police report, the entire interview was based on Baker's recollection of the phone call Petitioner made to her home on the night he was arrested. Furthermore, Moreno's younger brother, Mario Hernandez, corroborated the testimony of Moreno and Baker by testifying that he answered the phone when Petitioner called.  (RT 9/15/97 at 66.)  The evidence at trial further corroborated their testimony because it was undisputed that Petitioner had been living with the Baker household off and on for a number of months leading up to his trip to Arizona.  (*Id.* at 68-78.)  The additional impeachment would not have aided Petitioner and certainly is not demonstrative of actual innocence. Therefore, Claim 16 is procedurally barred, and Petitioner's request for evidentiary development on the merits of Claim 16 is denied.

**Claim 17**

Petitioner asserts that trial counsel was ineffective for failing to obtain an independent pathologist, effectively impeach the testimony of the prosecution's pathologist, and move for relief after the prosecution presented undisclosed expert testimony at trial. (Dkt. 30 at 138.) Respondents contend that Claim 17 is procedurally defaulted because Petitioner failed to present it during state PCR proceedings.  (Dkt. 50 at 82.)  Petitioner concedes that he failed to raise these allegations in state court. (Dkt. 57 at 89.)  If Petitioner were to return to state court now and attempt to litigate Claim 17, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, Claim 17 is "technically" exhausted but procedurally defaulted because Petitioner no longer

1   has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1. Claim 17 will not be

2   considered on the merits absent a showing of cause and prejudice or a fundamental

3   miscarriage of justice.

4       As cause, Petitioner contends that the prosecution suppressed information in violation

5   of *Brady*. (*Id.* at 94.) Specifically, he asserts that defense counsel was not told before trial

6   that the medical examiner's opinion about the shot sequence had changed. (Dkt. 57 at 92.)

7   Prior to trial, Dr. Phillip Keen opined that the shot to the victim's back was likely the last

8   shot fired. (Dkt. 62-4, Ex. 14 at 28.) At trial, Dr. Keen testified that the fatal shot to the

9   victim's head was the last shot fired. (RT 9/23/97 at 56, 59.) Petitioner speculates that the

10  prosecution was aware of the change in the medical examiner's testimony and suppressed

11  that information from the defense. (*Id.*) Had the defense been aware of the change, they

12  could have obtained an independent pathologist to provide their own expert opinion. (*Id.*)

13      Petitioner's speculation that Respondents withheld *Brady* information regarding Claim

14  17 is insufficient and does not establish cause. (Dkt. 57 at 92-94.) Moreover, the alleged

15  *Brady* violation does not explain why Claim 17 was not developed and presented in

16  Petitioner's state PCR proceeding. The factual basis for the claim was evident from a review

17  of the record and trial counsel's pretrial interview with Dr. Keen. Absent cause, there is no

18  need to discuss prejudice.

19      Petitioner contends that a fundamental miscarriage of justice will occur if Claim 17

20  is not addressed on the merits. In support, he has submitted an affidavit from a pathologist,

21  Dr. Eric Peters. (Dkt. 62-4, Ex. 14.) Dr. Peters disagrees with the trial testimony of Dr.

22  Keen regarding the sequence of shots. (*Id.*) In his view, the neck and head shots occurred

23  at the same time, and the back shot occurred last. (*Id.*) This, Petitioner contends, undermines

24  the State's theory that the head shot was fired after Officer Martin was already prone on the

25  ground. (Dkt. 57 at 94-95.) Petitioner's proffer falls short of establishing "new reliable

26  evidence" to support his claim of actual innocence. *Schlup v. Delo*, 513 U.S. at 324. The

27  best that Dr. Peters' affidavit does is to make it a closer factual question whether the head or

28  the back shot was last. Given all of the evidence admitted at trial and the new evidence

considered during these habeas proceedings, Petitioner has not established that a fundamental miscarriage of justice will occur if Claim 17 is not considered on the merits. Thus, Claim 17 is procedurally barred, and Petitioner's request for evidentiary development on the merits of Claim 17 is denied.

**Claim 21**

Claim 21 is comprised of numerous sub-claims. (Dkt. 30 at 169-91.) In his Traverse, Petitioner states that he has withdrawn sub-claims A, B-3, B-4, C, D, F, and G. (Dkt. 57 at 1.) The remaining allegations are:

B-1    The trial judge made improper comments to the jury;

B-2    The trial judge failed to reassign his bailiff; and

E       The sentencing judge improperly considered victim statements.

Petitioner raised these claims in his PCR petition, however, the court ruled they were waived pursuant to Ariz. R. Crim. P. 32.2(a)(3) because Petitioner could have raised them on direct appeal. (ME 8/24/04 at 4, 8.) This preclusion ruling rests on an independent and adequate state procedural bar. *See Smith*, 536 U.S. at 860 (holding that Arizona's Rule 32.2(a) is independent of federal law); *Ortiz*, 149 F.3d at 931-32 (holding that Arizona's Rule 32.2(a)(3) is an adequate procedural bar). Consequently, federal habeas review of Claim 21 is barred unless Petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the default.

As cause, Petitioner contends that appellate counsel rendered ineffective assistance by failing to raise these issues on direct appeal. (Dkt. 57 at 97, 102.) Although Petitioner properly exhausted in his PCR petition appellate IAC claims based on the failure to raise sub-claims B-1 and B-2 on direct appeal, he did not exhaust an appellate IAC claim based on the failure to raise sub-claim E on appeal. Accordingly, appellate IAC cannot constitute cause for the failure to properly exhaust sub-claim E. *Edwards v. Carpenter*, 529 U.S. at 451-53. Because Petitioner has failed to establish cause, there is no need to address prejudice. Petitioner does not argue that a fundamental miscarriage will occur if sub-claim E is not addressed on the merits. Accordingly, sub-claim E of Claim 21 is procedurally barred.

Petitioner properly exhausted IAC allegations based on appellate counsel's failure to raise sub-claims B-1 and B-2 on appeal, which the PCR court denied on the merits.  (ME 8/24/04 at 4-5.)  The Court therefore considers whether appellate counsel's failure to raise sub-claims B-1 and B-2 was constitutionally ineffective and thus serves as cause to excuse Petitioner's procedural default.

**Sub-claim B-1**

Petitioner asserts that during voir dire, the judge told the jury it had heard only one side of the evidence in the media, implying that the jury should wait to hear Petitioner's side of the story.  (Dkt. 57 at 97-98.)  Petitioner claims that such comments to the jury impermissibly bolstered the truthfulness of the prosecution's case and the media account of the case and violated his Fifth Amendment right to remain silent.  (*Id.*)  The court also contrasted this case with the O.J. Simpson trial, stating that in this case there would be no lawyer misconduct, no lying or disrespect, and no hiding of the evidence.  (*Id.*)  Petitioner asserts that such comments violated his right to an impartial judge.  (*Id.*)

The trial record shows that Petitioner's co-counsel at trial, Todd Coolidge, recommended that the O.J. Simpson case be addressed in jury questionnaires.  (RT 9/2/97 at 79-81.)  The prosecutor objected to the proposed questions about the Simpson case.  (*Id.*) The trial judge inquired of defense counsel, as follows:

THE COURT:  Mr. Coolidge, speak to 37 and 38 and 39.  Why do you want to even raise the ugly specter of the O.J. Simpson case?

MR. COOLIDGE:  Well, starting with question 37, I think more – I mean, increasingly more and more we are seeing in the news just crimes about, I mean, stories about crime, and I think it is very important especially with a questionnaire rather than to go through individual jurors, we can hear what their idea is right now of crime in society and whether they think it is too prevalent.  Whether they think that, oh, it is not a problem.  I think that is very important.  The questions that then follow regarding the O.J. Simpson case is that's the most recent and probably the most publicized criminal trial gives – there has been so much follow-up from that we are given the idea from that what people – what their views are of attorneys, judges, the criminal system itself, and crime in general.

. . . .

MR. COOLIDGE:  My feeling is this:  This questionnaire is just to give us an idea of who these people are without spending a lot of time talking to

them individually, and I think most of these questions are appropriate.

THE COURT:  So you are anticipating an answer, yeah, the O.J. case really stunk.  I am so upset with this whole process that I will find everybody guilty just to get even, or some sort of weird, bizarre answer like that.  Is that what you are saying?

MR. COOLIDGE:  I am not ever going to believe a criminal defense attorney's words that they state in a courtroom.  I think statements such as this.

THE COURT:  All right.  I will leave in 37, 38, 39 and 40.

(*Id.* at 80-81.)

During voir dire, the trial judge, based on responses to the jury questionnaires, addressed the issue of pretrial publicity and the O.J. Simpson trial, as follows:

Many of you folks indicated in your questionnaires that you had formed an opinion about this case based upon the pretrial publicity. Let me talk to you a little bit about that. It is very important that you set aside and ignore what you may have seen on TV or heard on radios or saw in the newspaper print. You have actually only heard one side of the story. I have no idea what it is that you may have heard. And what you heard was presented in a highly sensationalized fashion. And, as we know, media people are just like any other human being and they make mistakes and they say things that may not be accurate. So what we are asking you to do is to completely set aside and ignore anything that you may have heard by way of pretrial publicity. This case must be decided only, solely upon the cold, hard facts in evidence that is produced here in the courtroom. That's the only thing that you can consider as a juror is what is presented here in the courtroom.

. . . .

Now, also some of you indicated that since the defendant has been charged with crimes, he is likely to be guilty, and some folks may be of that thought. People who are not schooled in the law may think that, but I wanted to give you some legal instructions about that. Let me remind you that charges are not evidence against the defendant. It is just part of a process, and simply because someone is charged does not have anything to do with your function as jurors in determining whether or not the State can prove Mr. Martinez guilty beyond a reasonable doubt. The defendant has several important constitutional rights that I am going to review with you right now. The law requires that the State must prove the defendant guilty beyond a reasonable doubt. The defendant is presumed by the law to be innocent. That means that as you glance over to Mr. Martinez during this jury selection process, the lawyers and the judge sometimes refer to a cloak of innocence, instead of having his shirt there, he is cloaked or clothed with the presumption of innocence, and that stays in place unless and until the State convinces you beyond a reasonable doubt that he is guilty. So at this point all of you must be of that frame of mind that he is presumed to be innocent. The charges, the fact that he is charged, as I told you, is not evidence and is not used against him. This presumption of innocence means that the defendant is not required to prove his innocence. He is not required to produce any evidence. He is not required to testify. If, in fact, [Petitioner] chooses to testify, that decision is something

- 54 -

Case 2:05-cv-01561-ROS   Document 88   Filed 03/21/08   Page 55 of 60


that he and his lawyers will review. And if that decision is made, that cannot be used against him in any fashion. I will repeat that. If the defendant chooses not to testify, that cannot be used in your decision in any fashion.

. . . .

Also, from your questionnaires, some of you folks raised concerns about the criminal justice system because of the O.J. Simpson criminal trial. No matter what your thoughts are about that trial in Los Angeles, California, let me assure you that the criminal justice system is alive and well here in Phoenix, Arizona. There will be no media circus in this case. No reporters stumbling over each other trying to get a story. Our Arizona media people are more professional and responsible. There will be no lawyer misconduct in this case. No backstabbing. No grandstanding. No hiding evidence. No lying or disrespect to the Court. All four of our lawyers are ethical and professional. In fact, I have known Emmet Ronan and Bob Shutts, the lead lawyers for each side, I have known both these gentlemen for more than 20 years, and these gentlemen are good examples of what criminal lawyers are supposed to be like. Also, with all due modesty, let me tell you that Arizona courts are nationally recognized for their excellence. We lead the nation in jury reform. We encourage jurors to take notes, and we allow jurors to ask questions. So in summary, I expect this trial to be exactly what it is supposed to be: A fair and impartial search for the truth, and I fully expect that justice will prevail in this case.

(RT 9/4/97 at 18-23.)

To establish cause, Petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, Petitioner would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. at 285-86. Not presenting weaker issues on appeal is one of the hallmarks of effective appellate advocacy. *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

In *Griffin v. California*, 380 U.S. 611(1965), the Court reviewed jury instructions that allowed the jury to draw a negative inference upon a defendant's decision not to testify about matters within his knowledge that he could be reasonably expected to deny or explain. The Court held that the trial court's instructions regarding a defendant's decision not to testify violated his Fifth Amendment right against self-incrimination. *Id.* at 613. In this matter, the trial judge's comments to the jury do not similarly tread upon Petitioner's Fifth Amendment rights. Rather, the trial judge instructed the jury not to prejudge the defendant. (RT 9/4/97 at 18.) The judge specifically indicated that the defendant was not required to testify and that

if he chose not to testify, such a decision could not be used against him in any fashion. (RT 9/4/97 at 20-21.) Appellate counsel's failure to include this meritless issue on appeal was not constitutionally ineffective.

Regarding alleged judicial partiality, as already discussed, a defendant is entitled to a fair trial, free from judicial bias, and there is a presumption that judges are unbiased, honest, and have integrity. *See Schweiker v. McClure*, 456 U.S. at 195; *Withrow v. Larkin*, 421 U.S. at 47. The trial judge's response to the widespread pretrial publicity did not demonstrate actual bias. The trial judge specifically instructed the jury that it was to regard Petitioner as being clothed with a presumption of innocence and that such a presumption could not be overcome unless the state proved its case beyond a reasonable doubt. (RT 9/4/97 at 20.) Further, the court admonished the jurors to disregard media coverage and to consider only the evidence admitted at trial. (*Id.* at 18.) The court's comment about Arizona media being more responsible had nothing to do with the accuracy of reporting, which the court had already instructed the jurors to disregard, but referred to their professional behavior in not stumbling over one another in an effort to cover a story during the trial. (*Id.* at 22-23.) The reference to hiding evidence and lying was in the context of the trial judge assuring that there would not be lawyer misconduct and was not a comment on the truthfulness of the State's evidence. (*Id.*) The trial court's comment that justice would prevail followed the comment that the court expected the trial to be what it ought to be – a fair and impartial search for the truth. (*Id.* at 23.) Appellate counsel was not ineffective for failing to raise this meritless claim on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

**Sub-claim B-2**

Petitioner also argues that appellate counsel was ineffective for failing to assert error on appeal based on the trial judge's refusal to remove his bailiff from the case. As discussed with respect to Claim 2, there is nothing in the record to indicate that the bailiff violated Judge Hotham's admonitions to not interact with the victim's family, relay his law enforcement background to the jurors, or have any emotional reaction during trial. Nor is there any evidence that the bailiff was unable to carry out his official responsibilities.

1    Appellate counsel was not ineffective for failing to raise this meritless issue on appeal.

2        **Conclusion**

3        Petitioner has failed to establish cause and prejudice for the default of sub-claims B-1

4    and B-2, and he does not assert that a fundamental miscarriage of justice will occur if the

5    claims are not heard on the merits.  Therefore, sub-claims B-1 and B-2 are procedurally

6    barred, and Petitioner's request for evidentiary development on the merits of Claim 21 is

7    denied.

8        **Claim 22**

9        Petitioner argues that the Eighth Amendment prohibits execution of a person who,

10   based on "mental age," lacks sufficient moral culpability.  (Dkt. 30 at 191.)  Petitioner

11   acknowledges that he did not exhaust this claim in state court and asserts that appellate

12   counsel's constitutional ineffectiveness serves as cause for the default.  (Dkt. 57 at 101.)

13   However, he did not exhaust in his state PCR proceedings any appellate IAC claims based

14   on the failure to raise Claim 22 on direct appeal.  Accordingly, appellate IAC cannot

15   constitute cause.  *Edwards v. Carpenter*, 529 U.S. at 451-53.  Because Petitioner has failed

16   to establish cause, there is no need to address prejudice.  Petitioner does not assert that a

17   fundamental miscarriage of justice will occur if Claim 22 is not addressed on the merits.

18   Accordingly, Claim 22 is procedurally barred.

19       **Claim 23**

20       Petitioner argues that Arizona's death penalty discriminates against poor, male

21   defendants.  (Dkt. 30 at 194.)  Petitioner acknowledges that Claim 23 was not exhausted in

22   state court and asserts that he has raised the claim solely to preserve the issues raised therein

23   should the Supreme Court's jurisprudence on the constitutionality of Arizona's death penalty

24   statute change in the future.  (Dkt. 57 at 101.)  Claim 23 is procedurally barred.

25       **Claim 24**

26       Petitioner alleges that he was entitled to a jury determination on the aggravating

27   factors that rendered him eligible for a death sentence.  (Dkt. 30 at 211.)  In *Ring v. Arizona*,

28   536 U.S. 584 (2002), the Supreme Court ruled that Arizona's aggravating factors are an

element of the offense of capital murder and must be found by a jury.  However, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Supreme Court held that *Ring* does not apply retroactively to cases already final on direct review.  Because Petitioner's direct review was final prior to *Ring*, he is not entitled to relief premised on that ruling.

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue.  Therefore, in the event that Petitioner appeals, this Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of the following issues:

1.    Whether the Court erred in determining that part of Claim 1, alleging trial and appellate counsel ineffectiveness for failing to challenge Judge Hotham for cause, lacked merit;

2.    Whether the Court erred in determining that Petitioner failed to establish cause to overcome the default of the judicial bias allegation in Claim 1;

3.    Whether the Court erred in determining that Claim 7, alleging an unconstitutional premeditation instruction, lacked merit; and

4.    Whether the Court erred in determining that Petitioner failed to establish cause

to overcome the default of the *Brady* allegation in Claim 9.

Therefore, the Court issues a COA as to these issues.  For the remaining claims, the Court declines to issue a COA for the reasons set forth in the instant Order.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Motion for Discovery, to Expand the Record and for Evidentiary Hearing (Dkt. 62) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's supplemental motion for evidentiary development (Dkt. 74), Petitioner's motion to produce trial exhibit 21 (Dkt. 80), and Petitioner's motion for leave to file additional evidence in support of his motion for evidentiary development (Dkt. 85) are **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 30) is **DENIED WITH PREJUDICE**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on May 25, 2005, is **VACATED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

1.    Whether the Court erred in determining that part of Claim 1, alleging trial and appellate counsel ineffectiveness for failing to challenge Judge Hotham for cause, lacked merit;

2.    Whether the Court erred in determining that Petitioner failed to establish cause to overcome the default of the judicial bias allegation in Claim 1;

3.    Whether the Court erred in determining that Claim 7, alleging an unconstitutional premeditation instruction, lacked merit; and

4.    Whether the Court erred in determining that Petitioner failed to establish cause to overcome the default of the *Brady* allegation in Claim 9.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

1    AZ 85007-3329.

2

3         DATED this 20th day of March, 2008.

4

5

6         _____
          Earl H. Carroll
7         United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28