WO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Ernesto Salgado Martinez,

Petitioner,

v.

Charles L. Ryan, et al.,

Respondents.

No. CV-05-01561-PHX-ROS

DEATH PENALTY CASE

**ORDER**

This matter is before the Court on limited remand from the Court of Appeals for the Ninth Circuit for reconsideration of five procedurally defaulted claims—Claims 4, 11, 12, 16, and 17 of Petitioner's amended habeas petition—in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ("*Martinez*"). (Doc. 104.) The Ninth Circuit also granted Petitioner's motion for leave to file a renewed request for indication whether the District Court would consider a Rule 60(b) motion for reconsideration of Claim 4 and for consideration of a possible claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), in light of newly discovered evidence. (*Id.*) Petitioner has now filed one brief comprising both his renewed request and his supplemental *Martinez* brief, and seeking evidentiary development and an evidentiary hearing with respect to both issues. (Doc. 115.) Respondents filed a response, and Petitioner filed a reply. (Docs. 121, 126.) For reasons set forth below, the Court declines Petitioner's invitation to entertain a motion under Rule 60(b), and finds that Petitioner has failed to overcome the procedural default of Claims 4, 11, 12, 16, and 17, and is not entitled to evidentiary development or hearing.

# I.    BACKGROUND

In 1997, a jury convicted Petitioner of theft, weapons-related charges, and first-degree murder for the killing of Robert Martin, a Department of Public Safety Officer who had stopped Petitioner on the Beeline Highway between Mesa and Payson, Arizona. The trial court sentenced Petitioner to death for the murder conviction and to terms of imprisonment on the other counts. The following facts concerning the crime are derived from the Arizona Supreme Court's opinion affirming Petitioner's convictions and sentences.

Martinez drove from California to Globe, Arizona in a stolen blue Monte Carlo to visit friends and family. After learning that his parents had moved to Payson, Arizona, Martinez met his friend Oscar Fryer. Fryer asked Martinez where he had been. Martinez told Fryer that he had been in California. Fryer then asked Martinez if he was still on probation. Martinez responded that he was on probation for eight years and had a warrant out for his arrest. Martinez then pulled a .38 caliber handgun with black tape on the handle from under his shirt and showed it to Fryer. Fryer asked Martinez why he had the gun, to which Martinez responded, "[f]or protection and if shit happens." Tr. Sept. 9, 1997 at 83. Fryer then asked Martinez what he would do if he was stopped by the police. Martinez told Fryer, "he wasn't going back to jail." *Id.* at 85.

Sometime after his conversation with Fryer, Martinez left Globe and drove to Payson. On August 15, 1995, at approximately 11:30 a.m., Martinez was seen at a Circle K in Payson. He bought ten dollars worth of gas and proceeded south down the Beeline Highway toward Phoenix. Martinez was driving extremely fast and passed several motorists, including a car driven by Steve and Susan Ball. Officer Martin was patrolling the Beeline Highway that morning and pulled Martinez over at Milepost 195. Steve and Susan Ball saw Officer Martin's patrol car stopped behind Martinez' Monte Carlo and commented, "Oh, good, he got the speeding ticket." Tr. Sept. 10, 1997 at 32. As they passed by, Susan Ball noticed Officer Martin standing at the driver's side door of the Monte Carlo while Martinez looked in the backseat.

Shortly after Steve and Susan Ball passed, Martinez shot Officer Martin four times with the .38 caliber handgun. One shot entered the back of Officer Martin's right hand and left through his palm. Another shot passed through Officer Martin's neck near his collar bone. A third shot entered Officer Martin's back, proceeded through his kidney, through the

right lobe of his liver, through his diaphragm, and lodged in his back. A fourth shot entered his right cheek, passed through his skull, and was recovered inside Officer Martin's head. The hand and neck wounds were not fatal. The back and head wounds were.

After murdering Officer Martin, Martinez took Officer Martin's .9mm Sig Sauer service weapon and continued down the Beeline Highway at speeds over 100 mph. Martinez again passed Steve and Susan Ball, which they found strange. They began discussing how not enough time had passed for Martinez to have received a speeding ticket because it had only been a couple of minutes since they had seen him pulled over. They stayed behind Martinez for some time and watched him go through a red light at the Fort McDowell turnoff. Steve Ball commented, "Yeah, he just ran that red light. Something is up here. Something is going on." Tr. Sept. 10, 1997 at 69. Steve and Susan Ball continued down the Beeline Highway and lost sight of Martinez until they reached Gilbert Road. At the red light on Gilbert Road, they caught up to him and took down his license plate.

Martinez passed through Phoenix and arrived in Blythe, California at around 4:00 p.m. where he called his aunt for money. At 6:00 p.m., Martinez called his aunt again because she failed to wire the money he requested. Growing impatient, at approximately 8:00 p.m., Martinez entered a Mini–Mart in Blythe and, at gunpoint, stole all of the $10 and $20 bills from the register. Martinez killed the clerk with a single shot during the robbery.[FN1] A .9mm shell casing was recovered at the Mini–Mart the following day. Ballistics reports determined that this shell casing was consistent with the ammunition used in Officer Martin's .9mm Sig Sauer.

> FN1: The trial court excluded evidence of the murder under Rule 403, Ariz. R. Evid.

Later that night, Martinez drove to his cousin's house in Coachella, California, near Indio. Around 12:00 p.m. the next day, August 16, 1995, Martinez took David Martinez, his cousin, and Anna Martinez, David's wife, to a restaurant in Indio. After leaving the restaurant, Martinez noticed that a police car was following him. David asked Martinez if the car was stolen to which Martinez responded, "I think so." Tr. Sept. 15, 1997 at 146–47. Martinez turned onto a dirt road and instructed David and Anna to get out of the car. They left the car and went to a nearby trailer compound to call Anna's aunt to come and get them.

Tommy Acuna,[FN2] who lived in his grandmother's house at the compound, was swimming when David and Anna appeared at the fence

surrounding the compound. David and Anna asked Tommy if they could use his phone but Tommy refused. Tommy did permit Anna to use the bathroom. Anna went into the bathroom and came out a couple of minutes later. After showing David and Anna out, Tommy went back to the bathroom "to see if they left anything in there because she wasn't in there that long." Tr. Sept. 16, 1997 at 48. He found a towel on the floor with the .38 caliber handgun wrapped inside. Tommy took the gun, hid it in his pants, and walked outside. He testified that he hid the gun because it was his grandmother's house. By the time Tommy walked outside, the police had surrounded the compound. An officer monitoring the perimeter called out to Tommy and told him that he was going to search him. Tommy walked over to the officer and exclaimed, "I have got the murder weapon." Tr. Sept. 15, 1997 at 192. The officer searched Tommy and found the .38 caliber handgun. This gun was later identified as the weapon that fired the bullets which killed Officer Martin.

 FN2: Tommy's brother Johnny Acuna was a friend of Martinez.

 After David and Anna got out of the Monte Carlo, Martinez turned around on the dirt road. Another police car appeared on the scene and headed towards Martinez. Martinez saw this second police car, left the Monte Carlo, ran toward the trailer compound, and jumped the fence. He then ran into Johnny Acuna's trailer.

 The SWAT team evacuated the area and tried to communicate with Martinez. After those attempts failed, the SWAT team negotiator threatened to use tear gas. Martinez responded, "I am not coming out; you will have to come in and shoot me." Tr. Sept. 17, 1999 at 23. After further negotiations, however, Martinez agreed to come out and was taken into custody.

 While in custody, Martinez called his friend, Eric Moreno, and laughingly told Moreno that "he got busted for blasting a jura." [FN3] Tr. Sept. 15, 1997 at 13. Martinez also told Moreno that a woman on the highway might have seen what had happened. They talked about the guns and Martinez told Moreno that one of the guns had been "stashed." *Id.* at 21. After obtaining a warrant, the police searched Johnny Acuna's trailer and found Officer Martin's .9mm Sig Sauer under a mattress.

 FN3: "Jura" is slang for police officer. Tr. Sept. 15, 1997 at 13.

*State v. Martinez*, 196 Ariz. 451, 453–55, 999 P.2d 795, 797–99, *cert. denied,* 531 U.S.

934 (2000) ("*State v. Martinez*").

In 2002, Petitioner initiated state post-conviction relief ("PCR") proceedings pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. The trial court denied PCR relief, and the Arizona Supreme Court denied a petition for review.

Petitioner filed a petition for writ of habeas corpus with this Court on May 25, 2005, and an amended petition on May 23, 2006. Petitioner asserted the following claims in the amended petition which are relevant to this motion and supplemental brief:

Claim 4:      the trial court violated Petitioner's right of confrontation by allowing testimonial hearsay of reports of a stolen vehicle and license plates to prove the charged offense of vehicle theft, and as evidence supporting a finding that Officer Martin's murder was premeditated.

Claim 11:     trial counsel was ineffective for failing to ameliorate Petitioner's 1993 prior conviction for aggravated assault.

Claim 12:     (in part) trial counsel was ineffective for failing to rebut the State expert's diagnosis of anti-social personality disorder and substantiate the defense expert's diagnosis of post-traumatic stress disorder.

Claim 16:     trial counsel was ineffective for failing to adequately investigate and confront witnesses Eric Moreno and Patricia Baker.

Claim 17:     trial counsel was ineffective for failing to secure an independent pathologist, properly impeach the state's pathologist, and move for corrective action after presentation of undisclosed testimony.

(Doc. 30 at 34–40, 86–92, 101–05, 133–43.)

This Court denied the amended petition, finding Claims 4, 11, 12, 16, and 17 procedurally defaulted because Petitioner failed to present them in state court and no remedies remained available to exhaust the claims, denied further evidentiary development of these claims, and granted a certificate of appealability ("COA") on three other claims. (Doc. 88 at 27, 44–48, 50, 52, 58–59.) Subsequently, the Court denied

1    Petitioner's motion to alter or amend the judgment and to expand the COA. (Doc. 91.)

2    Petitioner filed a notice of appeal, and, while the appeal was pending, filed a

3    request for an indication whether the District Court would consider a Rule 60(b) motion.

4    (Docs. 92, 95.) The Court summarily denied the motion. (Doc. 101.)

5    While the appeal was pending, the Supreme Court decided *Martinez v. Ryan*,

6    holding that where ineffective assistance of counsel ("IAC") claims must be raised in an

7    initial PCR proceeding, failure of counsel in that proceeding to raise a substantial trial

8    IAC claim may provide cause to excuse the procedural default of that claim. 132 S. Ct. at

9    1320. Petitioner moved the Ninth Circuit to stay his appeal and remand the case in light

10   of *Martinez*. Petitioner also moved to stay the proceedings and remand based on newly-

11   discovered evidence supporting a *Brady–Napue* claim.[1] The Ninth Circuit granted

12   Petitioner's motions and remanded for reconsideration of procedurally defaulted Claims

13   4, 11, 12, 16, and 17 in light of *Martinez*, and for leave to file a renewed request for

14   indication whether the district court would consider a Rule 60(b) motion for

15   reconsideration of Claim 4 and for consideration of a possible *Brady–Napue* claim in

16   light of newly discovered evidence. (Doc. 121.)

17                              **II.    DISCUSSION**

18   Petitioner moves this Court to indicate that it will consider a motion for relief from

19   judgment under Rule 60(b)(6) on the basis that "such action is appropriate to accomplish

20   justice." (Doc. 115 at 2) (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S.

21   847, 864 (1988)). Petitioner also seeks reconsideration based on *Martinez* for three trial-

22   level IAC claims. (Doc. 115 at 8-9.) Petitioner seeks evidentiary development and an

23   evidentiary hearing with respect to both the renewed Rule 60(b) request and the *Martinez*

24   claims. (*Id.* at 45–48, 79.)

25   _____

26   [1] The Ninth Circuit construed Petitioner's motion for remand pursuant to *Townsend v. Sain*, 372 U.S. 293 (1963), and *Quezada v. Scribner*, 611 F.3d 1165 (9th Cir. 2010), as a

27   motion for leave to file in the district court a renewed request for indication whether the District Court would consider a Rule 60(b) motion for reconsideration of Claim 4 and for

28   consideration of a possible *Brady – Napue* claim in light of newly discovered evidence. (Doc. 121.)

**A.    Renewed Request for Indication Whether This Court Would Consider a Rule 60(b) Motion**

Petitioner seeks an indication that the Court will consider a motion for relief from judgment under Rule 60(b)(6) based on the suppression of material exculpatory evidence at trial by the Maricopa County Attorney, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Arizona Attorney General's subsequent failure, in this federal habeas proceeding, to inspect the Maricopa County Attorney's files for *Brady* material. Additionally, Petitioner seeks authorization to conduct further evidentiary development in support of a related claim that the Maricopa County Attorney knowingly elicited false or misleading testimony from Detective Douglas Beatty, or failed to correct such testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

According to Petitioner, a Rule 60(b) motion is the appropriate vehicle for vindicating the rights he alleges were violated under *Brady* and *Napue* because the new evidence demonstrates that the earlier federal habeas proceedings lacked integrity.

Respondents contend that the Court should deny Petitioner's renewed request because Petitioner's Rule 60(b) motion is really a second or successive petition, which is barred under 28 U.S.C. § 2244(b)(1). Respondents also assert that Petitioner cannot show extraordinary circumstances warranting reopening of the habeas proceeding because no *Brady* or *Napue* violation occurred.

For the reasons discussed, the Court finds that Petitioner's motion does not establish a defect in the integrity of these proceedings, but rather, seeks to raise new substantive claims. Accordingly, this Court lacks jurisdiction to consider the claims absent authorization from the Court of Appeals pursuant to 28 U.S.C. § 2244(b)(3).

**1.    Applicable Law**

**a.    Rule 60(b)**

Federal Rule of Civil Procedure 60(b) "allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances." *Jones v. Ryan*, 733 F.3d 825, 833 (9th Cir. 2013) (quoting *Gonzalez v. Crosby*, 545 U.S. 524,

528 (2005)). Generally, the filing of a notice of appeal divests the district court of jurisdiction to consider a motion for relief from judgment. *See Gould v. Mut. Life Ins. Co. of New York*, 790 F.2d 769, 772 (9th Cir. 1986). In such a case, it is appropriate for a petitioner to ask the district court whether it wishes to entertain a Rule 60(b) motion, and, if the request is granted, to then move in the appellate court for remand of the case. *See Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004).

A claim for relief under Rule 60(b)(6), the "catch-all" provision of the rule on which Petitioner relies, must be brought "within a reasonable time," Fed.R.Civ.P. 60(c)(1), and requires a showing of "extraordinary circumstances" that justify reopening a judgment. *See Gonzalez*, 545 U.S. at 535–36 (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)). "Such circumstances 'rarely occur in the habeas context.'" *Jones*, 733 F.3d at 833 (quoting *Gonzalez*, 545 U.S. at 535).

For habeas petitioners, a Rule 60(b) motion may not be used to "make an end-run around the requirements of AEDPA or to otherwise circumvent that statute's restrictions on second or successive habeas corpus petitions" set forth in 28 U.S.C. § 2244(b). *Jones*, 733 F.3d at 833 (quoting *Calderon v. Thompson*, 523 U.S. 538 (1998)) (internal quotation marks omitted). This statute has three relevant provisions: First, § 2244(b)(1) requires dismissal of any claim that has already been adjudicated in a previous habeas petition. Second, § 2244(b)(2) requires dismissal of any claim not previously adjudicated unless the claim relies on either a new and retroactive rule of constitutional law or on new facts demonstrating actual innocence of the underlying offense. Third, § 2244(b)(3) requires prior authorization from the court of appeals before a district court may entertain a second or successive petition under § 2244(b)(2). Absent such authorization, a district court lacks jurisdiction to consider the merits of a second or successive petition. *United States v. Washington*, 653 F.3d 1057, 1065 (9th Cir. 2011); *Cooper v. Calderon*, 274 F.3d 1270, 1274 (9th Cir. 2001).

There is no "bright-line rule for distinguishing between a bona fide Rule 60(b) motion and a disguised second or successive [§ 2254] motion." *Jones*, 733 F.3d at 834

(quoting *Washington*, 653 F.3d at 1060). In *Gonzalez*, the Court held that a Rule 60(b) motion constitutes a second or successive habeas petition when it advances a new ground for relief or "attacks the federal court's previous resolution of a claim *on the merits*." 545 U.S. at 532. "On the merits" refers "to a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§ 2254(a) and (d)." *Id.* at 532 n. 4. A legitimate Rule 60(b) motion "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.* at 532; *accord United States v. Buenrostro*, 638 F.3d 720, 722 (9th Cir. 2011) (observing that a defect in the integrity of a habeas proceeding requires a showing that something happened during that proceeding "that rendered its outcome suspect"). For example, a Rule 60(b) motion does *not* constitute a second or successive petition when the petitioner "merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar"—or contends that the habeas proceeding was flawed due to fraud on the court. *Id.* at 532 nn. 4–5; *see, e.g.*, *Butz v. Mendoza–Powers*, 474 F.3d 1193 (9th Cir. 2007) (holding that "where the district court dismisses a petition for failure to pay the filing fee or to comply with the court's orders, the district court does not thereby reach the "merits" of the claims presented in the petition and a Rule 60(b) motion challenging the dismissal is not treated as a second or successive petition"). The Court reasoned that if "neither the motion itself nor the federal judgment from which it seeks relief substantively addresses federal grounds for setting aside the movant's state conviction," there is no basis for treating it like a habeas application. *Gonzalez*, 545 U.S. at 533.

On the other hand, if a Rule 60(b) motion "presents a 'claim,' i.e., 'an asserted federal basis for relief from a . . . judgment of conviction,' then it is, in substance, a new request for relief on the merits and should be treated as a disguised" habeas application. *Washington*, 653 F.3d at 1063 (quoting *Gonzalez*, 545 U.S. at 530). Interpreting *Gonzalez*, the court in *Washington* identified numerous examples of such "claims,"

1   including:

2        a motion asserting that owing to excusable neglect, the movant's habeas
3        petition had omitted a claim of constitutional error; a motion to present
         newly discovered evidence in support of a claim previously denied; a
4        contention that a subsequent change in substantive law is a reason
         justifying relief from the previous denial of a claim; a motion that seeks to
5        add a new ground for relief; a motion that attacks the federal court's
6        previous resolution of a claim on the merits; a motion that otherwise
         challenges the federal court's determination that there exist or do not exist
7        grounds entitling a petitioner to habeas corpus relief; and finally, an attack
8        based on the movant's own conduct, or his habeas counsel's omissions.

9   *Id.* (internal quotations and citations omitted). If a Rule 60(b) motion includes such

10  claims, it is not a challenge "to the integrity of the proceedings, but in effect asks for a

11  second chance to have the merits determined favorably." *Gonzalez*, 545 U.S. at 532 n. 5.

12              **b.    Brady *and* Napue**

13       Due process requires a prosecutor to disclose material exculpatory evidence to the

14  defendant before trial. *Brady*, 373 U.S. at 87. This duty extends to evidence "that could

15  be used to impeach one of the prosecution's witnesses or undermine the prosecution's

16  case," *Milke v. Ryan*, 711 F.3d 998, 1003 (9th Cir. 2013), and arises regardless of

17  whether the defendant makes a request for the evidence. *United States v. Bagley*, 473

18  U.S. 667, 682 (1985) (plurality opinion); *see also Kyles v. Whitley*, 514 U.S. 419, 433

19  (1995) ("[R]egardless of request, favorable evidence is material."). Moreover, a

20  prosecutor has an affirmative duty to learn of and disclose exculpatory or impeachment

21  evidence known to other government agents, including any agents involved in the

22  investigation. *See Kyles*, 514 U.S. at 437.

23       Evidence is "material" if there is a reasonable probability that disclosure of the

24  evidence would have changed the outcome of the proceeding. *Bagley*, 473 U.S. at 682. A

25  "reasonable probability" is "a probability sufficient to undermine confidence in the

26  outcome." *Id.* at 678. When assessing materiality, the court must take into account the

27  cumulative effect of the suppressed evidence in light of other evidence, not merely the

28  probative value of the suppressed evidence standing alone. *See Kyles*, 514 U.S. at 436

1   (explaining that materiality under *Bagley* is evaluated in distinct, cumulative analysis in

2   which "suppressed evidence [is] considered collectively").

3       Thus, to establish a *Brady* violation, a defendant must prove: 1) the evidence at

4   issue is favorable to the accused, either because it is exculpatory or because it is

5   impeaching, 2) the evidence was suppressed either willfully or inadvertently, and 3)

6   prejudice resulted, meaning there is a reasonable probability that disclosing the evidence

7   to the defense would have changed the result. *Andrews v. Davis*, 798 F.3d 759, 793 (9th

8   Cir. 2015) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Bagle*y, 473 U.S.

9   at 682).

10      A *Napue* violation occurs when prosecutors "knowingly use false evidence,

11  including false testimony" or "allow[ ] it to go uncorrected when it appears." *Napue*, 360

12  U.S. at 269. To prevail on a *Napue* claim, a petitioner must show that (1) the testimony or

13  evidence was actually false, (2) the prosecution knew or should have known that the

14  testimony was actually false, and (3) the false testimony was material. *United States v.

15  Zuno–Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269–71).

16      **2.      Relevant facts**

17      Petitioner asserts that the Maricopa County Attorney has suppressed material

18  exculpatory evidence, in violation of *Brady*. The Court considers the new evidence

19  Petitioner proffers in support of his Rule 60(b) motion and *Brady* and *Napue* claims for

20  purposes of making this determination. *See e.g.*, *Poyson v. Ryan*, 743 F.3d 1185, 1203

21  (9th Cir. 2013), *overruled on other grounds by McKinney v. Ryan*, ––– F.3d ––––, 2015

22  WL 9466506, (9th Cir. 2015) (en banc); *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir.

23  2014) (en banc). The new evidence consists of, primarily, a photograph of an intact

24  ignition in the 1975 Chevrolet Monte Carlo ("Monte Carlo") driven by Petitioner before

25  his arrest, and disclosed to Petitioner in 2012 as part of court-ordered discovery in his

26  prosecution in California for the murder of a convenience store clerk in Blythe,

27  California. (Doc. 115, Ex. 1.) Petitioner submits this photograph cannot be reconciled

28  with Detective Beatty's testimony during his trial, and, had it been disclosed at trial,

would have undermined proof of premeditation, an element of first-degree murder (the "Beatty *Brady* claim").

Petitioner also asserts that Respondents suppressed a report by California Department of Justice Senior Criminalist Ricci Cooksey, identifying other matters of evidentiary significance with respect to the Monte Carlo, but failing to note a missing ignition, which, Petitioner contends, implies that the ignition was intact. (Doc. 115, Ex. 2.) The report also indicates that Cooksey attempted telephonic contact with Detective Beatty and the prosecutor prior to trial, which Petitioner contends demonstrates a possible *Napue* violation because it implies that Cooksey informed Detective Beatty and the prosecutor that the ignition was intact when he inspected the vehicle.

To place Petitioner's argument and new evidence into context, the Court will summarize the evidence offered during the guilt phase of Petitioner's trial relevant to the determination that the Monte Carlo driven by Petitioner was stolen and that Officer Martin's murder was premeditated, and the new evidence proffered in this habeas proceeding.

### a.   *Guilt Phase Evidence*

#### i.   **Officers Rochelle Carlton and Owen Krings**

Rochelle Carlton, a community service officer for the Indio Police Department, testified that she took a call on July 29, 1995, from Herman Hines, who reported his California license plate, number 1 CUK 259, stolen. (Doc 121, App. C at 87–91.) Officer Owen Krings, with the Cathedral City Police Department, testified that he took a stolen car report on July 29, 1995, from Sonia Tison. (Doc. 121, App. D at 149–50.) Tison described the car as a 1975, white over blue Chevy Monte Carlo, and provided the vehicle identification number for the vehicle. (*Id.* at 151.) It was later determined that the VIN number matched the number of the Monte Carlo being driven by Petitioner. (Doc. 115, App. 12 at 100–101.)

In Claim 4 of his amended habeas petition, Petitioner argued that the trial court denied his federal constitutional right of confrontation by allowing the prosecution to

introduce testimonial hearsay through the officers' testimony to prove the vehicle driven by Petitioner at the time of the crime, and the license plate on the vehicle, were stolen. (Doc. 30 at 34–40.) Because the claim was procedurally defaulted, the Court considered Petitioner's argument that a fundamental miscarriage of justice would occur if the claim was not heard on the merits because "the exclusion of the purported theft of the Monte Carlo greatly weakens the prosecution's case for motive and premeditation." (Doc 50 at 31.) Based on habeas counsels' discovery that the ignition switch was in two pieces under the passenger seat, and the parts were not listed in the vehicle inventory, Petitioner's counsel sought additional discovery to establish that the ignition was intact at the time the vehicle was impounded. The Court considered the evidence and concluded that Petitioner had failed to establish that no reasonable juror would have found him guilty of premeditated first-degree murder, declined to review the claim on the merits, and denied further evidentiary development.

### ii. Oscar Fryer

Oscar Fryer testified he saw Petitioner in Globe, Arizona, in the days before Officer Martin's murder. (Doc. 115, App. 8 at 75.) Fryer testified Petitioner was driving a blue Monte Carlo with a white top, and that Petitioner showed him a .38-caliber handgun with black tape around the handle, which he had for protection and if "shit happens." (*Id.* at 78-86.) Fryer further testified that Petitioner told him he was on probation and indicated that he had a warrant for his arrest, that he was on the run, and that he was not going back to jail if stopped by the police. (*Id.*)

Defense counsel impeached Fryer at trial with two prior felony convictions. (*Id.* at 88.) Defense counsel also elicited from Fryer that prior to trial he had violated his probation, that he was on the run, and that he would not agree to cooperate or turn himself into authorities until he had negotiated and had in his possession a written plea agreement dealing with charges of assault on a police officer, domestic violence, resisting arrest, and escape. (*Id.* at 88-93.) Defense counsel introduced Fryer's plea agreement into evidence, which provided that if Fryer cooperated and testified for the prosecution, his

three felony charges would be reduced to one misdemeanor assault charge and he would be sentenced to probation. (*Id.*)

In Claim 9 of his amended federal habeas petition, Petitioner argued that the prosecution violated *Brady* by failing to disclose that Fryer would receive other benefits in exchange for his testimony, that he was using drugs at the time of trial but the prosecution did not move to revoke his probation, and that the prosecution did not charge Fryer with making a false report to law enforcement when he lied to a police officer about a suspect's location (the "Fryer *Brady* claim"). Because the claim had been procedurally defaulted, the Court considered whether the prosecution's withholding of material exculpatory evidence established cause for the default. The Court considered the evidence proffered by Petitioner in his motion for evidentiary development in support of the alleged *Brady* violation and denied the Fryer *Brady* claim, concluding the withheld impeachment information was not material, and that "Fryer's testimony was not the linchpin evidence of premeditation portrayed by Petitioner." (Doc. 88 at 37–38.)

### iii.    Elizabeth Martin

Elizabeth Martin testified that she knew Petitioner and had seen him in Globe, Arizona, driving a white and blue Monte Carlo with California license plates, two or three days before Officer Martin was shot on the Beeline Highway. (Doc. 115, App. 8, at 44–47.) After Elizabeth Martin informed Petitioner that his parents were living in Payson, Arizona, Petitioner indicated he would go to Payson to visit them. (*Id.* at 50.) On the day Officer Martin was shot, Elizabeth spoke by phone with Petitioner's mother, who indicated that her son was returning to Indio, California. (*Id.* at 54.) After hearing about the shooting, Elizabeth provided the police department with information about Petitioner, the car he was driving, and where she thought he would be going. (*Id.* at 52–54.)

### iv.    Detective Beatty

Detective Beatty, with the Maricopa County Sheriff's Office, was the case agent assigned to Officer Martin's homicide. (Doc. 115, App. 1 at 4, 8–9.) In the course of his investigation, Detective Beatty received information that a California license plate, 1

CUK 259, on a blue and white Monte Carlo had been reported lost or stolen. (Doc. 115, App. 1 at 23.) Detective Beatty testified that when he was a uniform patrol officer investigating car thefts, thieves would commonly change the plate on a stolen car to make it more difficult to determine that it was stolen. (*Id.* at 5–6.) Detective Beatty also received information that Petitioner had been in Globe driving a blue and white Monte Carlo with California license plates. (*Id.*) Detective Beatty determined that an arrest warrant for Petitioner for a felony violation had been issued on April 13, 1995, from the Superior Court in Globe, Arizona. (*Id.* at 24, 33.)

Detective Beatty was present at the execution of the search warrant on the Monte Carlo on August 17, 1995. (Doc. 115, App. 1 at 23, 65.) Detective Beatty identified Exhibit 198 as a photo of the Monte Carlo taken where it was abandoned just before Martinez' arrest. (*Id.* at 48–49; Doc. 115 Ex. 14.) The photograph shows an intact trunk lock.

After the state rested, the trial court granted the state's motion to reopen to allow the prosecution to question Detective Beatty regarding the condition of the ignition on the Monte Carlo. Detective Beatty gave the following testimony which Petitioner now argues cannot be reconciled with the recently discovered evidence that the ignition was intact:

> Q. Now, with regard to the Monte Carlo with the license plates 1 CUK 259, at some point in this investigation did you try to determine if there were any keys found in that Monte Carlo?
>
> A. Yes, sir. After we left the search warrant, the trailer -- after I went to the Riverside County District Attorney's Office I went to the location where the search warrant was still being served on the Monte Carlo, and there were some keys found in the Monte Carlo during the search warrant.
>
> Q. Where were keys found, if you know?
>
> A. The keys were found in the glove compartment, I believe.
>
> Q. At a later time did you try to determine if those keys accessed the ignition on that car?
>
> A. Yes, sir, I did.
>
> Q. And what did you determine?
>
> A. Well, I took the keys out of evidence out of our property room and I

went to the Monte Carlo, and actually there was really no need because the ignition switch to the Monte Carlo was missing. It is a hollow cavity in there, and then you can stick some sort of instrument in there, and then turn what would have been the ignition without a key.

Q. Okay. Would a screwdriver be able to turn that?

A. Yes, sir.

(Pet. App. 1 at 64–65.)

### v.   Anna Martinez

Anna Martinez testified that she was riding in Petitioner's car, the blue Monte Carlo, on August 16, 1995, with her husband, her son, and Petitioner. (Doc. 121, App. C at 140–41.) Anna saw a police car driving behind them, and her husband asked if the car was stolen. (*Id.* at 142–45.) Petitioner smiled and said, "I think so" and told Anna to "[g]et out of the car." (*Id.* at 148.)

### vi.   Officer Robert Whitney

City of Blythe Police Officer Robert Whitney interviewed Petitioner after his arrest. (Doc. 115, App. 12 at 104, Doc. 121, App. B at 119–20.) When asked if the car was stolen, Petitioner indicated to Officer Whitney that "he found it parked in the barrio in Indio and took it there to Arizona and back." (Doc. 121, App. B at 120.)

### b.   *New Evidence*

Petitioner's counsel in these habeas proceedings, the Federal Public Defender ("FPD"), received permission to inspect the Monte Carlo at the Maricopa County Sheriff's impound lot in Phoenix in June 2007. (*See* Doc. 74, Ex. 29.) FPD investigator John Castro inspected the Monte Carlo and discovered a chrome bezel and ignition cylinder on the vehicle's passenger front floor, but was not allowed to test keys that had been seized from Petitioner when he was arrested and from the Monte Carlo when it was impounded. (*Id.*) Petitioner argued in his supplemental motion for evidentiary development that the two ignition parts were not listed on three separate inventories of the Monte Carlo's contents, supporting an inference that the ignition was still intact at the time of Petitioner's arrest, but was later punched out by law enforcement. (*See* Doc. 74,

at 7.) Petitioner sought discovery of documents concerning the Monte Carlo's chain of custody, the depositions of Detectives Beatty and Colbert, and production of three sets of keys seized as well as permission to test the keys in the ignition cylinder. (*Id.* at 9–10.) Petitioner also sought to expand the record to include the three inventories, photographs of the ignition bezel and cylinder, and the declarations of two witnesses who drove or rode in the Monte Carlo in Globe, Arizona, before the shooting of Officer Martin. (*Id.* at 10.) The witnesses recalled that the keys were in the ignition, the ignition was intact, and no screwdriver or ice pick was needed to start the car. (*Id.* at 10–11.)

The Court considered the new evidence proffered by Petitioner in his motion for evidentiary development in the context of a claim of actual innocence sufficient to overcome the procedural default of Claim 4 of the amended petition—a claim that the trial court denied Petitioner's federal constitutional right to confrontation by allowing the prosecution to introduce testimonial hearsay to prove that the vehicle and the license plate were stolen. (Doc. 88 at 25–26.) The Court determined that Petitioner had not made the requisite showing of actual innocence, finding that "whether the ignition was intact at the time Petitioner was arrested does not negate the fact that the owner had reported it stolen." (*Id.* at 26–27.) The Court denied evidentiary development and habeas relief on this claim. (*Id.* at 27, 59.)

In Petitioner's first motion requesting an indication that the Court would consider a Rule 60(b) motion, Petitioner asserted that he had uncovered new evidence supporting his motion for evidentiary development, the denial of which affected the integrity of the federal habeas corpus proceeding by depriving the Court of all evidence necessary to determine the merits of Claim 4 and a potential related *Brady* claim. (Doc. 95.) According to Petitioner, the new evidence, and that for which evidentiary development was sought with respect to Claims 4, 9, and 17, undercuts "motive" and calls into question the finding of "premeditation," an element of first-degree murder the prosecution was required to prove beyond a reasonable doubt. (*Id.*) The Court denied the motion. (Doc. 101.)

In July 27, 2010, Petitioner was ordered extradited to Riverside County, California, to stand trial on charges arising from the shooting death of a convenience store clerk in Blythe. Petitioner asserts that, as a result of discovery ordered by the Superior Court of Riverside County, two critical pieces of *Brady* evidence have now been unearthed: the investigative notes of criminalist Cooksey (Doc. 115, Ex. 2) and the photograph of the intact ignition (Doc. 115, Ex. 1).

Petitioner asserts that this recent disclosure of Cooksey's notes included 13 pages (*see* Ex. 2, Bates numbers 1854, 1857–68) that were not disclosed to Petitioner until so ordered by the Riverside County Superior Court. Petitioner asserts that these notes are quite detailed with respect to the contents and condition of the Monte Carlo, but fail to note anything unusual with respect to the ignition switch. Petitioner also submits the declaration of Randall Hecht, Petitioner's court appointed California investigator. (Doc. 115, Ex. 29.) Hecht declares Cooksey told him that although he did not recall the investigation, he would normally record information about the condition of the vehicle's ignition switch, but needed to review his notes before he could answer any questions about his investigation. (*Id.* at ¶¶ 5, 6.) Hecht asserts that, after reviewing his notes, Cooksey stated that he would have noted it in his report if the vehicle ignition switch had been removed from the steering column and had been lying on the floor of the vehicle, and also stated conclusively that the vehicle's ignition switch had not been removed and was not missing from the steering column at the time he processed the vehicle. (*Id.* at ¶¶ 10, 11.) Cooksey later signed a declaration disavowing that he made those statements to Hecht. (Doc. 115, Ex. 20.)

Petitioner asserts that other critical facts are evident from Cooksey's disclosure. First, Cooksey's notes include the names and phone numbers of "Doug Beatty" of the "Maricopa County Sheriff" and "Bob Shutz (sic) D.A."—the prosecutor at Petitioner's trial—and that Cooksey attempted to call Shutts and left a message more than six months prior to the start of the jury selection in Petitioner's Maricopa County trial. (Doc. 115, Ex. 2 at 1867) Cooksey's notes also contain a hand-drawn diagram of the driver front

door of the Monte Carlo, showing "exceptional detail" and including matters thought to be of evidentiary value, including the mirror, keyhole, handle, trim, and paint scrapings with notations that there may be paint transfer on the door. (*Id.* at 1863.)

Petitioner also cites the newly disclosed report of Riverside County District Attorney Investigator Thomas Gleeson, who transferred the Monte Carlo to officers of the Maricopa County Sheriff's Office. The report, dated October 24, 1995, indicates that the trunk lock was "missing" and had been "punched out." (Doc. 115, Ex. 13 at 1776, 1778.) A photo of the trunk lid taken at the time of Petitioner's arrest shows the trunk lock intact. (Doc. 115, Ex. 14.)

Petitioner's trial counsel have executed sworn declarations that, to the best of their recollections, the photograph of the intact ignition was not produced at trial. (Doc. 115, Ex. 17 ¶ 10; Ex. 18, ¶ 10.) Petitioner's PCR counsel has also executed a declaration stating that he has no memory of seeing the photo in prior counsel's files. (Doc. 115, Ex. 10, ¶ 8.) An FPD records custodian has also executed a declaration that the trial files of prior counsel do not contain the photograph. (Doc. 115, Ex. 19, ¶ 4.)

In September, 2012, Deputy District Attorney Haringsma traveled to Phoenix and took photocopies of all of the pictures and documents that were used at trial. (Doc. 115, Ex. 30 at 386.) Petitioner moved for disclosure of the photographs taken of the Monte Carlo by technician Tom Fisher, "at the time it was taken into custody," which included photos of the "steering column." (*Id.* at 399–400.) Petitioner received more than 900 photographs as part of the disclosure, including the photograph of the intact ignition. (Doc. 115, Ex. 1, Ex. 31 at 404.) On October 17, 2012, Petitioner's investigator emailed a copy of the photo to habeas counsel. (Doc. 115, Ex. 1.)

### 3.    Analysis

Petitioner argues that both the *Brady* and *Napue* violations require that the writ issue in this habeas proceeding, and that he is entitled to seek evidentiary development in support of the claims. (*See* Doc. 115 at 37-45.) Applying the analysis in *Gonzalez*, the Court concludes that Petitioner's Beatty *Brady* and possible *Napue* claims are properly

1   characterized as second or successive claims because Petitioner is asserting new bases for
2   relief from the underlying convictions. *See Gonzalez*, 545 U.S. at 532 (motion seeking to
3   add a new ground for relief qualifies in substance as a successive habeas petition); *In re*
4   *Pickard*, 681 F.3d 1201, 1205 (10th Cir. 2012) (claims that prosecution violated its
5   *Brady/Giglio* duties at trial are certainly second-or-successive claims because they assert
6   a basis for relief from the underlying convictions). Absent a certification by the Ninth
7   Circuit Court of Appeals, this Court cannot consider these claims for relief from the
8   underlying conviction. *See* 28 U.S.C. § 2244(a). Petitioner recognizes this limitation to
9   consideration of his claims, but asserts that he is not foreclosed from seeking relief
10  pursuant to Rule 60(b) because he is attacking the integrity of the earlier proceedings.

11          Petitioner raises three challenges to the integrity of the earlier proceedings: (1) the
12  suppression of the Beatty *Brady* material by the Maricopa County Attorney and the
13  Arizona Attorney General thwarted Petitioner's ability to file a petition including all
14  known claims; (2) without the suppressed material, the Court could not properly assess
15  the Fryer *Brady* claim in the aggregate; and (3) had Petitioner been aware of a possible
16  *Napue* violation, he would have moved to amend his federal petition. (Doc. 115 at 25–
17  26.) In assessing whether Petitioner has established that the integrity of these proceedings
18  has been undermined by the alleged *Brady* and *Napue* violations, the Court has
19  considered the evidence proffered by Petitioner in his Rule 60(b) motion, (Doc. 115, Exs.
20  1–38). The Court concludes that Petitioner has failed to establish a defect in the integrity
21  of these proceedings "that rendered its outcome suspect." *See Buenrostro*, 638 F.3d at
22  722.

23          Assuming for purposes of this analysis that the evidence proffered by Petitioner
24  establishes conclusively that the Maricopa County Attorney suppressed evidence which
25  would have established that the ignition switch was intact at the time of Petitioner's
26  arrest, Petitioner cannot establish that this undermined the Court's ability to properly
27  assess the Fryer *Brady* claim. When this Court considered the allegation that the
28  prosecution withheld evidence that would have impeached Fryer's testimony, it found:

Fryer was thoroughly impeached at trial. His plea agreement was introduced, he was cross-examined about all of the favorable treatment he obtained as a result of the agreement, and was impeached with the factual basis of his prior felony convictions. The fact that he tested positive for drugs two weeks prior to his testimony would not likely have affected the jury's verdict. Similarly, the fact that Fryer continued to engage in criminal activity even after working out a plea to testify against Petitioner does not put his credibility in a whole new light given all of the other impeaching evidence brought out at trial.

Second, the additional impeachment evidence would have had little effect on Fryer's already impeached credibility because his testimony was corroborated by other evidence. Consistent with Fryer's testimony, Petitioner was driving a blue Monte Carlo with a white top, had a warrant out for his arrest, had violated his probation and was on the run from authorities, and had possession of a .38-caliber revolver with black tape around the handle of the gun. Moreover, his fingerprint was found on the tape, and it was this revolver that was later identified as the murder weapon (RT 9/22/97 at 114). *See [State v.] Martinez*, 196 Ariz. at 453–55, 999 P.2d at 797-99.

Finally, Fryer's testimony was not the linchpin evidence of premeditation portrayed by Petitioner. Fryer relayed a conversation with Petitioner that took place *prior* to the shooting. *Although damaging, it was less relevant than the fact that Petitioner was driving a stolen car when pulled over, that he had absconded from law enforcement and there was an outstanding warrant for his arrest, and that he shot Officer Martin not once, but four times.*

In addition, after his arrest Petitioner bragged about "blasting" a police officer. (RT 9/15/97 at 13.) This was more than enough evidence from which the jury could find that Petitioner acted with premeditation.

(Doc. 88 at 37-38) (*emphasis added*).

Thus, even assuming Petitioner could conclusively establish that the ignition switch was punched out after Petitioner's arrest or that the keys in Petitioner's possession would have started the car, this additional evidence, considered together with the Fryer *Brady* material[2], does not call into question the integrity of the habeas proceedings

---

[2] Including Petitioner's claim raised for the first time in the supplemental brief, that Fryer recanted his statement and admitted he was using methamphetamine both when questioned by police and when he testified at trial. (*See* Doc. 115, Ex. 22, ¶ 20)

because it does not change the pivotal fact relied on by the Court that Petitioner was driving a stolen car when pulled over. The new evidence also does not call into question any of the critical facts the Court relied on in reaching a conclusion that Fryer's testimony was not the "linchpin evidence of premeditation"—Petitioner was driving a stolen car, had absconded from law enforcement, had an outstanding warrant for his arrest, shot Officer Martin four times, and bragged about the murder. (*Id.* at 38.)

Petitioner's assertion that suppression of the Beatty *Brady* and *Napue* evidence prevented him from complying with the Court's order that he file a petition containing all of his claims, or from amending his petition to include those claims, is not a proper basis for attacking the integrity of the proceedings. "Rule 60(b) is properly applied when there is some problem going to the integrity of the court process on the claims that were previously asserted." *Jones*, 733 F.3d at 836. In *Jones*, the Ninth Circuit rejected the petitioner's attempts to circumvent the limitations on second or successive petitions by alleging that he did not have a "fair shot" at raising three IAC claims in his first habeas corpus proceedings because his habeas corpus counsel, who was also his state PCR counsel, operated under a *per se* conflict of interest. 733 F.3d at 835–36. The Court explained that "the rule announced in *Gonzalez*, that a valid Rule 60(b) motion 'attacks . . . some defect in the integrity of the federal habeas proceedings,' . . . must be understood in the context generally to mean the integrity of the prior proceeding with regard to the claims that were actually asserted in this proceeding." *Jones*, 733 F.3d at 836 (internal citation omitted). Rule 60(b) does not permit a petitioner to assert entirely new claims for relief by contending those claims "were required to ensure those proceedings' integrity." *Id.* Thus, because Petitioner is not challenging the integrity of the process on a claim previously asserted, he cannot utilize Rule 60(b) to bring these new claims before the Court. *See id.*

To the extent Petitioner asserts that a defect in the integrity of these proceedings is established by Respondents' failure to discover and disclose the alleged exculpatory material during these federal habeas proceedings, Respondents were under no duty to

disclose the alleged exculpatory material. *See Jones*, 733 F.3d at 837 ("[T]he *Brady* right of pretrial disclosure available to defendants at trial does not extend to habeas corpus petitioners seeking post-conviction relief.") (citing *Dist. Atttorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009)). Because there was no duty of disclosure in these proceedings, any failure by Respondents to comply with *Brady* did not undermine the integrity of the proceedings.

Petitioner points to the holdings in *Pickard*, 681 F.3d at 1206-06, and *Douglas v. Workman*, 560 F.3d 1156, 1192 (10th Cir. 2009), to support his claim that Respondents are not entitled to rely on the restrictions in filing a second or successive habeas petition because they have continued to suppress *Brady* material in these habeas proceedings. (*See* Doc. 126 at 7.) Petitioner's reliance on *Pickard* and *Douglas* is misplaced.

In *Pickard*, the Tenth Circuit held that claims of prosecutorial misconduct during trial, based on the prosecution's denial that agencies other than the DEA were involved in the investigation, were properly considered a second or successive claim, but petitioner's claim that the prosecution committed fraud in habeas proceedings by falsely denying other agencies were involved, was a proper Rule 60(b) claim. *In re Pickard*, 681 F.3d at 1204. Similarly, in *Douglas*, the Tenth Circuit permitted Douglas to supplement his habeas petition with an untimely *Brady* claim after it found the prosecutor took affirmative actions to conceal his tacit agreement with the state's key witness until it was too late to bring a *Brady* claim in his first habeas petition. 560 F.3d at 1190-91. The Ninth Circuit has explained that "[f]raud on the court must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Buenrostro*, 638 F.3d at 722 (quoting *Abatti v. Comm'r*, 859 F.2d 115, 118 (9th Cir. 1988)).

In this case Petitioner points to two arguments made by Respondents in opposing discovery related to Claim 4 that he asserts demonstrate a defect in the integrity of these habeas proceedings. Respondents objected to discovery of evidence "which may not even exist to refute '[t]he implication . . . that the car [Martinez was driving] was stolen and that [he] would have feared being arrested for the theft when stopped on the Beeline

Highway'" (Doc. 66 at 31), and asserted that "[t]here is no evidence that the State knew about the broken ignition switch lodged under the passenger seat" (Doc. 77 at 6).

First, Petitioner has not demonstrated that Respondents' assertions in opposing discovery are false, nor are the assertions evidence of "an unconscionable plan or scheme . . . designed to improperly influence the court in its decision." *See Buenrostro*, 638 at 722. Even if Petitioner could demonstrate the assertions were false and part of such a scheme, he cannot demonstrate a defect in the integrity of the proceedings because the assertions had no effect on the outcome of the proceedings. The Court found Claim 4 procedurally barred and denied further evidentiary development of Petitioner's theory that the ignition was intact at the time the vehicle was impounded. The Court considered the evidence proffered in support of Claims 9, 16, and 17, and assumed that Petitioner's new evidence would demonstrate that "the ignition was intact at the time Petitioner was arrested," but nonetheless concluded that Petitioner failed to establish that no reasonable juror would have found him guilty of premeditated first degree murder because "*whether the ignition was intact at the time Petitioner was arrested does not negate the fact that the owner had reported it stolen.*" (Doc. 88 at 26-27) (emphasis added).

The Court agrees with Respondents' contention that this finding demonstrates that the Court has in essence already concluded that Petitioner failed to show that any evidence regarding the alleged intact ignition undermines the integrity of these proceedings relevant to the claims raised in the petition. The Court has already determined that evidence of an intact ignition would not change its procedural or evidentiary rulings on Claim 4, and would not call into question the jury's finding of premeditation. The Court's decision was not based on the strength of Petitioner's evidence—in reaching its decision the Court assumed Petitioner's evidence was conclusive. Consequently, additional or stronger evidence in support of Petitioner's allegation that the ignition was intact does not change this Court's previous analysis. Because the Court's procedural and evidentiary rulings are not rendered "suspect" as a result of Respondents' allegations, regardless of the veracity of the assertions, Petitioner

1    cannot demonstrate a defect in the integrity of the habeas proceedings. *See Buenrostro*,

2    638 F.3d at 722.

3        In sum, Petitioner has not demonstrated any defect in the integrity of these habeas

4    proceedings, but instead seeks to raise new substantive claims that his rights under *Brady*

5    and *Napue* were violated. It is therefore a second or successive petition, and this Court

6    lacks jurisdiction to consider the *Brady* and *Napue* claims absent authorization from the

7    court of appeals pursuant to 28 U.S.C. § 2244(b)(3).

8        **4.    Motion for Evidentiary Development**

9        In his request for evidentiary development, Petitioner seeks discovery and an

10   evidentiary hearing in support of his Rule 60(b) motion and his request for relief based on

11   *Brady* and *Napue* violations. As determined above, however, Petitioner's motions for

12   Rule 60(b) relief and for consideration of a possible *Brady* or *Napue* claim are denied as a

13   second or successive petition filed without authorization. Therefore, the Court finds no

14   basis for evidentiary development or an evidentiary hearing and denies Petitioner's

15   request.

16   **B.    Supplemental *Martinez* Brief**

17       The Ninth Circuit remanded this case for the reconsideration of five claims that

18   this Court previously found procedurally defaulted because Petitioner failed to present

19   them in state court and no remedies remained available to exhaust the claims. Petitioner

20   now seeks reconsideration based on *Martinez* for three claims alleging counsel

21   ineffectiveness in the guilt phase for failing to retain an independent pathologist when the

22   State's expert pathologist changed his opinion as to the sequence of shots that struck

23   Officer Martin (Claim 17); and in the sentencing phase proceedings for failing to mitigate

24   a 1993 conviction admitted as a statutory aggravating factor at sentencing (Claim 11) and

25   for failing to rebut testimony that Petitioner suffered from antisocial personality disorder

26   ("APD") (Claim 12). (Doc. 115 at 8–9.)

27       **1.    Evidentiary Development & *Martinez v. Ryan***

28       Petitioner seeks to expand the record, under Rule 7 of the Rules Governing

Section 2254 Cases, to include all of the Exhibits (Exs. 1–38) cited in his supplemental *Martinez* brief in support of Claims 11, 12, and 17. (Doc. 115 at 79.) Petitioner also requests that the Court grant an evidentiary hearing to resolve any factual disputes regarding the evidence submitted in support of his *Martinez* claims. Respondents object to expansion of the record to determine if Petitioner is entitled to habeas relief, but do not object to the Court considering the evidence, with one exception,[3] for the limited purpose of evaluating cause and prejudice. (Doc. 121 at 68–69.) Respondents object to Petitioner's request for an evidentiary hearing. (*Id.* at 68.)

The evidentiary limitations described in *Cullen v. Pinholster,* 563 U.S. 170 (2011),[4] do not apply to Petitioner's procedurally defaulted ineffective assistance claims because they were not previously adjudicated on the merits by the state courts. *See Dickens*, 740 F.3d at 1320–21. Furthermore, the Court is not restricted, under 28 U.S.C. § 2254(e)(2)[5], from  holding an evidentiary hearing for Petitioner to show cause and prejudice under *Martinez* because Petitioner is not asserting a constitutional "claim" for relief. *See Dickens*, 740 F.3d at 1320–21. Accordingly, the Court considers the new evidence Petitioner proffers in support of his *Martinez* claims for the limited purpose of evaluating Petitioner's cause and prejudice arguments.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, habeas review of a defaulted

---

[3] Respondents object to expansion of the record to include Attorney Gregory J. Kuykendall's opinion (Doc. 115, Ex. 38) on the standard of care, even for the limited purpose of evaluating cause and prejudice. Respondents assert the opinion is irrelevant to the ineffectiveness inquiry. Because the Court resolves the ineffectiveness claims strictly on the basis of Petitioner's failure to demonstrate prejudice, without addressing the quality of counsel's performance, Respondents objection is moot.

[4] Limiting a federal court's consideration of evidence in support of a claim to the evidence that was before the state court that adjudicated the claim on the merits. 563 U.S. at 180–81.

[5] Limiting the court's discretion to hold an evidentiary hearing on a claim for relief where the petitioner "failed to develop the factual basis of a claim in State court proceedings."

claim is barred unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753. In *Coleman*, the Court held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court established a "narrow exception" to the rule announced in *Coleman*. The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez*, 132 S. Ct. at 1320).

Accordingly, under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance claim, "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.' " *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) *overruled on other grounds by McKinney*, — F.3d —, 2015 WL 9466506; *Dickens*, 740 F.3d at 1319–

- 27 -

20; *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).

In a series of recent cases, the Ninth Circuit has provided guidance for applying *Martinez*. The most recent case, *Clabourne*, summarizes the court's *Martinez* analysis. To demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must make two showings. "First, to establish 'cause,' he must establish that his counsel in the state post-conviction proceeding was ineffective under the standards of *Strickland*. *Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. Second, "to establish 'prejudice,' the petitioner must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

Under *Martinez*, a claim is substantial if it meets the standard for issuing a certificate of appealability. *Martinez*, 132 S. Ct. at 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). According to that standard, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (quoting *Miller-El*, 537 U.S. at 336).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland*, 466 U.S. at 674. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687–88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As discussed below, the Court has determined that Petitioner was not prejudiced by trial counsel's performance. Accordingly, Petitioner's attempt to excuse the default of these claims under *Martinez* fails because the underlying ineffectiveness claims are not substantial, and thus PCR counsel was not ineffective for failing to raise them. Because the claims are both defaulted and meritless, expansion of the record will be denied.

For the same reason, Petitioner is not entitled to an evidentiary hearing. Having reviewed the entire record, including the evidence presented by Petitioner in his supplemental *Martinez* brief, the Court concludes that an evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); Rule 8(a) of the Rules Governing Section 2254 Cases. Whether Petitioner's allegations of ineffective assistance of trial counsel are "substantial" under *Martinez* is resolvable on the record. *Cf. Dickens*, 740 F.3d at 1321 (explaining that "a district court may take evidence to the extent necessary to determine

1   whether the petitioner's claim of ineffective assistance of trial counsel is substantial

2   under *Martinez*") (emphasis added).

3        **2.    Claim 4**

4        The Ninth Circuit ordered this court, on remand, to address whether Claim 4 falls

5   within the *Martinez* exception for procedurally defaulted claims because Petitioner

6   referred in his first amended petition to ineffective assistance of trial counsel as to Claim

7   4. (Doc. 104 at 2.) Respondents contend that *Martinez* does not apply to Claim 4 and,

8   moreover, that Petitioner abandoned the claim by failing address it in the supplemental

9   brief, thus waiving any argument that *Martinez* excuses the procedural default. (Doc. 121

10  at 50.) The Court agrees.

11       In Claim 4 of his amended habeas petition, Petitioner argued that the trial court

12  violated his constitutional right of confrontation by allowing testimonial hearsay to prove

13  the Monte Carlo and the license plate were stolen. (Doc. 30 at 34.) While the Ninth

14  Circuit Court of Appeals has expanded *Martinez*'s scope to include procedurally

15  defaulted claims of ineffective appellate counsel, *Ha Van Nguyen v. Curry*, 736 F.3d

16  1287, 1294–96 (9th Cir. 2013), it has also recognized that only the Supreme Court could

17  expand the application of *Martinez* outside the context of ineffective assistance claims,

18  and has declined to extend *Martinez* to claims of trial error. *See Pizzuto v. Ramirez*, 783

19  F.3d 1171, 1177 (9th Cir. 2015) (declining to extend *Martinez* to cover claims of trial

20  error); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (acknowledging that

21  only the Supreme Court may extend the scope of *Martinez*). Because Petitioner's claim

22  that the trial court erred in allowing the introduction of testimonial hearsay is not an

23  ineffective assistance of counsel claim, it does not fall within the *Martinez* exception, and

24  PCR counsel's deficient performance may not serve as cause to excuse the procedural

25  default. *See Pizzuto*, 783 F.3d at 1176–77.

26       Respondents assert that, to the extent Claim 18 of the amended petition raised an

27  ineffective assistance of trial counsel claim related to Claim 4, Petitioner withdrew this

28  claim in the traverse. In Claim 18 of his amended habeas petition, Petitioner argued that

PCR counsel's performance was deficient, in violation of Petitioner's constitutional right to due process and effective representation, because Petitioner failed, among other things, to raise an argument that trial and appellate counsel failed to adequately litigate his confrontation claim or assert error regarding the admission of hearsay to prove that the Monte Carlo was stolen. (Doc. 30 at 143–152, 157.) Subsequently, however, Petitioner withdrew Claim 18 from his amended petition. (*See* Doc. 57 at 1, 92.) Thus, Petitioner has abandoned any claim of ineffective assistance of counsel as to Claim 4.

Finally, by failing to address Claim 4 in his supplemental *Martinez* brief, Petitioner has further abandoned the claim. *See Cook v. Schriro*, 538 F.3d 1000, 1014, n. 5 (9th Cir. 2008) (citing *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991) (noting failure to raise or brief an issue in a timely fashion may constitute waiver on appeal)).

In conclusion, the Court finds that *Martinez* does not apply to Claim 4. Furthermore, to the extent Petitioner argued ineffective assistance of trial counsel related to Claim 4, he abandoned this argument by withdrawing the claim, and waived any argument that *Martinez* excuses his procedural default of Claim 4 by failing to raise it in his supplemental *Martinez* brief.

### 3.     Claim 11

In Claim 11 of Petitioner's amended habeas petition, Petitioner argues that trial counsel was ineffective for failing to mitigate Petitioner's 1993 Gila County aggravated assault conviction which was admitted during the penalty phase of Petitioner's trial as a statutory aggravating factor. To excuse the default of Claim 11, Petitioner argues PCR counsel rendered ineffective assistance for failing to investigate and present this trial IAC claim in state proceedings. Because this trial-level IAC claim lacks merit, Petitioner has failed to establish a reasonable probability of a different result had PCR counsel raised it in the state PCR petition. Therefore, he has failed to establish cause under *Martinez* to excuse the procedural default of Claim 11.

#### a.     *Facts*

In the penalty phase of trial, the prosecution moved to admit a minute entry of

Petitioner's conviction in Gila County for aggravated assault in 1993, and a minute entry from Maricopa County sentencing Petitioner on two counts of dangerous or deadly assault by a prisoner in 1996. (Doc. 115, App. 18 at 53–54.) Without objection, the trial court admitted both minute entries. (*Id.*)  The trial court found that Petitioner conceded that the 1993 conviction qualified as a previous conviction for a "serious offense," a statutory aggravating factor under A.R.S. § 13-703(F)(2) ("(F)(2)"). *See State v. Martinez*, 196 Ariz. at 461, 999 P.2d at 805. Petitioner argued that the 1996 convictions did not qualify as "serious offenses" under (F)(2), but the trial court rejected this argument, finding they constituted a previous conviction of a serious offense under (F)(2) and had been proved beyond a reasonable doubt. *See id*. The Arizona Supreme Court agreed with the trial court. (*Id.* at 461–62, 999 P.2d 805–06.) The trial court also found that Officer Martin was an on duty police officer killed in the course of performing his duties, thus satisfying the A.R.S. 13-702 (F)(10) ("(F)(10)") statutory aggravating factor. (Doc. 121, Ex. G at 9.) This finding was not challenged on appeal. *See Martinez*, 196 at 462, 999 P.2d at 806.

During sentencing, the court made the following observation regarding the (F)(2) aggravating circumstance:

> The (F)(2) aggravating circumstance here is strong not only because of the number of serious offenses, but because the later serious offenses cast doubt on whether defendant could be imprisoned for many years without endangering the safety of others in the prison system. The (F)(10) aggravating circumstance also carries significant weight. The unprovoked murder of a peace officer, so the defendant can avoid his obligation under the law, is really no less than a personal declaration of war against a civilized society. In sum, the aggravating circumstances are strong. The mitigating circumstances are not.

(Doc. 115, App. 19 at 30.)

Because Petitioner had raised a challenge to the 1996 convictions, for purposes of appellate review, the sentencing court went on to address whether the aggravating circumstances would still outweigh the mitigating circumstances if the (F)(2) aggravating factor were based solely on the 1993 conviction, and found "that the mitigating

circumstances in this case, individually and cumulatively, are just not sufficiently substantial to outweigh the (F)(2) and (F)(10) circumstances." (*Id.*)

### b.    Analysis

In Claim 11 of his amended habeas petition, Petitioner alleges IAC at sentencing for counsel's failure to investigate and present evidence to rebut the "serious offense" aggravating factor. (Doc. 30 at 86-91.) Petitioner asserts that trial counsel ignored police reports regarding the 1993 conviction that indicated that Petitioner may have been guilty of no crime at all, and suggested that it appeared trial counsel did not know they could challenge this factor. (*Id.* at 87-88.)

The charging instrument in the 1993 assault alleged that there were two victims, Saul Salas and Guillermo Garcia, that Petitioner intentionally placed each in reasonable apprehension of imminent physical injury, and that he committed the offense while using a deadly weapon—a "hand gun." (Doc. 115, Ex. 3.) The police reports underlying Petitioner's 1993 aggravated assault consist of statements from two witnesses, one of whom noted he saw Petitioner had a gun during the assault. (Doc. 115, Exs. 4, 5.) Petitioner pleaded guilty to the offense. (Doc. 115, Ex. 6.)

Petitioner argues he cannot be put to death since his prior conduct, as described by the witnesses, is insufficient to establish the aggravating factor. (Doc. 30. at 89.) Petitioner also argues that even if the facts support the aggravated assault conviction, the presentation of the mitigating evidence alone could reasonably have been expected to result in a sentence of life. (*Id.* at 90–91)

This Court previously found the claim was procedurally defaulted, and would not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice. Petitioner argued as cause that Respondents failed to disclose the police reports underlying his 1993 Gila County conviction. (Doc. 57 at 74–77.) These reports, he argued, would have mitigated the weight of the aggravating factor by showing that although a witness said Petitioner had a gun in his hand, there was no allegation that he discharged or pointed it at anyone. (*Id.* at 77.) The Court found this insufficient to

establish cause for Petitioner's failure to pursue Claim 11 in his state PCR proceedings because Petitioner's assertion that he did not point the gun at the victims or discharge it "hardly mitigates the fact that he was convicted of aggravated assault and says nothing of the two 1996 prior offenses for dangerous or deadly assault by a prisoner that were also found by the Court to satisfy the (F)(2) aggravating factor." (Doc. 88 at 43–44.) The Court found that the police reports, consisting of the witness statements from both victims, were not necessarily mitigating and were not material because they "fall far short of being favorable to the defense." (*Id.*)

Petitioner now asserts that PCR counsel rendered ineffective assistance for failing to investigate and present the trial IAC claim and he was prejudiced by the failure because the sentencing court placed tremendous significance on the admission of the Gila County aggravated assault conviction. (Doc. 115 at 53, 61.) However, there is no reasonable probability that the mitigating evidence would have negated a finding of the (F)(2) aggravating circumstance. There is also no reasonable probability that the evidence related to the 1993 convictions would have affected the sentencing outcome had it been presented at trial because the evidence was not necessarily mitigating, and the sentencing court unquestionably found the 1996 convictions carried more weight than the 1993 conviction. Accordingly, the Court finds no reasonable probability that Petitioner would have obtained post-conviction relief had PCR counsel raised Claim 11 in the PCR petition. Petitioner has failed to establish cause under *Martinez*, and Claim 11 remains procedurally barred.

Clearly established federal law establishes that, in preparing for the sentencing phase of a capital trial, a defendant's attorney is "bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Rompilla v. Beard*, 545 U.S. 374, 377 (2005).

In this case, Petitioner asserts that trial counsel admitted they were not aware that statutory aggravators admitted at capital sentencing could be mitigated, and that PCR

counsel had no reason for failing to raise the IAC claim. (Doc. 115 at 58; Ex. 8 ¶ 6; Ex. 9, ¶ 6.) The Court need not address counsel's performance, however, because even if counsel performed deficiently, Petitioner has failed to establish prejudice. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

In *Rompilla*, the Supreme Court found counsel deficient in failing to examine the court file on Rompilla's prior conviction. 545 U.S. at 383. In addressing the prejudice prong of *Strickland*, the Court found that if counsel had examined the file, they would have found a range of mitigation leads that no other source had opened up including evidence pointing to organic brain damage, fetal alcohol syndrome, a traumatic childhood, and intellectual disability. *Id.* at 391–93. The mitigating evidence "'might well have influenced the jury's appraisal' of [Rompilla's] culpability . . . and the likelihood of a different result . . . [is] 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Id.* at 393 (quoting *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Strickland* 466 U.S. at 694).

Unlike the mitigating evidence discovered in *Rompilla*, the mitigating evidence Petitioner asserts counsel should have uncovered here—that Petitioner was "not guilty of any crime" with regard to one witness, and "it is highly questionable that [Petitioner] was guilty of the aggravated assault" of the other—is not sufficient to undermine confidence in the outcome reached at sentencing.

First, as Respondents note, the 1993 conviction was only one of three convictions used to establish the (F)(2) aggravating factor. Each of the two 1996 convictions were also found to establish the (F)(2) factor, and though challenged, were not found invalid. *See State v. Martinez*, 196 Ariz. at 462, 999 P.2d at 806. Thus, there is no reasonable probability that even if the 1993 conviction had been challenged in state court and found

1    to be legally insufficient to establish the (F)(2) circumstance,[6] the trial court would not

2    have found the (F)(2) factor established based on the 1996 convictions.

3         Additionally, Petitioner's attempt to portray the 1993 conviction as crucial to the

4    trial court's decision to impose the death penalty is simply not supported by the record.

5    The trial court found that it was proven beyond a reasonable doubt that Officer Martin

6    was an on duty police officer killed in the course of performing his duties, thus

7    establishing the (F)(10) factor. While the trial court placed great weight on the 1993

8    conviction, the trial court placed even greater weight on the (F)(10) factor and the later

9    serious offenses committed while Petitioner was in custody because they cast doubt on

10   whether Petitioner could be imprisoned without endangering the safety of others and

11   indicated that Petitioner had "declare[d] war against a civilized society." (Doc. 115, App.

12   9 at 30.) Thus, even if the evidence established that the 1993 conviction was insufficient

13   by itself to establish the (F)(2) factor, given the substantial weight of the remaining

14   aggravating factors there is no reasonable probability that the trial court would have

15   imposed a life sentence.

16        Finally, this Court previously found, and reiterates here, that the facts underlying

17   Petitioner's claim fall far short of being favorable to the defense. Even if Petitioner did

18   not point the gun at the victims, or discharge the weapon, the facts still clearly establish

19   that Petitioner assaulted the victims with a weapon in his hand. There is no reasonable

20   probability that the evidence related to the 1993 convictions would have affected the

21   sentencing outcome had it been presented at trial. Because the trial-level IAC claim has

22   no merit it is not a substantial claim under *Martinez* and PCR counsel was not ineffective

23

24        [6] The 1993 conviction is conclusively valid and Petitioner has not demonstrated
25   circumstances that would demonstrate he could have overcome the conviction's validity
     if he had raised the issue during trial. *See Lackawanna County Dist. Attorney v. Coss*, 532
26   U.S. 394 (2001) (holding that "once a state conviction is no longer open to direct or
     collateral attack in its own right because the defendant failed to pursue those remedies
27   while they were available (or because the defendant did so unsuccessfully), the
     conviction may be regarded as conclusively valid"). The exceptions to that rule, for prior
28   convictions "obtained where there was a failure to appoint counsel in violation of the
     Sixth Amendment," *id.* at 404, or where equitable tolling or actual innocence would
     avoid the bar to the consideration of the earlier conviction, *id.* at 405, do not apply here.

1    for failing to raise it. *See Clabourne*, 745 F.3d at 377. Thus, Petitioner has failed to

2    establish cause under *Martinez*, and Claim 11 remains procedurally barred.

3         **4.    Claim 12**

4         In Claim 12 of Petitioner's amended habeas petition, Petition argues that trial

5    counsel was ineffective for failing to recall the defense psychologist, Dr. Susan Parrish,

6    to rebut the sentencing hearing testimony of the prosecution's psychologist, Dr. Michael

7    Bayless. To excuse the default of Claim 12, Petitioner argues PCR counsel rendered

8    ineffective assistance for failing to investigate and present this trial IAC claim in state

9    proceedings. Because this trial-level IAC claim lacks merit, Petitioner has failed to

10   establish a reasonable probability of a different result had PCR counsel raised it in the

11   state PCR petition. Therefore, he has failed to establish cause under *Martinez* to excuse

12   the procedural default of Claim 12.

13              *a.    Facts*

14        In the penalty phase of trial, Petitioner sought to establish that his "capacity to

15   appreciate the wrongfulness of his conduct or to conform his conduct to the requirements

16   of law was significantly impaired, but not so impaired as to constitute a defense to

17   prosecution." A.R.S. § 13-703(G)(1) ("(G)(1)"). Both Petitioner and Respondents

18   presented testimony from mental health experts who opined about his mental condition.

19   (Doc. 115, Apps. 5, 6.)

20        Psychologist Susan Parrish, Ph.D., specializing in Posttraumatic Stress Disorder

21   ("PTSD") and neuropsychology, testified on behalf of Petitioner during his mitigation

22   hearing. (Doc. 115, App. 6 at 5–8.) Due to Petitioner's traumatic upbringing, which

23   included chronic violence inside the home by his father battering his mother, Dr. Parrish

24   opined that Petitioner suffers from PTSD. (Doc. 115, App. 6. at 16, 30.) Dr. Parrish

25   described PTSD as an anxiety disorder, a response to trauma; specifically in Petitioner's

26   case, a response to "a prolonged situation that's ongoing, such as . . . exposure to an

27   environment in which there was physical abuse, an unsafe environment." (*Id.* at 17.) She

28   testified that Petitioner met the diagnostic criteria of PTSD as set out in the Diagnostic

and Statistical Manual of Mental Disorders, 4th Edition ("DSM-IV"). (Doc. 115, App. 6 at 18-24.) Dr. Parrish also diagnosed a personality disorder not otherwise specified (Doc. 115, App. 7 at 12),[7] and explained that Petitioner exhibited characteristics of antisocial personality disorder, borderline personality disorder, and narcissistic personality disorder. (Doc. 115, App. 6 at 30–34.) She also noted that characteristics of those personality disorders occur with frequency in people who suffered trauma as children. (*Id.* at 31–34.)

Dr. Parrish explained that, according to the DSM-IV, APD is a pervasive pattern of disregard for, and violation of, the rights of others after the age of 15, and opined that Petitioner displayed characteristics of APD, including impulsivity or failure to plan, irritability and aggressiveness, and reckless disregard for safety of self and others. (Doc. 115, App. 6 at 30–31.) She stated that these characteristics are also not unusual in someone suffering from PTSD "who comes from an environment where there was a prolonged exposure to violence." (*Id.*) Dr. Parrish described Petitioner as "a product of his environment and his nature. . . . [G]iven the environment that he had . . . the decision that . . . is the most salient is that he's going to survive." (*Id.* at 51.) Dr. Parrish explained that survival is the first thing that anyone with PTSD considers. A stressful event becomes a "life-and-death situation." (*Id.*) She testified that when Officer Martin stopped Petitioner on the Beeline Highway, Petitioner "saw that as a survival situation in which it was Officer Martin or himself. There was going to be one person who survived that." (*Id.* at 73.) Dr. Parrish believed Petitioner's response was reactive: "I'm not going back to prison. This man intends to put me in prison. It's me or him." (*Id.* at 75). Dr. Parrish concluded in her report that "if [Petitioner] shot Officer Martin, he was in a dissociative state." (Doc. 115, App. 7 at 14.)

The state's mental health expert, psychologist Michael Bayless, Ph.D., opined that Petitioner does not suffer from a mental disease or defect but does suffer from an antisocial personality disorder. (Doc. 115, App. 5 at 5–6, 16.) Dr. Bayless, who

---

[7] Dr. Parrish's report submitted with Petitioner's supplemental *Martinez* brief is missing page 12. The complete report can be found attached to Petitioner's amended habeas corpus petition (Doc. 30) at Ex. E-4.

1   conducted his own clinical evaluation of Petitioner and reviewed the results of the

2   Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") administered by Dr. Parrish,

3   opined that the results very clearly indicated a classic anti-social personality profile. (*Id.*

4   at 9–11, 18.) Dr. Bayless described Petitioner as a young man with a "basic absence of

5   anxiety and guilt" and a lack of remorse and empathy. (*Id.* at 16-17.) Dr. Bayless

6   disagreed with Dr. Parrish's diagnosis of PTSD for several reasons, explaining that there

7   was an absence of expected PTSD symptoms in the historical and clinical data from Dr.

8   MacDonald and others, there was an absence of anxiety regarding Petitioner's recall of

9   the traumatic events from his childhood, and Dr. MacDonald predicted Petitioner was

10  moving towards a full-blown anti-social personality disorder. (*Id.* at 19-21.) Dr. Bayless

11  also opined that Petitioner's actions in calling Eric Moreno, and explaining to him what

12  had happened, was the type of behavior you would see in somebody who understood the

13  nature and quality of his acts. (*Id.* at 33.)

14         The sentencing court considered all of the mental health evidence presented and

15  concluded that Petitioner did not establish that his capacity to appreciate the

16  wrongfulness of his conduct or to conform his conduct to the requirements of law was

17  significantly impaired at the time of the crime by his personality disorder, the traumatic

18  effect of his exposure to domestic violence, and any PTSD-like symptoms he might have.

19  (Doc 121, App. G at 13–14.) The sentencing court rejected a diagnosis of post-traumatic

20  stress disorder, finding instead that Petitioner suffers from a personality disorder with

21  predominantly anti-social features and also with borderline and narcissistic features. (*Id.*

22  at 12.) The court found ample support for this finding within the evidence that showed:

23  Petitioner killed Officer Martin because he did not want to return to prison; three days

24  before the murder he told Fryer he had a warrant for his arrest and he was on the run; he

25  told Fryer he had a gun in case something happened; he took Officer Martin's service

26  weapon after the murder; and other choices he made after the murder, including the

27  robbery and shooting in Blythe, as well as decisions he made at the time he was

28  apprehended. (*Id.* at 12–13.) These choices, the sentencing court found, "belie the notion

that the homicide of Officer Martin was the result of being in a dissociative state or a mere impulsive reaction" (*id.* at 13), and demonstrate Petitioner's "ability to reflect, to calculate and to make choices." (*Id.* at 13, n.1.) The trial court acknowledged that Petitioner's personality disorder and other conditions "undoubtedly affect his conduct and behavior," but, significant to this analysis, that he "has not proved by a preponderance of the evidence that his capacity to inform his conduct to the requirements of law was significantly impaired." (*Id.* at 14) (emphasis in original).

In addressing a related claim, the Arizona Supreme Court, disregarding Fryer's testimony, disagreed with Petitioner's argument that taking Officer Martin's gun, robbing the Mini-Mart and shooting the clerk are consistent with the "it's me or him" line of thought:

> [W]e think Martinez' actions speak louder than Fryer's words. Even if we were to disregard Fryer's testimony, Martinez still emptied his .38 caliber handgun into Officer Martin. Using his "superior" intellect and after recognizing that he had just murdered an Arizona police officer, Martinez stole Officer Martin's .9mm Sig Sauer and drove to Blythe, California where he robbed a Mini–Mart and shot the clerk. Although Martinez alleges that the clerk "threatened" him with a chair or weapon, this does not support Dr. Parrish's PTSD diagnosis. Martinez could not have reasonably felt that it was "me or him." In fact, any threat Martinez may have feared was self-induced. He drove to Blythe and ran out of gas. He then called his aunt for money. After she failed to send the needed funds, he called her again. Losing his patience, he eventually robbed the Mini–Mart with Officer Martin's service weapon. The record does not suggest that the clerk randomly came up to Martinez in the parking lot, noticed the stolen car and threatened to call the police. Rather, Martinez' robbery and subsequent murder created any threat he may have felt.[9]
>
> > FN9: Martinez also created the threat of being caught by Officer Martin when he excessively sped down the Beeline Highway.
>
> Martinez' actions in Indio also demonstrate his systematic thought processes and "superior" intelligence. At the first sight of the Indio police, Martinez didn't simply open fire even though he had two guns in his possession. Rather, he tried to flee after leaving the .38 caliber handgun with David and Anna. Once Martinez reached Johnny Acuna's trailer and the police surrounded the compound, Martinez did not "come out shooting." He still had Officer Martin's .9mm Sig Sauer. This conflicts

with Dr. Parrish's diagnosis. This was the ultimate "me or him" situation.

The trial court's finding that Martinez did not suffer from PTSD is supported by the evidence. His actions are not consistent with Dr. Parrish's diagnosis. He knew right from wrong. His IQ was well-above average. He consciously decided that "he wasn't going back to jail" and carried the .38 caliber handgun "[f]or protection and if shit happens." Tr. Sept. 9, 1997 at 83, 85. Without more, we believe that Martinez' personality disorder does not qualify as a statutory mitigating circumstance.

*Martinez*, 196 Ariz. at 464, 999 P.2d at 808.

### b. Analysis

In Claim 12 of the amended habeas petition (Doc. 30 at 101–104), restated with more specificity in Petitioner's supplemental *Martinez* brief (Doc. 115 at 66), Petitioner asserts that sentencing counsel was ineffective for failing to rebut the erroneous testimony of the state's mental health expert through presentation of his own mental health evidence. Petitioner asserts that there is a reasonable probability that, had Dr. Parrish observed or been informed of Dr. Bayless' testimony, and been called to rebut it at sentencing, the court would have found the (G)(1) mitigating factor proven, or that there was, otherwise, sufficient mitigating evidence to call for leniency. (Doc. 115 at 69.)

Petitioner relies on an affidavit from Dr. Parrish (Doc. 30, Ex. E-6), which has been resubmitted in support of his supplemental *Martinez* brief. (Doc. 115, Ex. 11.) Dr. Parrish criticizes Dr. Bayless' work, including his failure to generate a report, failure to take into account the warning in the DSM-IV that an APD diagnosis may be misapplied when antisocial behavior is part of a protective survival strategy, failure to consider Petitioner's upbringing, extended family or culture in making a diagnosis, failure to conduct objective testing to assess the appropriateness of an APD diagnosis, reliance on Dr. MacDonald's report, and reliance on subjectively graded testing instruments when objective ones were available. (*Id.* at ¶ 17-23.) Dr. Parrish also notes that Dr. Bayless was inaccurate in reporting an absence of evidence of anxiety when Dr. MacDonald noted that Petitioner had substantial and considerable anxiety. (*Id.* at ¶ 24; *see* Doc. 115, App. 21 at 4.) Dr. Parrish states that had she been consulted regarding the merits of Dr. Bayless

1   testimony and opinion, she "could have provided a clear means of challenging/rebutting

2   the reliability of his work," observing that "a much fuller and deeper review of his

3   evaluation (e.g. access to all inquiries and responses) may bring to light equal and or

4   greater reasons to disregard his opinions." (Doc. 115, Ex. 11 at ¶ 34.)

5        The Court did not address Dr. Parrish's affidavit in its earlier order because the

6   IAC claim was found to be procedurally defaulted. (Doc. 88 at 45.) Petitioner argued as

7   cause for the default that direct appellate counsel should have raised the issue. (Doc. 57 at

8   79.) Because Petitioner did not exhaust the claim that appellate counsel was ineffective

9   for failing to raise the issue, the Court found that Petitioner failed to establish cause and

10  found the claim procedurally barred. (Doc. 88 at 45–46.)

11       Petitioner now asserts that PCR counsel rendered ineffective assistance for failing

12  to investigate and present the trial IAC claim and that he was prejudiced by the failure

13  because had trial counsel called Dr. Parrish to rebut Dr. Bayless' testimony, the

14  sentencing court would have found the (G)(1) statutory mitigating factor proven or found

15  sufficient mitigating evidence to call for leniency. (Doc. 115 at 53, 61.) *See Wiggins*, 539

16  U.S. at 524 ("The ABA Guidelines provide that investigations into mitigating evidence

17  'should comprise efforts to discover *all reasonably available* mitigating evidence and

18  evidence to rebut any aggravating evidence that may be introduced by the prosecutor' "

19  (quoting 1989 ABA Guideline 11.4.1.C; emphasis in original)). As discussed above in

20  Claim 11, the Court need not address counsels' performance because, even if counsel

21  performed deficiently, Petitioner has failed to establish prejudice. *See Strickland*, 466

22  U.S. at 697.

23       To establish prejudice for counsel's failure to present mitigating evidence,

24  Petitioner must show a "reasonable probability that the [sentencer] would have rejected a

25  capital sentence after it weighed the entire body of mitigating evidence . . . against the

26  entire body of aggravating evidence." *Wong*, 558 U.S. at 20. Petitioner cannot meet this

27  burden. There is no reasonable probability that if Petitioner had submitted the evidence

28  he now contends should have been offered in rebuttal at sentencing, it would have

changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the Court finds no reasonable probability that Petitioner would have obtained post-conviction relief had PCR counsel raised Claim 11 in the PCR petition. Petitioner has failed to establish cause under *Martinez*, and Claim 11 remains procedurally barred.

In these proceedings, Petitioner has submitted a declaration expanding on Dr. Parrish's 1998 report and 2006 affidavit, and addressing how her substantial criticisms of Dr. Bayless' methodology and diagnoses would be affected by the promulgation of the DSM-V in 2013. (Doc. 115, Ex. 12.) Dr. Parrish states that, had she been asked to rebut Dr. Bayless's testimony, she "would have pointed out that he did not explain how he dismissed the notion that, in general, Mr. Martinez's behavior constituted an adaptation to a violent environment." (*Id.* ¶ 47.)

There is no reasonable probability that such testimony would have had any effect on the outcome of sentencing. In the penalty phase, Dr. Parrish explained how Petitioner met the DSM-IV diagnostic criteria for establishing a PTSD diagnosis, and how he also exhibited characteristics of antisocial personality disorder, borderline personality disorder, and narcissistic personality disorder—characteristics which are not uncommon in people who suffer trauma as a child. Although the trial court rejected a PTSD diagnosis, the court accepted that Petitioner exhibited PTSD-like symptoms, and concluded that Petitioner's personality disorder was related to the chaotic and violent family life during his formative years, and that his "personality disorder and other conditions undoubtedly affect his conduct and behavior." (Doc. 115 App. 19 at 20; Doc. 121, App. G at 12.) Nonetheless the court rejected both Dr. Parrish's conclusion that Petitioner was in a dissociative state or acted impulsively at the time he killed Officer Martin, and Petitioner's assertion that his capacity to conform his conduct to the requirements of law was significantly impaired. In rejecting the assertion that Petitioner had PTSD or that his capacity to conform his conduct to the requirements of law was significantly impaired by his personality disorder, the court relied heavily on the evidence

of actions Petitioner took shortly before and after the murder. (Doc. 115, App. 19 at 18-20.) The trial court further noted that while Dr. Parrish's opinions were based on her clinical interview with Petitioner, she had not discussed either the murder or events occurring shortly thereafter with Petitioner. (*Id.* at 16). The court found that Petitioner's actions surrounding the murder demonstrated "abundant evidence of [Petitioner's] ability to plan, to think rationally and to make choices even when 'threatened' as he would have been when he was confronted and subsequently apprehended by law enforcement officers after the murder." (*Id.* at 18.)

In affirming the trial court's decision rejecting the impaired capacity statutory mitigating factor and finding Petitioner's personality disorder insufficient to warrant substantial weight as a non-statutory mitigating factor, the Arizona Supreme Court also relied heavily on the evidence of Petitioner's conduct in shooting Officer Martin to "further his goal" of not going back to jail. *Martinez*, 196 Ariz. at 463–65, 999 P.2d at 807-09. Petitioner's actions were simply "not consistent with Dr. Parrish's diagnosis." *Id.* at 464, 999 P.2d at 808. Thus, even if Petitioner had been able to effectively rebut Dr. Bayless's testimony, and establish that Dr. Parrish's PTSD diagnosis was correct, this is not a critical determination. In light of the aggravating evidence and the evidence demonstrating that at the time Petitioner shot Officer Martin he was not acting impulsively or reflexively, but rather had the ability to reflect, calculate and make choices to further his goals, there is no reasonable likelihood that the sentencing court would have imposed a life sentence. Because the trial-level IAC claim has no merit it is not a substantial claim under *Martinez* and PCR counsel was not ineffective for failing to raise it. *See Clabourne*, 745 F.3d at 377. Thus, Petitioner has failed to establish cause under *Martinez*, and Claim 12 remains procedurally barred.

### 5.    Claim 16

In Claim 16 of his amended habeas petition, Petitioner argues that counsel was ineffective at trial and sentencing for failing to properly investigate and prepare for the testimony of Eric Moreno and Patricia Baker. (Doc. 30 at 133–38.) Petitioner did not

allege, in his amended petition or traverse, that PCR counsel's failure to raise this claim should excuse the procedural default. Petitioner also failed to address Claim 16 in these supplemental proceedings. Therefore, he has waived any claim that he can establish cause and prejudice, under *Martinez*, to excuse the procedural default of this claim. *See Cook*, 538 F.3d at 1014, n. 5 (citing *Martinez v. Ylst*, 951 F.2d at 1157).

### 6.      Claim 17

In Claim 17 of Petitioner's amended habeas petition, he argues that trial counsel was ineffective for failing to take corrective action and to retain an independent pathologist to refute the testimony of Dr. Phillip Keen regarding the sequence of shots that struck and killed Officer Martin. To excuse the default of Claim 17, Petitioner argues PCR counsel rendered ineffective assistance for failing to investigate and present the trial-level IAC claim. Because this IAC claim lacks merit, Petitioner has failed to establish a reasonable probability of a different result had PCR counsel raised it in the state PCR petition. Therefore, he has failed to establish cause under *Martinez* to excuse the procedural default of Claim 17.

#### a.      Facts

Dr. Phillip Keen, the Maricopa County Chief Medical Examiner, testified at trial that the autopsy of Officer Martin revealed four gunshot wounds to his right hand, neck, back, and head. (Doc. 115, App. 4 at 44, 47–49.) Two of the wounds, to the back and head, were fatal injuries. (*Id.* at 53–54.) Dr. Keen opined, based on his review of another medical examiner's evaluation of the body, the wounds, the scene, and the photographs, that the head shot was the last among the four shots, and may have been inflicted while Officer Martin was lying on the pavement. (*Id.* at 56, 59.) Dr. Keen based this opinion on evidence of a "pivot mark" found on Officer Martin's left boot. (*Id.* at 56–57.) Because Dr. Keen determined that the mark on the boot was a result of a deliberate spinning move, and since the shot to the head would have caused immediate unconsciousness, he opined that the head wound would necessarily have occurred last. (*Id.*) Dr. Keen also testified there was evidence Officer Martin was lying on his left side when he was shot in

the head based on the blood stain pattern from the cheek, streaming in both directions. (*Id.* at 59.)

Dr. Keen agreed on cross-examination that the opinion he gave in his testimony conflicted with the one he gave in a pretrial interview in which he said he could not determine the sequence in which Officer Martin was struck with four bullets but the shot to the back was the last shot fired. (*Id.* at 63–65; *see also* Doc. 115, Ex. 34 at 28.)  Dr. Keen attributed his change of opinion to his further reflection on the immediate consequences of the head injury, i.e., immediate paralysis. (Doc. 115, App. 4 at 64.)

During closing argument, the prosecution argued that the number and sequence of shots supported a finding of premeditation:

> Four times he pulled this trigger, and four times he struck Bob Martin each time in the location designed to murder this police officer. In the neck, in the hand area, and then as the police officer spun, as he gets to the back of his car and perhaps to safety he shot him in the back. And then when he was down -- and we have scuff marks on both of Bob Martin's knees -- when he was down he pulled that trigger again. That's four, four times he shot this man. Premeditation each time he pulls that trigger he's thinking what I am doing to this man in the uniform? I am trying to kill him so I can get out of here. Four times. And then after he was dead or shortly before he died, he shot at him twice more and missed. Six times.
> . . .
> [W]e know that when he fell on his left side there was no possible way for any of those other shots to impacted [sic] his body other than the one in the head.

(Doc. 115, App. 2 at 18–19.)

The prosecution addressed the issue of premeditation again in the rebuttal closing:

> So in this particular case, regardless of the sequence of the shots, what ended up happening is that Mr. Martinez took this handgun and took a total of 60 pounds for him to empty the gun into Officer Martin. That's exactly what happened in this case. And what's important about it, too, is if you look at it, we don't have to tell you which one of these holes. And, again, they were talking about conjecture and about how you don't have to guess at anything. We don't have to prove this case for you to perfection. We don't have to tell you which one of these little holes the bullet was in that killed him. . . .
> . . .

- 46 -

And what's important about this to show that this was premeditation is that he didn't stop at the first shot. And we don't know the sequence as to any of the shots other than the one that killed him was the one to the forehead, and that's the last shot. It had to be the last shot based on everything we know about this case. So we do know about that. But in terms of premeditation, again, he's got the gun. Could have let him go after the first shot, but he didn't let him do that, did he? He could have let him go after the second shot. And, again, that's where the premeditation, the thought process comes in. We are not saying he hit him in the hand first, not saying he hit him in the back first or in the throat first. We really don't know. But what we are saying is we do know that the shot to the face, to the near right eye which is what Bob Martin saw, the last thing he saw was the muzzle of this gun, the last shot. This last shot was to the face, and that means that this defendant thought about it. Thought about it as this officer was on the ground. Why? He could have already left. Why did he have to go over there and shoot him? And that goes to premeditation. He had already wounded him in the arm. He had already wounded him in the throat. He had already shot him in the back. Why did he have to shoot the coup de grace? Why did he have to go up to him when he was down? Or even if he was standing. He didn't. So the premeditation in this case is right here in the gun.

. . .

The other aspect that we have is the actual distance. It wasn't -- it wasn't like he shot him right there and that was the end of it. Because of the scuff marks on the boots, it is clear that the officer moved away. It is clear at that point that he was not a danger. It is not that he ever was, but at that point it was clear that the encounter was over that he was going to let him go by the defendant and, again, we can't go into his mind, perform a lobotomy and look inside, but we know from the surrounding circumstances that he then thought, hey, he is going away. He is not dead yet. I better stop him. How do I do that? Well, I shoot him and I shoot him, and then I have some more bullets. That's the coup de grace right to the face, and that takes care of it. Everybody knows it's coming down now if you shoot somebody in the head they are going to die, especially if they are out in the middle of nowhere, and that's exactly what he did in this case.

(Doc. 115, App. 3 at 72–74, 77.)

### b.   *Analysis*

Petitioner asserts that trial counsel was ineffective for failing to obtain an independent pathologist, effectively impeach the testimony of the prosecution's

1   pathologist, and move for relief after the prosecution presented undisclosed expert

2   testimony at trial. (Doc. 30 at 138; Doc. 115 at 73–79.) Petitioner asserts that Dr. Keen's

3   testimony allowed the prosecution to argue premeditation from the sequence of shots,

4   thus portraying Petitioner's actions in a more incriminating light. (Doc. 30 at 139-140,

5   Doc. 115 at 73.) Petitioner supports this claim with the Affidavit of Dr. Eric Peters, M.D.,

6   a Pima County medical examiner. (Doc. 115, Ex. 35.) Dr. Peters concluded that Dr. Keen

7   had been correct in his pretrial interview that the last shot fired was to Officer Martin's

8   back. (Doc. 115, Ex. 35, ¶ 6(A)–(D).)

9         The Court found Claim 17 procedurally defaulted, and rejected Petitioner's

10   assertion that the default should be excused because the prosecution violated *Brady* by

11   failing to inform defense counsel before trial that Dr. Keen's opinion regarding the shot

12   sequence had changed. (Doc. 88 at 50–51.) The Court found the factual basis for the

13   claim should have been evident to PCR counsel, but PCR counsel did not present the

14   claim. (*Id.* at 51.) The Court also considered whether a fundamental miscarriage of justice

15   would occur if Claim 17 was not heard on the merits, and concluded that Petitioner's

16   proffer of Dr. Peter's affidavit fell short of establishing reliable new evidence to support

17   his claim of actual innocence: "The best that Dr. Peter's affidavit does is to make it a

18   closer factual question whether the head or the back shot was last." (*Id.* at 51–52.)

19         Petitioner now asserts that PCR counsel rendered ineffective assistance by failing

20   to investigate and present the trial IAC claim and that he was prejudiced by the failure

21   because had trial counsel retained an independent pathologist to rebut the guilt phase

22   testimony of Dr. Keen, there is a reasonable probability the jury would not have found

23   premeditation. (Doc. 115 at 74, 78.) As discussed above in Claims 11 and 12, the Court

24   need not address counsel's performance because Petitioner has failed to demonstrate he

25   was prejudiced thereby. *See Strickland*, 466 U.S. at 697.

26         Respondents assert that there is no reasonable probability that failing to present

27   testimony consistent with Dr. Peter's affidavit would have changed Petitioner's

28   conviction for premeditated murder because the prosecutor did not argue that the sequence

of shots evidenced premeditation. Although the Court disagrees with Respondents' portrayal of the prosecutor's argument—the prosecutor did in fact suggest the sequence of shots evidenced premeditation—the Court agrees that there is no reasonable probability such testimony would have changed the verdict in the face of the overwhelming evidence of premeditation. *See Williams v. Calderon*, 52 F.3d 1465, 1470 (9th Cir. 1995) (no prejudice established by failure to introduce evidence of diminished capacity, where other evidence of defendant's intent to kill and reflect on his actions was overwhelming); *Wood v. Ryan*, 693 F.3d 1104, 1119 (9th Cir. 2012) (no prejudice demonstrated by counsel's failure to assert a stronger impulsivity defense "in the face of the overwhelming evidence of premeditation").

Assuming, *arguendo*, that Dr. Peter's affidavit conclusively establishes that the back shot was last, and Dr. Keen's opinion on this fact was wrong, Petitioner cannot establish prejudice for failing to present testimony consistent with Dr. Peter's affidavit because considerable evidence of Petitioner's premeditation was introduced at trial. First, as the prosecutor emphasized during closing argument, the number of shots alone supported a finding of premeditation each time Petitioner pulled the trigger—a total of six shots all together. Other substantial evidence of premeditation includes his statements to Fryer which "explained why [Petitioner] acted as he did, and showed [Petitioner's] motive for murdering Officer Martin. He had a warrant out for his arrest and knew that if he were caught, he would be sent back to prison," *Martinez*, 196 Ariz. at 459, 999 P.2d at 803, and the fact that Petitioner waited for the Balls to pass by him on the road before shooting Officer Martin, *id.* at 453–54, 999 P.2d at 797-98. Even if Fryer's testimony were excluded, the Court previously found other evidence of premeditation was more relevant: "Petitioner was driving a stolen car, had absconded from law enforcement, had an outstanding warrant for his arrest, shot Officer Martin four times, and bragged about the murder." (Doc. 88 at 38.) Given this evidence, a reasonable juror could have found him guilty of premeditated murder. Because the trial-level IAC claim has no merit it is not a substantial claim under *Martinez* and PCR counsel was not ineffective for failing to

raise it. *See Clabourne*, 745 F.3d at 377. Thus, Petitioner has failed to establish cause under *Martinez*, and Claim 17 remains procedurally barred.

## CONCLUSION

Pursuant to the Ninth Circuit's directive on remand, the Court has reconsidered five claims in light of *Martinez* and Petitioner's Renewed Request for Indication Whether District Court Would Consider a Rule 60(b) Motion. Because Petitioner failed to raise any argument in this brief regarding Claims 4 and 16, the Court finds these claims remain procedurally defaulted. Because Petitioner failed to demonstrate a reasonable probability of a different result had Claims 11, 12, and 17 been raised in state PCR proceedings, the Court finds that he has not demonstrated cause and prejudice under *Martinez* and those claims remain procedurally barred. Because Petitioner's Rule 60(b) motion does not demonstrate any defect in the integrity of these habeas proceedings but instead seeks to raise new substantive claims, it is a second or successive petition, and this Court lacks jurisdiction to consider it absent authorization from the court of appeals pursuant to § 2244(b)(3).

## CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c)(2), a certificate of appealability ("COA") may issue only when a petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

For the reason stated in this order, the Court finds that reasonable jurists could not debate its application of Rule 60(b) to Petitioner's renewed request for reconsideration, or to the Court's finding that Claims 4, 11, 12, 16 and 17 are procedurally barred.

Accordingly,

**IT IS ORDERED** Petitioner's Renewed Request for Indication Whether the District Court Would Consider a Rule 60(b) Motion (Doc. 115) is **DENIED**.

**IT IS FURTHER ORDERED** Claims 4, 11, 12, 16, and 17 are **DENIED** as procedurally barred.

**IT IS FURTHER ORDERED** Petitioner's request to expand the record, for evidentiary development, and for an evidentiary hearing is **DENIED** except as to the Court's consideration of the expanded record for the purpose of evaluating cause and prejudice.

**IT IS FURTHER ORDERED** a Certificate of Appealability is **DENIED**.

Dated this 30th day of March, 2016.

Honorable Roslyn O. Silver
Senior United States District Judge